UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Robert J. Patterson, individually and as representative of a class of similarly situated persons of the Morgan Stanley Retirement Plan,<br><br>Plaintiff,<br><br>-- against --<br><br>MORGAN STANLEY, Morgan Stanley Domestic Holdings, Inc., Morgan Stanley Capital Management, LLC, and Morgan Stanley Investment Management, Inc., Morgan Stanley Retirement Plan Investment Committee, Morgan Stanley Board of Directors, James P. Gorman, Roy J. Bostock, Erskine B. Bowles, Alistair Darling, Robert J. Davies, Thomas H. Glocer, James H. Hance, Jr., Robert H. Herz, Nobuyuki Hirano, C. Robert Kidder, Klaus Kleinfeld, John J. Mack, Jami Miscik, Donald T. Nicolaisen, Hutham S. Olayan, James W. Owens, O. Griffith Sexton, Ryosuke Tamakoshi, Masaaki Tanaka, Perry M. Traquina, Laura D. Tyson, Rayford Wilkins, Jr., and John Does 1-20<br><br>Defendants. | **COMPLAINT**<br><br>No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

1.      Plaintiff Robert J. Patterson ("Plaintiff"), individually and as a representative of the Class described herein, and on behalf of the Morgan Stanley 401(k) Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* (1974) ("ERISA"), against the Plan's fiduciaries: Defendants Morgan Stanley, Morgan Stanley Domestic Holdings, Inc., Morgan Stanley Capital Management, LLC, Morgan Stanley Investment Management, Inc., Morgan Stanley Retirement Plan Investment Committee, and the Board of Directors of Morgan Stanley (collectively "Morgan Stanley" or "Defendants").

1

As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions and unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. The Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA. In support thereof, Plaintiff alleges as follows:

## I.    NATURE OF THE CASE

2.      This case involves the Morgan Stanley Plan and some 60,000 participants and former participants. The case is of vital importance because today 401(k) retirement plans have become the primary tool for retirement planning and savings for millions of working Americans. Employers that fail in their duties to offer their captive employees prudent investment choices subject their employees' hard-earned retirement savings to risk of loss of value due to poor investment performance. For employees victimized by their employer's failure, what was meant to be the golden period of their lives becomes a retirement nightmare. For those victims, Plaintiff here seeks justice.

3.      The Plan is a profit-sharing plan that includes a "qualified cash or deferred arrangement" as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986) (hereinafter denoted as "the Code"), and is subject to the provisions of ERISA. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a). The Plan provides for retirement income for Morgan Stanley employees and former employees. That retirement income depends on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

4.      Morgan Stanley is the sponsor of the Plan. Morgan Stanley operates various investment-related businesses, including investment banking, brokerage, and investment management. Its investment management affiliate manages approximately $272,306,534,765 in assets.  With over $8 billion in assets, the Plan is one of the largest 401(k) plans in the country. With Morgan Stanley's investment sophistication combined with $8 billion of assets, the Plan has tremendous leverage to demand and receive superior investment products and services.

5.      As a fiduciary to the Plan, Morgan Stanley is obligated to act for the exclusive benefit of participants and beneficiaries and ensure that plan expenses are reasonable. These duties are the "highest known to the law" and must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

6.      Morgan Stanley failed to honor these duties. Instead of using its sophistication and the Plan's bargaining power to benefit participants and beneficiaries, Morgan Stanley selected and retained relatively high-cost and poor-performing investment options, some of which were managed for profit by Morgan Stanley. A prudent fiduciary at the time would have known that the investments were not suitable for the Plan.  By acting to benefit themselves and contrary to their fiduciary duty, Morgan Stanley caused the Plan, and hence participants, to suffer staggering losses of hundreds of millions of dollars.

7.      The allegations in this complaint are based upon an investigation of public documents, including filings with the U.S. Department of Labor and U.S. Securities and Exchange Commission, documents provided to Plaintiff because of his status as a Plan participant, and analytical investment data.

## II.      PRELIMINARY STATEMENT

3

8.     Morgan Stanley is a recognized leader in the investments and financial services fields.  Each year, thousands of Morgan Stanley employees and former employees invested hundreds of millions of dollars in the Plan. The Plan participants trusted that Morgan Stanley had constructed a stellar 401(k) plan that offered superior investment options and world-class investment management.  Instead, Morgan Stanley saddled each of their 60,000 captive participants with a sub-standard plan, loaded with $8 billion of investment options that were primarily poor-to-mediocre performers. As a result, each of the Plan's participants was subjected to poor investment performance relative to many other 401(k) plans with assets of between $4 billion and $12 billion.

9.     Based upon publicly available documents filed with the U.S. Department of Labor, for the years 2011 through 2014, the Plan had a total return, excluding Morgan Stanley stock, of approximately 31.6%.  By comparison, the 401(k) plans of other investment firms with plan assets of between $3 billion and $12 billion had superior relative investment returns excluding their company stock performance. For example, during the same period the Credit Suisse 401(k) plan returned approximately 39.8%; Goldman Sachs & Co., approximately 32.5%. There were many reasons for Morgan Stanley's overall poor performance.

10.     Morgan Stanley did not act in the best interest of the Plan and its participants. Instead, Morgan Stanley treated the Plan as an opportunity to promote Morgan Stanley's own mutual fund business and maximize profits at the expense of the Plan and its participants. Morgan Stanley loaded the Plan with mutual funds managed by Morgan Stanley, without thoroughly investigating whether Plan participants would be better served by investments managed by unaffiliated companies. For example, the investment performance of the Morgan Stanley Institutional Mid Cap Growth Fund IS Class performed worse than 88% and 87% of mid

4

cap growth mutual funds for the past three years and five years respectively. Similarly, the Morgan Stanley Institutional Small Cap Growth Fund IS Class performed worse than 99% of funds in 2014 and 94% in 2015 for small cap growth funds. A reasonable investor would have viewed these as imprudent investments. The selection and retention of these proprietary mutual funds costs Plan participants tens of millions of dollars in excess fees and poor investment performance every year.

11.     Unlike outside clients who are free to negotiate their investment advisory fees, employees in the Plan are captive to whatever mutual fund fees Morgan Stanley wants to charge. The fees Morgan Stanley charged its mutual funds in the Plan were higher than the fees Morgan Stanley charged its outside clients with like assets and similar investment strategies. For example, the investment advisory and administrative services fees Morgan Stanley charged the Morgan Stanley Institutional Global Real Estate Fund were .93%, or about $1.7 million per year. By comparison, the investment advisory fees Morgan Stanley charged an outside client with like assets for a global real estate investment strategy ranged between .65% and .75%, or about $1.2 million per year. The Morgan Stanley International Equity Fund paid Morgan Stanley investment advisory and administrative fees equal to .88% of assets under management, or about $2.2 million per year.  The investment advisory fees that Morgan Stanley charges a separate account client with like assets in the International Equity strategy are about .45% of the assets under management, or about $1.1 million per year.

12.     Morgan Stanley also failed to select investment options and monitor their investment performance with the skill, care and prudence required by ERISA. For the $1 billion in Plan assets owned by participants seeking to invest in target date retirement portfolios, Morgan Stanley selected and retained a variety of target date retirement portfolios managed by

BlackRock Institutional Trust Co. NA. (hereinafter denoted as "the BlackRock Target Date Funds"). Morgan Stanley continued to retain these portfolios despite the fact that BlackRock Institutional Trust Co. NA, was being sanctioned at the time by both the Securities and Exchange Commission and the Commodity Futures Trading Commission for violations of federal laws and regulations.

13.     The BlackRock Target Date Funds underperformed relative to their respective investment benchmarks and the Vanguard target date funds with comparable investment strategies. On average over the last five years, the seven BlackRock Target Date Funds, ranging from 2025 to 2055, each underperformed their Vanguard counterparts by approximately 700 basis points. Based on $1 billion the Plan invested in the BlackRock Target Date Funds, their selection and retention cost the Plan tens of millions of dollars in investment performance.

14.     There were also a number of other investment options that underperformed relative to their benchmarks and other available options with comparable investment strategies.

15.     Morgan Stanley wrongfully wasted and mismanaged the Plan's assets in a manner that flouted its fiduciary duties. The Plan, as a whole, lost hundreds of millions of dollars to this mismanagement. From a leading global investment firm that touts its investment acumen, the some 60,000 current and former Morgan Stanley employees who participated in the Plan deserved better.

### III.    PARTIES

#### A.    Plaintiff Robert J. Patterson

16.     Plaintiff Robert J. Patterson was a participant in the Plan from January 2011 through April 2014.

#### B.    Defendant Morgan Stanley

17.     Defendant Morgan Stanley is a Delaware corporation that operates various investment-related businesses, including investment banking, brokerage, and investment management. The firm traces its heritage to the mid-19th century and the renowned commercial and investment bank, JP Morgan & Company.  In the wake of the stock market crash of 1929, the investment bank separated, and Morgan Stanley opened its doors for business at 2 Wall Street, New York City, on September 16, 1935.

18.     Morgan Stanley's Chief Human Resources Officer or his or her delegate ("the Plan Administrator") has the authority to control and manage the operation and administration of the Plan, make rules and regulations and take actions to administer the Plan. The Plan Administrator has delegated certain operational and administrative responsibilities to certain employees in Morgan Stanley's Human Resources department.

### C.     Defendant Morgan Stanley Domestic Holdings, Inc.

19.     Defendant Morgan Stanley Domestic Holdings, Inc., the Plan's Sponsor, is a corporation wholly owned by Morgan Stanley Capital Management LLC, a limited liability company whose sole member is Morgan Stanley.  Morgan Stanley Domestics Holdings, Inc. is a for-profit domestic corporation organized under Delaware law with its principal place of business in New York, New York.

### D.     Defendant Morgan Stanley Capital Management, LLC

20.     Defendant Morgan Stanley Capital Management, LLC is the parent company of Morgan Stanley Domestic Holdings, Inc.

### E.     Defendant Morgan Stanley Investment Management, Inc.

20.     Defendant Morgan Stanley Investment Management, Inc. acts as an investment adviser to six investment options offered within the Plan. As of December 31, 2015, the firm

provided continuous and regular supervisory or management services to securities portfolios valued at $272,306,534,765.

**F.    Defendant Morgan Stanley Retirement Plan Investment Committee**

21.    Defendant The Morgan Stanley Retirement Plan Investment Committee ("Investment Committee") was established to manage the assets of the Plan.  The Investment Committee is a "Named Fiduciary" of the Plan.  The Board of Directors of Morgan Stanley appoints the Members of the Investment Committee, who serve at the pleasure of the Board. Current and former members of the Investment Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, and exercised authority or control respecting management or disposition of the Plan's assets.  Because Plaintiff is currently unaware of the identities of the individual members of the Investment Committee, those individuals are collectively named as Defendants John Does 1-20. Plaintiff will substitute the real names of the John Does when they are known to Plaintiff.  To the extent the Employee Benefits Plan Committee delegated any of its fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiff, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. § 1002(21)(A) for the same reasons.

**G.    Defendant Morgan Stanley Board of Directors**

22.    Section 7(e) of the Plan names the Board of Directors of Morgan Stanley as the party responsible for appointing and removing members of the Morgan Stanley Investment Committee.  The Board of Directors is responsible for oversight of the Plan. The following individuals are current or former members of the Board of Directors of Morgan Stanley: James P. Gorman, Roy J. Bostock, Erskine B. Bowles, Alistair Darling, Robert J. Davies, Thomas H.

Glocer, James H. Hance, Jr., Robert H. Herz, Nobuyuki Hirano, C. Robert Kidder, Klaus Kleinfeld, John J. Mack, Jami Miscik, Donald T. Nicolaisen, Hutham S. Olayan, James W. Owens, O. Griffith Sexton, Ryosuke Tamakoshi, Masaaki Tanaka, Perry M. Traquina, Laura D. Tyson, Rayford Wilkins, Jr.

23.    Each of the Defendants are also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of their duties, and failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

24.    Because the Morgan Stanley individual entities, Board members, and committee members have acted as alleged herein as the agents of Morgan Stanley, and/or co-fiduciaries, all defendants are collectively referred to hereafter as Morgan Stanley.

## IV.    JURISDICTION AND VENUE

25.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

26.    This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found. All Defendants are subject to nationwide service of process under 29 U.S.C. § 1132(e)(2).

## V.    ERISA'S FIDUCIARY STANDARDS

27.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

    a.  a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.    Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

    a.  The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

29.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

30.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Bierwirth*, 680 F.2d at 271, 272 n.8. Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would

be equal or superior to alternative investments available to the plan." Dep't of Labor Adv. Op. 88-16A, 1988 ERISA (emphasis added).

31.     Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Selecting higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729 F.3d at 1137–39.

32.     In considering whether a fiduciary has breached the duties of prudence and loyalty, mere "subjective good faith" in executing these duties is not a defense; "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

33.     ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. § 1105(a) provides for fiduciary liability for a co-fiduciary's breach:

> a. In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has

knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

34.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

      a.  Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

35.     Under ERISA, "[T]he question of loss to the Plan requires a comparison between the actual performance of the Plan and the performance that would have otherwise taken place." *Bierwirth*, 754 F.2d 1049; *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F. 2d 729 (11th Cir. 1990).

**VI.     PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN**

36.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan. The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. The second critical insight is that

fiduciaries must seek to minimize administrative fees.

### A.     Prudent Fiduciaries Should Limit a Plan's Investment Menu to Sound Long-Term Investments

37.     In a 401(k) plan, the value of a participant's retirement account is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan (less expenses). 29 U.S.C. § 1002(34). Accordingly, poor investment performance can significantly impair the value of a participant's account.

38.     Investment performance is measured in both absolute and relative terms. Absolute performance is the investment's actual investment return. Relative performance is how the actual investment return compares with comparable investments and well-recognized benchmarks or indexes, such as the Russell 2000 Growth Index or the S & P 500 Index (also known in the vernacular as the "Market"). A portfolio of small cap stocks that has an absolute return of 12% may look good unless the "Market" has absolute returns of 15%.

39.     Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter denoted as "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Contribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001).

40.     Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Colum. U. Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-

year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

41.     For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

**B.     Prudent Fiduciaries Will Select Low-Fee Investments for Plan Participants**

43.     401(k) plans all pay a certain fees and expenses, including for plan administration and investment services; however, the amount of fees varies from plan to plan. Such differences in fees can dramatically affect plan participants' accounts.  Over time, even seemingly small differences in fees can result in vast differences in the amount of savings available at retirement. *See, e.g.*, U.S. Dep't of Labor, A Look at 401(k) Plan Fees 1–2 (2013) (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).[1]

44.     Numerous academic and financial industry studies have demonstrated that high fees and expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz- Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); see also Jill E. Fisch,

---

1 Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

*Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

45.     Even if an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (Mar. 1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). It is possible for an investment management team, such as Morgan Stanley's Growth Team, to be named Morningstar's Domestic Fund Manager of the Year in one year and then rank in the bottom quartile of investment performance in the next.

46.     The Morgan Stanley Funds at issue in this action had high fees relative to comparable investment funds. An example is a comparison between the Morgan Stanley Institutional Small Company Growth Fund IS Share Class, the Vanguard Small Cap Index Fund, and the Wellington Small Cap Growth Trust II. Each of the portfolios holds stocks of small U.S. growth companies. The fees are 0.98% of the assets in the Morgan Stanley fund, 0.90% of the assets in the Wellington fund, and 0.07% in the Vanguard index fund. The graph below illustrates the growth of $1 million invested in each fund and in the Russell 2000 Growth Index.



### Investment Growth
#### 12-31-2010 to 12-31-2015

Currency USD

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| Morgan Stanley Inst Small Co Gr IS (USD, MFLIX) | 41.20 | 7.14 | 1,412,010.34 |
| Russell 2000 Growth TR USD (USD) | 66.04 | 10.67 | 1,660,385.85 |
| Vanguard Small Cap Growth Index I (USD, VSGIX) | 62.63 | 10.21 | 1,626,308.67 |
| Wellington CIF II Small Cap 2000 S1 (USD) | 74.75 | 11.81 | 1,747,495.77 |

47. As illustrated, the $1 million investment grew to $1,412,010.34 in the Morgan Stanley fund; $1,626,308.67 in the Vanguard fund; and $1,747,495.77 in the Wellington fund. Accordingly, the plans' respective fees and expenses did not automatically yield improved performance.

48. Fees and expenses are therefore of paramount importance to prudent investment selection. A prudent investor will not select higher-cost funds without undertaking a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses. Morgan Stanley imprudently and disloyally provided participants with their proprietary Morgan Stanley Funds even though comparable investment funds were available at a much lower cost.

## VII. FACTS APPLICABLE TO ALL COUNTS

### A. Plan Investments

16

49.     As of December 31, 2014, the majority of the assets of the Plan were invested in six Morgan Stanley funds, thirteen BlackRock funds, a BNY Mellon fund, a Morgan Stanley employer stock fund, and eight separately managed accounts.

| Plan Investments | Value as of 12/31/14 |
| --- | --- |
| MSIF Cap Growth (MGRPX) | $579,087,747 |
| MSIF Emerging Mkts I Fund (MMMPX) | $299,067,718 |
| MSIF Mid Cap Growth (MMCGX) | $294,449,060 |
| MSIF International Equity I (MIQPX) | $252,213,574 |
| MSIF Small Company Growth I (MFLLX) | $146,259,094 |
| BlackRock Liquidity Fund (TFDXX) | $624,325,485 |
| MSIF Global Real Estate I Fund (MGREX) | $182,539,621 |
| Morgan Stanley Common Stock | $1,818,460,436 |
| BlackRock Lifepath Index 2025 Non-Lendable Fund | $112,369,188 |
| BlackRock Lifepath Index 2030 Non-Lendable Fund | $125,125,643 |
| BlackRock Lifepath Index 2035 Non-Lendable Fund | $200,097,552 |
| BlackRock Lifepath Index 2040 Non-LendableFund | $95,721,675 |
| BlackRock Lifepath Index 2020 Non-Lendable Fund; | $94,183,424 |
| BlackRock Lifepath Index 2045 Non-Lendable Fund | $83,841,141 |
| BlackRock Lifepath Index 2050 Non-Lendable Fund | $69,890,954 |
| BlackRock Lifepath Index 2055 Non-Lendable Fund | $42,627,038 |
| BlackRock Lifepath Index Retirement Non-Lendable Fund | $152,895,066 |
| BNY Mellon Mellon S&P 500 Index Non-Lendable Fund | $755,594,853 |
| BlackRock Extended Equity Market Lendable Fund | $154,876,294 |

| BlackRock MSCI ACWI Ex-US Index Non-Lendable Fund | $104,490,766 |
|---|---|
| BlackRock Bond Index Non-Lendable Fund | $87,273,617 |

50.     The majority of the investment options selected and retained by Morgan Stanley underperformed both their benchmarks and comparable investment funds.  For the Plan as a whole, this resulted in a four-year total return, excluding the performance of Morgan Stanley stock, of approximately 31.6%, or less than 8% per annum.

51.     By comparison, the 401(k) plans of similarly situated companies had superior relative investment returns excluding their company stock performance. For example, the Credit Suisse 401(k) had an annualized return of approximately 10%;.

### 1.     Morgan Stanley Mutual Funds

52.     All six of the Morgan Stanley mutual funds offered in the Plan were tainted either by poor relative performance, high relative fees, or both.

53.     Morgan Stanley controlled the available investments in which the captive employees would place their retirement assets. Despite the many high-quality and low-cost investment options available in the market, the Plan's investment options have contained many of Morgan Stanley's own actively managed mutual funds. Morgan Stanley selected their proprietary funds not based on their merits as investments, or because doing so was in the interest of Plan participants, but because these products provided significant revenues and profits to Morgan Stanley.

54.     Morgan Stanley employees paid Morgan Stanley tens of millions of dollars in fees to attempt to outperform a market benchmark through "active" management, yet some of the Morgan Stanley funds consistently underperformed their respective benchmarks, comparable

18

collective investment funds, and Vanguard "index" funds.[2] Furthermore, the fees Morgan Stanley charged participants in the Plan were higher than the fees charged by the Vanguard funds, and often were higher than the fees it charged its institutional clients having like assets and like investment strategy. The high fees that Morgan Stanley charged participants were not justified by superior investment performance. Morgan Stanley continued to retain proprietary funds in the Plan, further demonstrating that the reason the funds were retained in the Plan was to maintain the revenue stream to Morgan Stanley from the millions of dollars of excess fees charged to participants.

55.     Defendants acted to benefit themselves by using proprietary investment funds managed by Morgan Stanley, thereby enriching Morgan Stanley at the expense of Plan participants. By acting for their own benefit rather than solely in the interest of Plan participants, and failing to consider a more judicious use of non-proprietary products and other low-cost options available to the Plan, Defendants breached their fiduciary duties of loyalty and prudence, and engaged in transactions expressly prohibited by ERISA.

56.     Despite the fact that 401(k) plan fiduciaries are held to the standard of prudent financial experts and must act for the exclusive benefit of participants in screening and selecting a menu of investment options, Morgan Stanley selected and offered to its employees the more expensive Morgan Stanley funds.  The selection by Morgan Stanley of its own funds generated millions of dollars each year in investment advisory and administrative services fees for Morgan Stanley.

---

[2]     The Vanguard Group, a highly respected investment adviser founded in 1975, offered funds to 401(k) plans that were comparable to the Morgan Stanley mutual funds in terms of investment objective and investment style. The major differences were that the fees charged by the Vanguard funds were lower than the fees charged by Morgan Stanley for their funds.

57.     Three of these imprudent investment options, described below, consistently underperformed their designated benchmarks and two of the three consistently underperformed other funds of the same investment style.

58.     For five of the six Morgan Stanley fund options, Morgan Stanley overcharged its participants relative to its outside clients with like assets and like investment strategies. The result is that participants in the Plan paid millions of dollars more per year to Morgan Stanley than did Morgan Stanley's outside clients for the same service.

### a.  Morgan Stanley Institutional Mid-Cap Growth Fund

59.     The Plan's worst-performing fund option through February 2016 was the Morgan Stanley Institutional Mid-Cap Growth Fund.  During the relevant period, the Plan's assets under management in the Fund ranged between approximately $200 million and $300 million.  If a participant sought a fund with mid-cap growth strategy, the Morgan Stanley Institutional Mid-Cap Fund was the only option available to them.

60.     Morningstar, Inc. is a leading and well-recognized independent investment research firm specializing in fund investing. Morningstar rates mutual funds from 1 to 5 stars based on how well they've performed over the last three, five, and ten years relative to similar funds. On a scale of 1-star to 5-stars, with 1 being the worst (bottom 10%) and 5 being the best (top 10%), Morningstar gave the Fund a 1-star rating for three and five years, and a 2-star rating for 10 years.  In 2014, Morningstar ranked the Fund worse than 87% of comparable funds; in 2015, worse than 88% of comparable funds; and through April 30, 2016, worse than 98% of comparable funds. Not only did Defendants place the Fund in the Plan lineup, but they also failed to prudently monitor its performance, and retained it in the Plan despite its many years of abysmal performance.

61. The Fund's prospectus, dated January 28, 2016, disclosed that the Fund was underperforming its benchmark, the Russell Midcap Growth Index, during the past five years by almost fifty percent (50%):

|  | One Year | Five Years |
|---|---|---|
| Morgan Stanley Mid-Cap Growth Fund IS/I | -5.73 | 6.11 |
| Russell Midcap Growth Index | -0.20 | 11.54 |

62. According to Morningstar, for the 5-year period ending December 31, 2015, the Morgan Stanley Institutional Mid-Cap Growth Fund underperformed its benchmark, the Russell Mid Cap Growth Index, by 24.87%, and the Vanguard Mid Cap Growth Index Fund by 21.27%. As shown in the chart below, the Morgan Stanley fund trailed the Vanguard fund and the Russell Index 4 out of the 5 years.

|  | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| Morgan Stanley Mid-Cap Investment Performance | -6.89 | 9.49 | 38.37 | 1.49 | -5.73 | 36.73 |
| Russell Mid-Cap Growth Index Investment Performance | -1.65 | 15.81 | 35.74 | 11.90 | -0.20 | 61.60 |
| **Morgan Stanley Relative Performance +-Russell Mid-Cap Growth Index** | **-5.24** | **-6.31** | **2.63** | **-10.41** | **-5.53** | **-24.87** |
| Vanguard Mid-Cap Growth Index Fund Investment Performance | -3.68 | 15.96 | 32.22 | 13.48 | -0.98 | 57.00 |
| **Morgan Stanley Relative Performance +-Vanguard Mid-Cap Growth Index** | **-3.21** | **-6.46** | **6.15** | **-11.99** | **-4.75** | **-21.27** |

63. The graph below also illustrates the significant underperformance during the relevant period. The graph represents the growth of $1 million had Morgan Stanley invested it on March 1, 2010 through February 29, 2016, in the Morgan Stanley Institutional Mid Cap Fund,

21

the Russell Mid Cap Growth Index, and the Vanguard Mid Cap Growth Index Fund. By February 29, 2016, the $1 million investment would have been worth $1,522,586 in the Morgan Stanley fund; $1,984,614 in the Vanguard fund; and $2,032,781 in the Russell Mid Cap Growth Index. That represents a difference of over $400,000 for every $1 million invested. For a fund with assets ranging between $200 million and $300 million, as much as $100 million was wasted due to the breach of fiduciary duty by Morgan Stanley.



**Investment Growth**
02-28-2010 to 02-29-2016

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| Morgan Stanley Inst Mid Cap Growth I8 (USD, MMCSX) | 52.26 | 7.26 | 1,522,586.00 |
| Russell Mid Cap Growth TR USD (USD) | 103.28 | 12.55 | 2,032,781.60 |
| Vanguard Mid-Cap Growth Index Admiral (USD, VMGMX) | 98.46 | 12.10 | 1,984,614.51 |

64.     The Mid Cap Growth Institutional Fund paid Morgan Stanley for investment advice and administrative services a fee of .58% of the Fund's assets, or approximately $7 million from March 1, 2010 through February 29, 2016.

### b. Morgan Stanley Small Company Fund

65.     The Morgan Stanley Small Company Fund also consistently underperformed its appropriate benchmark and the Vanguard Small Cap Growth Index Fund. During the relevant

period, the Plan's assets under management in the Morgan Stanley Fund ranged between approximately $80 million and $180 million. If a participant sought a small-cap growth strategy, the Morgan Stanley Small Company Fund was the only option available to them.

66.     On a scale of 1-star to 5-stars, with 1 being the worst and 5 being the best, Morningstar gave the Fund a 1-star rating for three years and a 2-star rating for five and ten years. In 2014, Morningstar ranked the Fund worse than 99% of comparable funds; in 2015, worse than 94%, and through April 30, 2016, worse than 71% of comparable funds. Not only did Morgan Stanley place the Fund in the Plan lineup, but they also retained it in the Plan despite its many years of abysmal performance.

67.     The Fund's prospectus, dated April 29, 2016, disclosed the Fund was underperforming its benchmark during the past five years by about thirty percent (30%):

|  | One Year | Five Years |
|---|---|---|
| Morgan Stanley Small Company Fund IS/I | -9.52% | 7.12% |
| Russell 2000 Growth Index | -1.38% | 10.67% |

68.     According to Morningstar, for the 5-year period ending December 31, 2015, the Morgan Stanley Institutional Small Company Growth Fund underperformed its benchmark, the Russell 2000 Growth Index, by 8.11%, and the Vanguard Small Cap Growth Index Fund by 4.91%.

|  | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| Morgan Stanley Small-Cap Investment Performance | -9.12 | 17.10 | 62.26 | -9.63 | -9.52 | 51.09 |
| Russell 2000 Growth Index Investment Performance | -2.91 | 14.59 | 43.30 | 5.60 | -1.38 | 59.20 |

| | | | | | |
|---|---|---|---|---|---|
| **Morgan Stanley Relative Performance**<br>**+- Russell 2000 Growth Index** | **-6.21** | **2.51** | **18.96** | **-15.23** | **-8.14** | **-8.11** |
| Vanguard Small Cap Growth Index Fund<br>Investment Performance | -1.40 | 17.68 | 38.20 | 4.04 | -2.52 | 56.00 |
| **Morgan Stanley Relative Performance**<br>**+- Vanguard Small Cap Growth Index Fund** | **-7.72** | **-0.58** | **24.06** | **-13.67** | **-7.00** | **-4.91** |

69.     The graph below also illustrates the significant underperformance during the relevant period. The graph represents the growth of $1 million had Morgan Stanley invested it on March 1, 2010 through February 29, 2016, in the Morgan Stanley Institutional Small Company Growth Fund, the Russell 2000 Growth Index, and the Vanguard Small Cap Growth Index Fund. By February 29, 2016, the $1 million investment would have been worth $1,628,698 in the Morgan Stanley fund; $1,920,556 in the Vanguard fund; and $1,903,448 in the Russell 2000 Growth Index. That represents a difference of between $274,000 and $292,000 for every $1 million invested. For a fund with assets ranging between $80 million and $180 million, as much as $30 million to $50 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.



70.     This fund paid Morgan Stanley investment advisory and administrative services fees approximately equal to .96% of the Fund's assets, or $7 million for Plan assets from March 1, 2010 through February 29, 2016.

71.     According to filings with the SEC, the investment advisory fees that Morgan Stanley charged its employees invested in the Small Cap Growth Fund were higher than the fees it charges its separate account clients who invested in the same investment strategy.   For a separate account client with $150 million in assets, Morgan Stanley would collect investment advisory fees of no more than .90% of the assets under management, compared with a fee of .96% for employees.

**c.   Morgan Stanley Global Real Estate Fund**

25

72.     The Morgan Stanley Global Real Estate Fund also underperformed it benchmark. During the relevant period, the Plan's assets under management in the Fund ranged between approximately $100 million and $182 million.  If a participant sought a real estate strategy, the Morgan Stanley Global Real Estate Fund was the only option available to them.

73.     The Fund's prospectus, dated April 29, 2016, disclosed the Fund was underperforming its benchmark, the FTSE EPRA/NAREIT Developed Real Estate Index, during the past five years by about fifteen percent (15%):

|                                              | **One Year** | **Five Years** |
| -------------------------------------------- | ------------ | -------------- |
| Morgan Stanley Global Real Estate Fund IS    | -0.84        | NA             |
| Morgan Stanley Global Real Estate Fund I[3]  | -0.94        | 6.59           |
| FTSE EPRA/NAREIT Developed Real Estate       | -0.11        | 7.73           |

74.     The graph below also illustrates the underperformance during the relevant period. The graph represents the growth of $1 million had Morgan Stanley invested it on March 1, 2010 through February 29, 2016 in the Morgan Stanley Institutional Global Real Estate Developed Countries Fund IS Shares and the First Trust FTSE EPRA/NAREIT Developed Markets Real Estate Fund. The First Trust fund replicates the FTSE EPRA/NAREIT Developed Real Estate Index, the benchmark for the Morgan Stanley fund. By February 29, 2016, the investment in the Morgan Stanley fund would have been worth $1,610,633.  Had Morgan Stanley invested in the First Trust fund, it would have been worth $1,647,816.  That represents a difference of $37,000 for every $1 million invested. For a fund with assets ranging between $100 million and $182 million, as much as $6.7 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.

---

3 The Morgan Stanley Global Real Estate Fund IS and the Morgan Stanley Global Real Estate Fund I are two share classes of the same Fund.



**Investment Growth**

02-28-2010 to 02-29-2016

Currency
USD

Initial Value: $1,000,000

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| ⊕ First Trust FTSE EN Dev Mkts Rel Est ETF (USD, FFR) | 64.78 | 8.68 | 1,647,818.82 |
| ⊕ Morgan Stanley Inst Global Real Est IS (USD, MGREX) | 61.06 | 8.27 | 1,610,633.51 |

75. This fund paid Morgan Stanley investment advisory and administrative services fees equal to .93% of the Fund's assets, or approximately $10 million of Plan assets, from March 1, 2010 through February 29, 2016.

76. The fees that Morgan Stanley charged the participants invested in the Global Real Estate Fund were higher than the fees it charged its separate account clients who invested in the same investment strategy. Separate account clients paid Morgan Stanley investment advisory fees of between .65% and .75% of assets under management. Accordingly, participants in the Global Real Estate Fund could have paid as much as $500,000 more in annual fees than did outside Morgan Stanley clients with like assets.

### d. Morgan Stanley Institutional International Equity Fund

74.     Morgan Stanley overcharged participants invested in the International Equity Fund relative to its separate account clients with like assets. According to the Plan's Annual Return/Report of Employee Benefit Plan ("Form 5500") as of December 31, 2014, participants had invested $252,213,574 in the International Equity Fund.   According to the Fund's registration statement filed with the SEC, the fund paid Morgan Stanley investment advisory and administrative fees equal to .88% of assets under management, or about $2.2 million per year. Accordingly to Morgan Stanley's Form ADV, the highest investment advisory fees that Morgan Stanley charges a separate account client with like assets in the International Equity strategy are about .45% of the assets under management, or about $1.1 million per year.

### e.  Morgan Stanley Institutional Emerging Markets Fund

75.     Morgan Stanley also overcharged participants invested in the Emerging Markets Fund relative to its separate account clients with like assets invested in the same strategy.

76.     According to the Plan's Form 5500 as of December 31, 2014, participants had invested $299,067,718 in the Emerging Markets Fund.   According to the Fund's registration statement filed with the SEC, the Fund paid Morgan Stanley investment advisory and administrative fees equal to .99% of assets under management, or about $2.9 million per year. The blended investment advisory fee that Morgan Stanley advertises for a separate account client in the Global Emerging Markets strategy is .95% on the first $100 million, .90% on the next $100 million, .85% on the next $100 million, and .80% thereafter. The fee for a client with like assets as the employees would be .90% of the assets under management, or about $2.6 million per year.

### f.  Morgan Stanley Institutional Growth Fund

77.     Morgan Stanley also overcharged participants invested in the Institutional Growth Fund relative to outside clients with like assets invested in the Growth strategy.

78.     According to the Plan's Form 5500 as of December 31, 2014, participants had invested $579,087,747 in the Fund. According to the Fund's registration statement, Morgan Stanley charged the fund .51% in investment advisory and administrative services fees. According to Morgan Stanley's Form ADV, for a similarly situated institutional client, Morgan Stanley's highest blended fee schedule for the Growth strategy is follows:  .75% on the first $50 million, .50% on the next $25 million, .40% on the next $25 million, and negotiable on all amounts above $100 million.  Even in the unlikely event the client declined to negotiate the fees for assets above $100 million, the blended fee Morgan Stanley would charge its clients with $579 million in assets is approximately .43%, or $2.48 million per year.  This is still more favorable than the fee of .51%, or $2.95 million, Morgan Stanley charges its mutual funds in which Plan participants invest.

## 2.     BlackRock Collective Investment Trust Life Path Portfolios

79.     During the relevant period, the Plan had seven different life path portfolios, also known as target date funds, with target retirement dates ranging from 2025 to 2055.  These BlackRock portfolios (the "BlackRock Life Path Funds") were created as collective investment trusts in February 2009 and added to the Plan shortly thereafter.  The BlackRock Life Path Funds were the only target date strategies available to Plan Participants.

80.     The BlackRock Life Path Funds selected and retained for the Plan by Morgan Stanley were managed by BlackRock Institutional Trust Co. NA. In March 2012, the U.S. Commodity Futures Trading Commission issued an order filing and simultaneously settling charges against BlackRock Institutional Trust Company NA for engaging in prearranged trades

29

that were noncompetitively executed and fictitious sales in ten year U.S. Treasury Note Futures spreads (ten year spreads) on the Chicago Board of Trade.  In September 2014, the Securities and Exchange Commission ordered the BlackRock Institutional Trust Company NA to pay disgorgement of $1,122,400, prejudgment interest of $22,471.13, and a civil penalty in the amount of $530,479 (for a total of $1,675,350.13) relating to allegations that BlackRock violated the Securities Exchange Act of 1934. Despite BlackRock's regulatory issues, Morgan Stanley retained them as an investment adviser of approximately $1 billion in Plan assets.

81.     As investment options, each of the BlackRock Life Path Funds underperformed their respective Dow Jones Target Date Indexes and each of the comparable Vanguard Target Retirement Collective Investment Trusts. The BlackRock Life Path Index Funds carried a 3-star rating.  The Vanguard Funds, on the other hand, carried a 5-star rating except for the 2050 and 2055 funds which each carried a 4-star rating.

82.     If the Defendants had not imprudently selected and retained the BlackRock Life Path Funds, the Plan would have accrued significantly more investment gains.

### a. BlackRock Life Path Index 2035 NL

83.     The graph below illustrates the significant underperformance of the BlackRock Life Path Index 2035 NL from March 1, 2010 through February 29, 2016.  The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Life Path Index 2035, the Dow Jones 2035 Index, and the Vanguard Target Retire 2035 I.  The investment would have been worth $1,500,825 in the BlackRock Fund; $1,560,389 in the Dow Jones Index; and $1,626,709 in the Vanguard Fund.  That represents a difference of between $60,000 and $125,000 on a $1 million investment.  For a $200 million fund, as much as $25 million more would have accrued to the Plan if there had been no

breach of fiduciary duty by Morgan Stanley.



### d.  BlackRock Life Path Index 2040 NL

84.     The graph below illustrates the significant underperformance of the BlackRock Life Path Index 2040 NL from March 1, 2010 through February 29, 2016.  The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Life Path Index 2040, the Dow Jones 2040 Index, and the Vanguard Target Retire 2040 I.  The investment would have been worth $1,517,435 in the BlackRock Fund; $1,585,452 in the Dow Jones Index; and $1,632,718 in the Vanguard Fund.  That represents a difference of between $68,000 and $115,000 on a $1 million investment.  For a $90 million fund, as much as $10 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.

31



### c. BlackRock Life Path Index 2030 NL

85.    The graph below illustrates the significant underperformance of the BlackRock Life Path Index 2030 NL from March 1, 2010 through February 29, 2016. The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Life Path Index 2030, the Dow Jones 2030 Index, and the Vanguard Target Retire 2030 I. The investment would have been worth $1,480,683 in the BlackRock Fund; $1,522,148 in the Dow Jones Index; and $1,599,291 in the Vanguard Fund. That represents a difference of between $41,000 and $118,000 on a $1 million investment. For a $125 million fund, as much as $14.7 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.



**Investment Growth**

02-28-2010 to 02-29-2016

Currency
USD

Initial Value: $1,000,000

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| ① BlackRock LifePath® Index 2030 NL F (USD) | 49.07 | 6.76 | 1,490,663.18 |
| ② DJ Target 2030 TR USD (USD) | 52.21 | 7.25 | 1,522,149.54 |
| ③ The Vanguard Target Retire 2030 Trust I (USD) | 59.63 | 8.14 | 1,593,291.52 |

### d. BlackRock Life Path Index 2045 NL

86.     The graph below illustrates the significant underperformance of the BlackRock Life Path Index 2045 NL from March 1, 2010 through February 29, 2016. The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Life Path Index 2045, the Dow Jones 2045 Index, and the Vanguard Target Retire 2045 I. The investment would have been worth $1,538,550 in the BlackRock Fund; $1,595,029 in the Dow Jones Index; and $1,630,731 in the Vanguard Fund. That represents a difference of between $56,000 and $92,000 on a $1 million investment. For an $80 million fund, as much as $7.3 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.



**Investment Growth**

02-28-2010 to 02-29-2016

Currency
USD

Initial Value: $1,000,000

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| ① BlackRock LifePath® Index 2045 NL F (USD) | 53.86 | 7.44 | 1,538,550.88 |
| ② DJ Target 2045 TR USD (USD) | 59.50 | 8.08 | 1,595,029.04 |
| ③ The Vanguard Target Retire 2045 Trust I (USD) | 63.07 | 8.49 | 1,630,731.12 |

#### e. BlackRock Life Path Index 2050 NL

87.     The graph below illustrates the significant underperformance of the BlackRock Life Path Index 2050 NL during the period March 1, 2010 through February 29, 2016.  The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Life Path Index 2050, the Dow Jones 2050 Index, and the Vanguard Target Retire 2050 I.  The investment would have been worth $1,566,999 in the BlackRock Fund; $1,593,185 in the Dow Jones Index; and $1,631,452 in the Vanguard Fund. That represents a difference of between $32,000 and $64,000 on a $1 million investment.  For a $69 million fund, as much as $4.4 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.

34



**Investment Growth**

02-28-2010 to 02-29-2016

Currency
USD

Initial Value: $1,000,000

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| BlackRock LifePath® Index 2050 NL F (USD) | 56.70 | 7.77 | 1,566,999.95 |
| DJ Target 2050 TR USD (USD) | 59.32 | 8.07 | 1,593,186.59 |
| The Vanguard Target Retire 2050 Trust I (USD) | 63.15 | 8.50 | 1,631,462.80 |

  **f. BlackRock Life Path Index 2025 NL**

  88. The graph below illustrates the significant underperformance of the BlackRock Life Path Index 2025 NL March 1, 2010 through February 29, 2016. The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Life Path Index 2025, the Dow Jones 2025 Index, and the Vanguard Target Retire 2025 I. The investment would have been worth $1,458,486 in the BlackRock Fund; $1,469,855 in the Dow Jones Index; and $1,570,394 in the Vanguard Fund. That represents a difference of as much as $11,000 and $111,000 on a $1 million investment. For a $112 million fund, as much as $12.4 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.



### g. BlackRock Life Path Index 2055 NL

89.     The graph below illustrates the significant underperformance of the BlackRock Life Path Index 2055 NL during the period November 1, 2010 through February 29, 2016.  The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Life Path Index 2055, the Dow Jones 2055 Index, and the Vanguard Target Retire 2055 I.  The investment would have been worth $1,425,636 in the BlackRock Fund; $1,426,821 in the Dow Jones Index; and $1,485,210 in the Vanguard Fund. That represents a difference of between $1,000 and $59,000 on a $1 million investment.  For a $42 million fund, as much as $2.4 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.

36



### Investment Growth
#### 10-31-2010 to 04-30-2016

Currency
USD

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| BlackRock LifePath® Index 2055 NL F (USD) | 55.12 | 8.31 | 1,551,220.13 |
| DJ Target 2055 TR USD (USD) | 55.24 | 8.32 | 1,552,361.56 |
| The Vanguard Target Retire 2055 Trust I (USD) | 60.56 | 8.99 | 1,605,616.55 |

### 3.    Systematic Financial Management Mid-Cap Value Portfolio

90.    The Systematic Financial Management Mid-Cap Value Portfolio was a companion portfolio to the Morgan Stanley Mid-Cap Growth Fund. The market capitalization of the stocks within both portfolios is substantially similar. The major difference is that one adhered to a value style of stock selection while the other adhered to a growth style.

91.    Like the Morgan Stanley Mid-Cap Growth Fund, the Systematic Financial Management Mid-Cap Value Portfolio was also a consistent underperformer relative to its benchmark, the Russell Mid Cap Value Index, and a comparable Vanguard mutual fund. According to Morningstar, the strategy carried a 2-star rating for the past three and five years with above-average risk and below-average return.

92.    The graph below illustrates the relative performance of Systematic's Mid-Cap Value Portfolio's separate account composite which, based on information and belief, is

37

comparable to the performance of the Systematic Mid-Cap Value Portfolio offered in the Plan. The graph represents the growth of $1 million had Morgan Stanley invested it on March 10, 2010 through February 29, 2016 in the Systematic Financial Management Mid-Cap Value Portfolio, the Vanguard Mid-Cap Value Index Fund, and the Russell Mid-Cap Value Index. The investment would have been worth $1,720,408 in the Mid-Cap Portfolio; $1,998,325 in the Vanguard fund; and $1,979,557 in the Russell Mid-Cap Value Index. That represents a difference of approximately $260,000 or more for every $1 million invested. For a portfolio with approximately $30 million in assets, as much as $7 million or more would have accrued to the Plan had there been no breach of fiduciary duty.



**Investment Growth**
02-28-2010 to 02-29-2016

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| Russell Mid Cap Value TR USD (USD) | 97.96 | 12.05 | 1,979,557.46 |
| Systematic Financial Mgt Mid-Cap Value (USD) | 72.04 | 9.46 | 1,720,408.33 |
| Vanguard Mid-Cap Value Index Admiral (USD, VMVAX) | 99.83 | 12.23 | 1,998,325.74 |

4.    **Other Equities and Bond Investment Options**

93.     The Plan also offered participants other poor-to-mediocre investment options. For example, the PIMCO Real Return Composite and the PIMCO Core Fixed Income Plus Composite each carried a Morningstar 2-star rating for three years, and a 3-star rating for five years.  The Fidelity (Pyramis) Select International Small Cap Composite carried a 3-star rating for three years and a 1-star rating for 5 years. The PIMCO Low Duration Fund, the PIMCO Total Return Composite, the PIMCO Foreign Bond (unhedged) Fund, the T. Rowe Price Large Cap Value Composite, and the Shenkman High Yield Composite each were mediocre performers and carried a Morningstar 3-star rating for three and five years.

### 5.     Blackrock Liquidity Fund

94.     The BlackRock Liquidity Fund is known as a money market fund or stable value fund, meaning that the net asset value of the fund's shares remain stable at $1.00.

95.     The Blackrock Liquidity Fund invests, under normal circumstances, at least 80% of its net assets, plus the amount of any borrowings for investment purposes, in U.S. Treasury bills, notes and other obligations issued or guaranteed as to principal and interest by the U.S. Government, its agencies or instrumentalities, and repurchase agreements maturing in 397 days or less (with certain exceptions). The portfolio will have a dollar-weighted average maturity of 60 days or less and a dollar-weighted average life of 120 days or less.

96.     Because these types of funds present both minimal credit risk and valuation risk, investors who are risk adverse seek these funds.  However, net investment returns are quite low, about 0.03%.

97.     Given the poor-to-mediocre performance of the majority of Plan options available to participants, many participants sought the safe confines of the BlackRock Liquidity Fund.

With over $600,000 million in Plan assets, it represented approximately 10% of the Plan's assets excluding Morgan Stanley's common stock.

98.     Unfortunately, like most of the other options in the Plan, the BlackRock Liquidity Fund performed poorly relative to its benchmark and comparable Vanguard fund.

99.     The graph below illustrates the significant underperformance from March 1, 2010 through February 29, 2016.  The graph represents the growth of $1 million had Morgan Stanley invested it through the time period noted on the graph in the BlackRock Liquidity Fund, the Barclays 3-month US Treasury Bill Index, the Bank of America 3-month LIBOR Index, and the Vanguard Prime Money Market Fund.  The investment in the BlackRock Liquidity Fund would have been worth $1,001,659.  The investment in the Vanguard Prime Money Market would have been worth $1,007,071. The Barclays 3-month Treasury Bill Index would have been worth $1,003,796, and the Bank of America 3-month LIBOR index would have been worth $1,020,221.  For a fund with $600 million in assets, as much as $11.4 million was wasted due to Morgan Stanley's breach of fiduciary duty.



## VIII.   CLASS ACTION ALLEGATIONS

100.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

101.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as a representative of, the following class:

a.    All participants and beneficiaries of the Plan from March 1, 2010 through the date of February 29, 2016, excluding the Defendants.

102.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

41

a. The Class includes approximately 60,000 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

c. Plaintiff's claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d. Plaintiff is an adequate representatives of the Class because he was a participant in the Plan during the relevant period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by

individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

103.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

104.    Plaintiff's counsel, Sanford Heisler LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## I.    CAUSES OF ACTION

### COUNT I

**Breach of Duties of Loyalty and Prudence by Mismanaging the Investment Options Selected For and Retained By the Plan During the Relevant Period Caused Losses To the 401(k) Plan
(Violation of ERISA, 29 U.S.C. § 1104 by Morgan Stanley)**

105.    Plaintiff restates and incorporates the allegations of the preceding paragraphs.

106.    Morgan Stanley used its Plan as a strategic and financial benefit to recruit and retain workers.

107.    In joining Morgan Stanley and subsequently enrolling in the Plan, Morgan Stanley employees trusted and relied on Morgan Stanley's resources and expertise to construct and maintain a state of the art 401(k) plan.

108.    At all relevant times, the Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and its assets.

109.    29 U.S.C. § 1104(a)(1) requires plan fiduciaries to act "solely in the interest" of plan participants and beneficiaries.

      a.  Subsection (A) of this section requires that the fiduciary act for the "exclusive purpose" of providing benefits to plan participants and defraying reasonable expenses of plan administration. 29 U.S.C. § 1104(a)(1)(A).

      b.  Subsection (B) adds the duty of prudence, requiring a plan fiduciary to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

110.    The scope of the fiduciary duties and responsibilities of Morgan Stanley includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses, and acting and administering the plan with the care, skill, diligence and prudence required by ERISA. Morgan Stanley is directly responsible for

44

selecting prudent investment options, eliminating imprudent ones, evaluating and monitoring the Plan's investment on an on-going basis, and taking all necessary steps to ensure the Plan's assets are invested prudently.

111.    Morgan Stanley selected and retained Plan investment options. The process for selecting and retaining the Plan's investment portfolio options is and has been based on a faulty investment process.

112.    The faulty process resulted in a plan loaded with relatively expensive and poor-to-mediocre options which substantially impaired the Plan's use, its value and its investment performance for all participants, past and present.  This process included the use of both proprietary and non-proprietary mutual funds, collective investment trusts, and separate accounts, and the retention of these options despite sustained high relative costs and mediocre and poor performance.

113.    Defendants restricted the captive participants to an investment portfolio that underperformed relative to its 401(k) peers of like size and composition.

114.    A prudent investigation would have concluded that the process used by Morgan Stanley was causing the Plan to waste hundreds of millions of dollars of participants' retirement savings.

115.    The fact that the Plan's poor-to-mediocre investment options have caused material underperformance relative to its peers constitutes a breach of Morgan Stanley's fiduciary duty under ERISA to each and every person who was a participant in the Plan during the relevant period regardless of the investment option in which the participant had actually invested.

116.    In failing to adequately consider better-performing investments for the Plan, Defendants failed to discharge their duties with respect to the entire Plan with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

117.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages and lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109.

## COUNT II

**Breach of Duties of Loyalty and Prudence by Failing to Remove or Replace Certain Morgan Stanley Proprietary Funds as 401(k) Plan Investment Vehicles During the Relevant Period Caused Losses to the 401(k) Plan (Violation of ERISA, 29 U.S.C. § 1104 by Morgan Stanley)**

118.    Plaintiff restates and incorporates the allegations of the preceding paragraphs.

119.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits fiduciaries from causing plans to engage in transactions that that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest.

120.    ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits fiduciary self-dealing.

    a.  Subsection (1) provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account."

    b.  Subsection (2) provides that a fiduciary shall not "in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

    c.   Subsection (3) provides that a fiduciary shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

121.    Morgan Stanley breached its duties of loyalty and prudence by selecting and then failing to timely remove as Plan investment options the following Morgan Stanley Funds:

Morgan Stanley Institutional Mid Cap Growth<br>
Morgan Stanley Institutional Small Company<br>
Morgan Stanley Institutional Global Real Estate

122.    The Morgan Stanley Institutional Mid Cap Growth Fund, the Morgan Stanley Institutional Small Company Growth Fund, and the Morgan Stanley Institutional Global Real Estate Fund (the "Morgan Stanly Funds"), exhibited poor performance during the relevant period.

123.    The fact that the Plan's investments were concentrated in poorly performing Morgan Stanley Funds reflects a failure to consider and obtain better-performing alternative, unaffiliated funds at the expense and to the detriment of the Plan.

124.    Instead, the Investment Committee members allowed Morgan Stanley to make a profit from the Plan by causing the Plan to retain Morgan Stanley's own proprietary funds with inferior performance.

125.    A prudent investigation not tainted by self-interest would have revealed to a reasonably prudent fiduciary that the Morgan Stanley Funds were inferior to other options available to the Plan.

126.    Had a prudent and loyal fiduciary conducted such an investigation, it would have concluded that the Morgan Stanley Funds were selected and retained for reasons other than the

47

best interest of the Plan and were causing the Plan to waste hundreds of millions of dollars of employees' retirement savings in underperformance relative to prudent investment options available to the Plan.

127.    Morgan Stanley committed these breaches during each of the meetings of the Investment Committee that occurred periodically during each year of the relevant period. At each of these meetings, the Investment Committee had cause to remove the Morgan Stanley Funds based on their poor performance, but failed to do so. A prudent fiduciary would have removed the Morgan Stanley Funds from the Plan.

128.    As a direct and proximate result of these breaches of duty, Morgan Stanley caused the Plan, and indirectly the Plan and its participants, hundreds of millions of dollars of lost investment return.

129.    Pursuant to ERISA, 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), the Defendants are liable to restore all losses suffered by the Plan caused by Morgan Stanley's breaches of fiduciary duty.

130.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

### COUNT III

**Breach of Duties of Loyalty and Prudence—**
**Excessive Advisory and Fund Administrative Services Fees**

**of Certain Morgan Stanley Proprietary Funds as 401(k) Plan Investment Vehicles During
The Relevant Period Caused Losses to the 401(k) Plan
(Violation of ERISA, 29 U.S.C. § 1104 by Morgan Stanley)**

131.   Plaintiff restates and incorporates the allegations of the preceding paragraphs.

132.   Morgan Stanley is directly responsible for ensuring the Plan's fees are reasonable
for the services provided.

133.   Morgan Stanley entered into contracts under which Morgan Stanley and its
affiliates provided investment advisory and fund administration services to the following Morgan
Stanley proprietary mutual funds offered on the Plan in exchange for compensation.

> Morgan Stanley Institutional Small Cap Growth Fund
> Morgan Stanley Institutional Global Real Estate Fund
> Morgan Stanley Institutional Emerging Markets Fund
> Morgan Stanley Institutional Growth Fund
> Morgan Stanley Institutional International Equity Fund

134.   Morgan Stanley's own proprietary mutual funds, which were open to Plan
participants through the Plan's menu of funds, paid investment advisory and fund administration
fees to Morgan Stanley.

135.   Mutual fund revenue, to pay investment advisory payments is generated by
regularly deducting money from mutual fund investors' accounts as "expenses."

136.   Morgan Stanley set the amount of its compensation for investment advisory and
administrative services in the same manner – calculated to earn a profit – as it set its rates for all
of its clients; though unlike as to its other clients, Morgan Stanley charged a higher rate to its
proprietary mutual funds and thus indirectly to employees who were participants in the Plan.

137.   Investment Committee approved Morgan Stanley's proprietary mutual funds for
inclusion in the Plan.

138.    The Investment Committee members allowed Morgan Stanley – also a fiduciary –
to make a profit from the Plan by collecting more in investment advisory and fund administration
fees from the proprietary Morgan Stanley mutual funds than it collected from its separate clients
with like assets and like investment strategy.

139.    Moreover, the Investment Committee members had a conflict of interest as
employees of the Plan sponsor Morgan Stanley, and failed to expressly consider the potential
effect of that conflict of interest on their decision making.

140.    By using its fiduciary authority as investment adviser to the Morgan Stanley
proprietary funds to affect its own compensation and by failing to use the excess fees collected
from the proprietary Morgan Stanley mutual funds to offset fees the Plan would have otherwise
had to pay, Morgan Stanley failed to discharge their duties with respect to the Plan:

    a.  Solely in the interest of the participants and beneficiaries and for the exclusive
purpose of providing benefits to participants and beneficiaries and defraying
reasonable expenses of administering the Plan, in violation of 29 U.S.C. §
1104(a)(1)(A); and

    b.  With the care, skill, prudence and diligence under the circumstances then
prevailing that a prudent person acting in a like capacity and familiar with such
matters would use in the conduct of an enterprise of a like character and with like
aims, in violation of 29 U.S.C. § 1104(a)(1)(B); and

    c.  By causing the Plan to engage in transactions that that they know or should know
constitute direct or indirect transfers of the Plans' assets to, or use of the Plans'
assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. §
1106(a)(1)(D); and

    d. By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in his own interest or for his own account in violation of 29 U.S.C. § 1106(b)(1); and

    e. By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan, in his individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries, in violation of 29 U.S.C. § 1106(b); and

    f. By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for his/its own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, in violation of 29 U.S.C. § 1106(b)(3).

141.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages and lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109.

## COUNT IV

**Breach of Duties of Loyalty and Prudence by Failing to Remove or Replace Certain Non-Morgan Stanley Funds and Portfolios as 401(k) Plan Investment Vehicles During the Relevant Period Caused Losses to the 401(k) Plan (Violation of ERISA, 29 U.S.C. § 1104 by Morgan Stanley)**

142.    Plaintiff restates and incorporates the allegations of the preceding paragraphs.

143.    Morgan Stanley breached its duties of loyalty and prudence under 29 U.S.C. §§ 1104(a)(1)(A) and (B) by selecting and then failing to timely remove as Plan investment options the following portfolios:

BlackRock Lifepath Index 2025 Non-LendableFund

BlackRock Lifepath Index 2030 Non-LendableFund

BlackRock Lifepath Index 2035 Non-LendableFund

BlackRock Lifepath Index 2040 Non-LendableFund

BlackRock Lifepath Index 2045 Non-LendableFund

BlackRock Lifepath Index 2050 Non-LendableFund

BlackRock Lifepath Index 2055 Non-Lendable Fund

Systematic Financial Management Mid-Cap Value Portfolio

PIMCO Real Return Portfolio

PIMCO Core Fixed Income Portfolio

Fidelity (Pyramis) Select International Small Cap Portfolio

BlackRock Liquidity Fund

144.    Morgan Stanley failed to engage in a prudent process for the selection and retention of Plan investment options. Instead, Morgan Stanley selected and retained the portfolios despite inferior historical performance relative to their benchmarks and comparable Vanguard options.    Furthermore, the investment adviser of the Blackrock Funds was being sanctioned for violations of federal laws and regulations by the Commodity Futures Trading Commission and the Securities and Exchange Commission.  Had a prudent and loyal fiduciary taken these factors into consideration, it would have concluded that the Plan's investment options were selected and retained for reasons other than the best interest of the Plan and its participants and were causing the Plan to lose millions of dollars of participants' retirement savings due underperformance relative to prudent investment options available to the Plan.

145.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this

Count, to restore to the Plan any profits made by Morgan Stanley through use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

Count V

**Failure to Monitor Fiduciaries**

**(Violation of ERISA, 29 U.S.C. § 1105 by Morgan Stanley)**

146.    Plaintiff restates and incorporates the allegations in the preceding paragraphs as though fully set forth here.

147.    This Count alleges breach of fiduciary duties against Morgan Stanley.

148.    As alleged above, Morgan Stanley is a fiduciary under 29 U.S.C. § 1002(21), and thus bound by the duties of loyalty and prudence.

149.    The Plan states that Morgan Stanley "has the authority to control and manage the operation and administration of the Plan, make rules and regulations and take actions to administer the Plan" and "has delegated certain operational and administrative responsibilities . . . ."

150.    The Plan further authorizes the Investment Committee to manage the investment options of the Plan.  Section 7(e) of the Plan also empowered the Board of Directors of Morgan Stanley to appoint and remove members of the Morgan Stanley Investment Committee.

151.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not doing so.

53

152. To the extent the Investment Committee managed the assets of the Plan fiduciary the Board of Directors monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

153. The Board of Directors breached its fiduciary monitoring duties by, among other things:

    a. failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b. failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

    c. failing to ensure that the monitored fiduciaries considered the ready availability of comparable investment options to such a jumbo plan, including lower-cost share classes of the identical mutual funds, still lower-cost separate accounts, and lower-cost collective trusts, that charged far lower fees than the Plan's mutual fund options; and

    d. failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive-cost investments, and an option that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.

154. As a consequence of these breaches of the fiduciary duty to select prudent

investments and monitor their performance, the Plan failed to accrue millions of dollars of additional investment performance and thus suffered very substantial losses. Had the Board of Directors discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and Plaintiff and other Class members, lost millions of dollars in their retirement savings.

155.   Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## II.   **PRAYER FOR RELIEF**

Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan $150 million in losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good the Plan under 29 U.S.C. § 1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- reform the Plan to render it compliant with ERISA;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint Plaintiff as a class representative, and appoint Sanford Heisler, LLP as Class Counsel;

- award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and/or the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

### III.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Constitution of the United States, Plaintiff hereby demands a trial by jury.

Dated:  August 19, 2016                    **SANFORD HEISLER LLP**

By: _____

    Jeremy Heisler (JH-0145)
    David Tracey (DT-8106)
    **SANFORD HEISLER, LLP**
    1350 Avenue of the Americas
    31st Floor
    New York, New York 10019

56

Phone:  (646) 402-5650
jheisler@sanfordheisler.com
dtracey@sanfordheisler.com

David Sanford, D.C. Bar No. 457933
**SANFORD HEISLER, LLP**
1666 Connecticut Ave. NW
Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7780
dsanford@sanfordheisler.com

Charles H. Field, CA Bar No. 189817
Edward Chapin, CA Bar No. 053287
**SANFORD HEISLER LLP**
501 West Broadway
Suite 515
San Diego, California  92101
Phone:  619.577.4252
cfield@sanfordheisler.com
echapin@sanfordheisler.com

*Attorneys for Plaintiff and the Proposed Class*