**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ROBERT J. PATTERSON, RALPH COLO, and TERRI LO SASSO** individually and as representative of a class of similarly situated persons of the Morgan Stanley Retirement Plan,<br><br>**Plaintiffs,**<br><br>-- against --<br><br>**MORGAN STANLEY, Morgan Stanley Domestic Holdings, Inc., Morgan Stanley & Co., LLC, Morgan Stanley Retirement Plan Investment Committee, and John Does 1-30**<br><br>**Defendants.** | **SECOND AMENDED COMPLAINT**<br><br>**No. 1:16-cv-06568-RJS** |

**COMPLAINT**

1.      Plaintiffs Robert J. Patterson, Ralph Colo, and Terri Lo Sasso ("Plaintiffs"), bring this action individually and in a representative capacity on behalf of the Morgan Stanley 401(k) Plan (the "Plan") as a whole, under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq.* (1974) ("ERISA"), against the Plan's fiduciaries: Defendants Morgan Stanley, Morgan Stanley Domestic Holdings, Inc., Morgan Stanley & Co., LLC, Morgan Stanley Retirement Plan Investment Committee, and the Board of Directors of Morgan Stanley Domestic Holdings, Inc., (collectively "Morgan Stanley" or "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions and unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. The Plaintiffs bring this action to remedy this unlawful

1

conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.  In support thereof, Plaintiffs allege as follows:

## I.       NATURE OF THE CASE

2.       This case involves the Morgan Stanley 401(k) Plan and some 60,000 participants and former participants.  Morgan Stanley is the sponsor of the Plan and a Plan fiduciary. As a fiduciary, Morgan Stanley is obligated to select prudent investments, monitor investment performance, and act for the exclusive benefit of participants and beneficiaries. Morgan Stanley failed to honor these duties. Instead of leveraging its sophistication and the Plan's bargaining power to benefit participants and beneficiaries, Morgan Stanley selected and retained relatively high-cost and poor-performing investment options.

3.       Morgan Stanley's investment decisions were tainted by self-interest. Morgan Stanley selected its proprietary mutual funds as the exclusive funds available for certain investment strategies. Morgan Stanley managed these funds for a profit by charging their investors—including Plan participants—significant investment advisory and administrative fees. Although there were cheaper and better-performing alternatives on the market, Morgan Stanley selected its propriety funds for the Plan in order to reap significant revenues and profits. Moreover, Morgan Stanley loaded the Plan with a suite of poorly-performing funds managed by BlackRock Institutional Trust Co. N.A. ("BlackRock") — a company which pays Morgan Stanley for a variety of services, including both brokerage services and for selling BlackRock products. By acting to benefit themselves and contrary to their fiduciary duties, Morgan Stanley caused the Plan, and hence participants, to suffer staggering losses of hundreds of millions of dollars. Further, Morgan Stanley rendered the Plan as a whole a substandard and inadequate investment option.

4.      The case is of vital importance because today 401(k) retirement plans have become the primary tool for retirement planning and savings for millions of working Americans. Employers—like Morgan Stanley—that engage in self-dealing or fail in their duties to offer their captive employees prudent investment choices subject their employees' hard-earned retirement savings to risk of loss of value due to poor investment performance. For employees victimized by their employer's self-dealing and neglect, what was meant to be the golden period of their lives becomes a retirement nightmare.

5.      The allegations in this complaint are based in part upon an investigation of public documents, including filings with the U.S. Department of Labor and U.S. Securities and Exchange Commission, documents provided to Plaintiffs because of their status as Plan participants, and analytical investment data compiled by third party sources.

## II.      PRELIMINARY STATEMENT

6.      The Plan is a profit-sharing plan that includes a "qualified cash or deferred arrangement" as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986) (hereinafter denoted as "the Code"), and is subject to the provisions of ERISA. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a). The Plan provides for retirement income for Morgan Stanley employees and former employees. That retirement income depends on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

7.     Morgan Stanley is the sponsor of the Plan. Morgan Stanley operates various investment-related businesses, including investment banking, brokerage, and investment management. Its investment advisor affiliate manages approximately $272,306,534,765 in assets. And with over $8 billion in assets, the Plan is one of the largest 401(k) plans in the country. With Morgan Stanley's investment sophistication combined with $8 billion of assets, the Plan has tremendous leverage to demand and receive superior investment products and services.

8.     Each year, thousands of Plan participants invested hundreds of millions of dollars in the Plan. The Plan participants trusted Morgan Stanley to construct a stellar 401(k) plan that offered superior investment options and world-class investment management.  Instead, Morgan Stanley saddled each of their 60,000 captive participants with a sub-standard plan The majority of available investment options were plagued by poor to mediocre investment performance, and a substantial portion were tainted by self-dealing. As a result, each of the Plan's participants was subjected to poor investment performance relative to many other 401(k) plans with assets of between $3 billion and $12 billion.

9.     Based upon publicly available documents filed with the U.S. Department of Labor, for the years 2011 through 2014, the Plan had a total return, excluding Morgan Stanley stock, of approximately 31.6%.  By comparison, the 401(k) plans of other investment firms with plan assets of between $3 billion and $12 billion had superior relative investment returns excluding their company stock performance. For example, during the same period the Credit Suisse 401(k) plan returned approximately 39.8%. Goldman Sachs & Co.'s 401(k) plan also significantly outperformed Morgan Stanley's Plan: if the latter's Plan had performed as well as the former, Morgan Stanley participants would have gained $72 million more than they did over this three-year period.

10. Morgan Stanley's imprudent and disloyal investment conduct manifests most prominently in three respects: (a) Morgan Stanley selected six of its proprietary mutual funds for the Plan, each of which charged unreasonable fees; (b) Morgan Stanley selected and retained three of its proprietary mutual funds despite their abysmal performance; (c) Morgan Stanley selected and retained seven underperforming BlackRock trusts. Each of these decisions was tainted by self-interest—they allowed Morgan Stanley to promote its business interests and reap profits at the expense and to the detriment of the Plan and its participants.

11. As of December 31, 2014, the proprietary funds and BlackRock trusts together constituted approximately one third of the investment options available in the Plan. Morgan Stanley deprived Plan participants of a prudently and loyally-managed and cost-effective Plan by retaining these investments.

**A.    Morgan Stanley Charged the Plan and Participants Unreasonable Fees**

12. Through a subsidiary, Morgan Stanley operates a registered investment advisor that manages its clients' assets for a fee. As part of its investment advisory business, Morgan Stanley offers its customers—including participants in the Plan—a variety of mutual funds. Morgan Stanley charges set fees for providing investment advice to these mutual funds that participants cannot negotiate. In addition to its mutual fund business, Morgan Stanley has outside clients (such as "institutional investors" like the New York State Employee Retirement System) that hire Morgan Stanley to manage their individual portfolios. These individual portfolios are known as "separate accounts" or "separately managed accounts." Morgan Stanley's separate accounts often contain the same investments as its mutual funds with similar investment strategies. However, unlike mutual funds, separate account clients are free to negotiate the investment advisory fees they pay to Morgan Stanley. Moreover, separate account clients usually must meet minimum asset

thresholds.

13.     Although the Plan had sufficient assets to qualify for separate account treatment, Morgan Stanley selected six of its proprietary mutual funds for the Plan. Each of these proprietary mutual funds was the exclusive option available for its respective investment strategy. For example, if a Plan participant wanted to invest in a Small Company Growth strategy, she had no choice but to invest in Morgan Stanley's Small Company Growth mutual fund.

14.     Plan participants who invested in these mutual funds paid Morgan Stanley significantly higher fees than separate account clients with like assets and similar investment strategies for basically the same service. For example, Morgan Stanley charged separate account clients in the International Equity strategy fees of about 0.45% (or less) of the assets under management. By contrast, Morgan Stanley charged Plan participants who invested in the International Equity Fund fees equal to 0.88% of assets under management. The pattern persists for each of the six proprietary mutual funds in the Plan: Participants paid unreasonable fees relative to separate account clients and well out of proportion to the services Morgan Stanley rendered. Morgan Stanley directly profited from these high fees.

**B.     Morgan Stanley Selected and Retained Poorly-Performing Proprietary Mutual Funds**

15.     Morgan Stanley selected and retained three of its proprietary mutual funds in the Plan despite their abysmal performance. By doing so, Morgan Stanley collected millions of dollars of fees every quarter from the participants who invested in them. Any prudent, loyal fiduciary would have viewed the following funds as poor investments, would not have selected them, and/or would have promptly removed them after they experienced poor performance:

a. **Morgan Stanley Small Company Growth Fund**. This Fund suffered from chronic underperformance relative to other readily available alternatives dating

back to at least January 2007. By 2011, the Fund performed worse than 86% of small cap growth mutual funds available on the market. In 2014 and 2015, the Fund performed worse than 99% and 94% of small cap growth mutual funds, respectively.

b. **Morgan Stanley Mid Cap Growth Fund.** In 2011 and 2012, the Fund performed worse than 72% and 88% of comparable mid cap growth mutual funds available on the market, respectively. After an anomalous spike in 2013 (indicating instability), the Fund again plummeted in 2014 and 2015, performing worse than 88% and 87% of mid cap growth mutual funds, respectively.

c. **Morgan Stanley Real Estate Fund**. Morgan Stanley launched this fund in 2006 and soon loaded it onto the Plan despite its shallow track record. Throughout the relevant period, the Fund consistently underperformed relative to its benchmark as well as other global real estate mutual funds that were readily available on the market.

16.    Any reasonable, disinterested investor would have viewed these funds as imprudent investments. In fact, from 2011 through 2015, both the Small Company Growth Fund and the Mid Cap Growth Fund suffered mass redemptions as investors sought to distance themselves from Morgan Stanley's investment advisory services.

17.    As the investment advisor to the Morgan Stanley Funds, Morgan Stanley would have been aware of the investment performance of its Funds as well as investor redemptions.

18.    Also, given the extremely and consistently poor performance of these funds, it would take Morgan Stanley little time and effort to find a better alternative for the Plan. Instead, Morgan Stanley selected and retained these Funds because as the "investment advisor" for these

funds—i.e., the seller—it stood to benefit from the fees it was earning from participants in the Plan.  Accordingly, Morgan Stanley's process for selecting and maintaining these Plan investment options was tainted by a failure of effort, competence and/or loyalty. The selection and retention of these and other proprietary mutual funds cost Plan participants tens of millions of dollars in fees and poor investment performance every year.

        **C.**     **Morgan Stanley Imprudently and Disloyally Selected Poorly-Performing BlackRock Target Date Trusts**

19.      Plan participants invested approximately $1 Billion in target date retirement portfolios. Target date portfolios are designed to achieve certain investment results based on the investor's anticipated retirement date.[1] Morgan Stanley selected and retained one investment advisor—BlackRock—to provide target date retirement portfolios for the Plan.

20.      According to public filings with the Securities and Exchange Commission, BlackRock and certain of their affiliates paid Morgan Stanley out of their own profits for the sale and distribution of BlackRock funds. In addition, based on information and belief, BlackRock selected Morgan Stanley to execute securities transactions for its securities portfolios and paid Morgan Stanley millions of dollars in commissions to do so. As a result of Morgan Stanley's ongoing business relationship with BlackRock, Morgan Stanley had financial and business incentives to select the BlackRock trusts.

21.      Unfortunately, the BlackRock Target Date Trusts were poor performers. The BlackRock trusts that were included in the Plan were organized in 2009 as entities known as bank collective investment trusts.  Some of the BlackRock Target Date Trusts had no predecessors and

---

[1] Target date retirement portfolios are comprised of a mix of stock, bonds and cash. The portfolio of an investor with a 2020 retirement date is weighted more heavily in bonds and cash to reduce risk exposure, whereas the portfolio for an investor with a 2060 retirement date is weighted more heavily in stocks. The portfolios adjust over time to reduce risk as the target retirement date gets closer.

therefore had no historical investment track record to test or analyze.  Other of the BlackRock Target Date Trusts had predecessor funds that were organized as mutual funds. Based on information and belief, the investment objectives and policies of the BlackRock Target Date Trusts were substantially similar to those of the predecessor target date mutual funds. The performance track record of the predecessor mutual funds dating back to at least 2007 was poor relative to their investment benchmarks and to target date funds with comparable investment strategies managed by their competitors that were readily available, such as those by the Vanguard Group. In addition to their poor performance history, the fees of the BlackRock Target Date Trusts were higher than their Vanguard collective investment trust counterparts. Accordingly, Morgan Stanley placed the BlackRock Target Date Trusts in the Plan as investment options when a prudent, disinterested fiduciary would have questioned their selection relative to better-performing and lower-cost alternatives that were readily available.

22.     Prudent, disinterested fiduciaries would also have removed the BlackRock Trusts when confronted with evidence of continued underperformance. Over the course of the class period, the BlackRock Target Date Trusts regularly underperformed relative to their respective investment benchmarks and the Vanguard target date funds with comparable investment strategies.

23.     According to the Plan's 2013 Fee Disclosures, every single BlackRock Target Date Trust underperformed its corresponding S&P Target Date Benchmark for the previous one and five year periods.  The poor performance continued.  According to the Plan's 2014 Fee Disclosures, again, every single BlackRock Target Date Trust underperformed its corresponding S&P Target Date Benchmark for the prior one and five years. Furthermore, the funds were underperforming to an increasingly alarming degree.

24.     Moreover, Morgan Stanley knew and/or should have known that BlackRock Institutional Trust Co. N.A., was sanctioned at the time by both the Securities and Exchange Commission and the Commodity Futures Trading Commission for violations of federal laws and regulations.   Accordingly, such sanctions should have given Morgan Stanley further cause to question the inclusion of the BlackRock trusts in the Plan.

25.     Morgan Stanley would have removed the BlackRock trusts from the Plan if it had acted prudently and loyally to the Plan and Plan participants. Morgan Stanley's imprudent and disloyal decision to select and retain the BlackRock trusts had dire consequences. Plan participants lost tens of millions of dollars in poor investment performance every year.

\*\*\*

26.     Morgan Stanley wrongfully wasted and mismanaged the Plan's assets in a manner that flouted its fiduciary duties. The Plan, as a whole, lost hundreds of millions of dollars due to Morgan Stanley's breaches of fiduciary duties. From a leading global investment firm that touts its investment acumen, the some 60,000 current and former Morgan Stanley employees who participated in the Plan deserved better.

## III.    PARTIES

### A.    Plaintiff Robert J. Patterson

27.     Plaintiff Robert J. Patterson was a participant in the Plan from January 2011 through April 2014. During his participation in the Plan, Mr. Patterson's ownership included, but may not have been limited to, the Morgan Stanley Real Estate Fund and the Morgan Stanley International Equity Fund. The harm Mr. Patterson suffered resulted from unreasonable fees Morgan Stanley charged these two funds relative to outside customers and from a lack of superior investment options from which to choose. Further, Mr. Patterson suffered from being saddled with

an inadequate plan menu with a lack of sufficient high-performing, cost-effective investment options. Instead, the plan was laden down by the proprietary and Black Rock funds.

**B.     Plaintiff Ralph A. Colo**

28.     Plaintiff Ralph A. Colo is a current participant in the Plan.  During the Class Period, Mr. Colo ownership included the Morgan Stanley Mid Cap Fund, the Morgan Stanley Global Real Estate Fund, the Morgan Stanley Emerging Markets Fund, Morgan Stanley International Equity Fund, and the Morgan Stanley Growth Fund. The harm Mr. Colo suffered resulted from unreasonable fees in each of the Morgan Stanley Funds and from the poor relative performance of the Morgan Stanley Mid Cap Fund. Further, like Mr. Patterson and all other class members, Mr. Colo suffered from a lack of superior investment options from which to choose.

**C.     Plaintiff Terri R. Lo Sasso**

29.     Plaintiff Terri Lo Sasso was a participant in the Plan through October 1, 2014. During the Class Period, Ms. Lo Sasso's ownership included, but may not have been limited to, the BlackRock LifePath Index 2025 Trust, the Morgan Stanley Growth Fund, the Morgan Stanley International Equity Fund, and the Morgan Stanley Emerging Markets Fund.  The harm Ms. Lo Sasso suffered resulted from unreasonable fees in each of the Morgan Stanley Funds, from the poor relative performance of the BlackRock LifePath Index 2025 Trust, and from a lack of superior investment options from which to choose.

****

30.     Morgan Stanley exacerbated the harm to Plaintiffs and all Plan participants by selecting a multitude of investment options that suffered from poor to mediocre investment performance.  As a whole, the Plan deprived Plaintiffs and other Plan participants of the right to

11

choose from superior investment options and restricted Plaintiffs' ability to pursue positive relative returns.

### D.   Defendant Morgan Stanley

31.   Defendant Morgan Stanley is a Delaware corporation that operates various investment-related businesses, including investment banking, brokerage, and investment management. The firm traces its heritage to the mid-19th century and the renowned commercial and investment bank JP Morgan & Company.  In the wake of the stock market crash of 1929, the investment bank separated, and Morgan Stanley opened its doors for business at 2 Wall Street, New York, New York, on September 16, 1935.

32.   Morgan Stanley's Chief Human Resources Officer or his or her delegate ("the Plan Administrator") has the authority to control and manage the operation and administration of the Plan, make rules and regulations, and take actions to administer the Plan. The Plan Administrator has delegated certain operational and administrative responsibilities to certain employees in Morgan Stanley's Human Resources department.

### E.   Defendant Morgan Stanley Domestic Holdings, Inc.

33.   Defendant Morgan Stanley Domestic Holdings, Inc., the Plan's Sponsor, is a corporation wholly owned by Morgan Stanley Capital Management LLC, a limited liability company whose sole member is Morgan Stanley.  Morgan Stanley Domestics Holdings, Inc. is a for-profit domestic corporation organized under Delaware law with its principal place of business in New York, New York. During part of the class period, Morgan Stanley Domestic Holdings, Inc. was the sponsor of the Plan.  It appointed members to the investment committee that was responsible for management of the investment funds in the Plan.  In addition, Morgan Stanley Domestic Holdings, Inc. had the authority to remove members of the investment committee and

to amend and terminate the Plan.

**F.     Defendant Morgan Stanley & Co., LLC**

34.     During a part of the class period, Morgan Stanley & Co., Inc., was the sponsor of the Plan.  It appointed members to the investment committee that was responsible for management of the investment funds in the Plan.  In addition, Morgan Stanley & Co., Inc. had the authority to remove members of the investment committee and to amend and terminate the Plan. Defendant Morgan Stanley & Co., LLC is the successor entity to Morgan Stanley & Co., Inc.

**G.     Defendant Morgan Stanley Retirement Plan Investment Committee**

35.     Defendant Morgan Stanley Retirement Plan Investment Committee ("Investment Committee") was established to manage the assets of the Plan.  The Investment Committee is a "Named Fiduciary" of the Plan.  The Board of Directors of Defendants Morgan Stanley Domestic Holdings, Inc. and Morgan Stanley & Co., LLC appoint the members of the Investment Committee, who serve at the pleasure of the Board.  Current and former members of the Investment Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, and exercised authority or control respecting management or disposition of the Plan's assets.

**H.     John Does**

36.     Because Plaintiffs are currently unaware of the identities of the individual members of the Investment Committee, and of the Board of Directors of Defendants Morgan Stanley Domestic Holdings, Inc. and Morgan Stanley & Co., LLC, those individuals collectively are named as Defendants John Does 1-30. Plaintiffs will substitute the real names of the John Does when they become known to Plaintiffs.  To the extent the Investment Committee delegated any of its fiduciary functions to another person or entity, the nature and extent of which has not been

disclosed to Plaintiffs, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. § 1002(21)(A) for the same reasons.

37.     Each of the Defendants is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of their duties, and failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

38.     Because the Morgan Stanley individual entities, Board members, and committee members have acted as alleged herein as the agents of Morgan Stanley, and/or co-fiduciaries, all defendants collectively are referred to hereafter as Morgan Stanley.

## IV.     JURISDICTION AND VENUE

39.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

40.     This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found. All Defendants are subject to nationwide service of process under 29 U.S.C. § 1132(e)(2).

## V.     ERISA'S FIDUCIARY STANDARDS

41.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

    a.  a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i)

14

providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

42.    Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

    a.    The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

43.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Advisory Op. 88-16A, (Dec. 19, 1988) (emphasis added).

44.    ERISA section 406(b)(1), 29 U.S. Code § 1106(b)(1), prohibits a fiduciary from dealing with plan assets in his own interest or for his own account, essentially prohibiting a fiduciary from using plan assets to receive additional fees. Selecting higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 596 (8th Cir. 2009); *cf. Tibble v. Edison Int'l*, 729 F.3d at 1137–39 (9th Cir. 2013).

45.     In measuring fiduciary conduct, Courts have made it clear that results, including investment results, are not the key; rather, the process for considering and examining relevant information is the key. As one court explained:

> ERISA § 404(a)(1)(B) requires only that [fiduciaries] vigorously and independently investigate the wisdom of a contemplated investment; it matters not that the investment succeeds or fails, as long as the investigation is intensive and scrupulous and . . . discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan.
>
> *Donovan v. Walton*, 609 F. Supp. 1221, 1238 (S.D. Fla. 1985)

46.     Thus, to meet the prudent process requirement, fiduciaries must vigorously and thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained. This means considering competing funds to determine which fund should be included in the plan's investment line-up. As explained by the Department of Labor in the preamble to the qualified default investment alternative regulations, "[a] fiduciary must engage in an objective, thorough, and analytical process that involves consideration of the quality of competing providers and investment products, as appropriate." 72 Fed. Reg. 60453 (October 24, 2007)

47.     In satisfying these duties, fiduciaries should consider a variety of funds and the expenses associated with the possible funds.  *See Tibble v. Edison International*, 49 EBC 1725 (C.D. Cal. 2010) (noting that fiduciaries must engage in a thorough investigation of the merits of an investment and noting that the fiduciaries considered five investment criteria, including the expense ratio, when selecting funds).

48.     Furthermore, under ERISA, a fiduciary "has a continuing duty to monitor [plan]

investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation omitted).

49.    ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. § 1105(a) provides for fiduciary liability for a co-fiduciary's breach:

a.    In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

50.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

a.    Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which

have been made through use of assets of the plan by the fiduciary, and shall be

subject to such other equitable or remedial relief as the court may deem appropriate,

including removal of such fiduciary.

51.     Under ERISA, "The question of loss to the Plan . . . requires a comparison between

the actual performance of the Plan and the performance that would have otherwise taken place."

*Bierwirth*, 754 F.2d 1049, 1057.

## VI.     PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

52.     A substantial body of academic and financial industry literature provides two

critical insights for fiduciaries to consider when selecting investments to be offered within a plan.

The first critical insight is that fiduciaries must carefully tend to their duty of investment menu

construction—selecting prudent investments, regularly reviewing plan options to ensure that

investment choices remain prudent, and weeding out costly or poorly-performing investments. The

second critical insight is that fiduciaries must seek to minimize administrative fees.

### A.     Prudent Fiduciaries Should Limit a Plan's Investment Menu to Investments that Exhibit Strong Relative Performance

53.     In a 401(k) plan, the value of a participant's retirement account is determined solely

by employee and employer contributions plus the amount gained through investment in the options

made available in the plan (less expenses). 29 U.S.C. § 1002(34). Accordingly, poor investment

performance can significantly impair the value of a participant's account.

54.     Investment performance is measured in both absolute and relative terms.  Absolute

performance is the investment's actual investment return.  Relative performance is how the actual

investment return compares with comparable investments and well-recognized benchmarks or

indexes, such as the Russell 2000 Growth Index, the Russell Midcap Growth Index, or the S & P

500 Index.   A portfolio of small cap stocks that has an absolute return of 12% may look attractive unless the results of the Russell 2000 Growth Index shows absolute returns of 15%.

55.     Research in the field of behavioral economics has revealed two common behaviors among 401(k) participants. First, Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter denoted as "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Contribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001).

56.     Second, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48-49, Colum. U. Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 47 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew et al., *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

57.     Accordingly, prudent fiduciaries will limit their menus to only those funds that exhibit strong investment performance relative to their benchmarks and comparable funds, and remove poor performing investments rather than trusting participants to move their money out of a poor performing investment.

### B.   Prudent Fiduciaries Will Select Low-Fee Investments for Plan Participants

58.   401(k) plans all pay certain fees and expenses, including for plan administration and investment services; however, the amount of fees varies from plan to plan. Such differences in fees can dramatically affect plan participants' accounts.  Over time, even seemingly small differences in fees can result in vast differences in the amount of savings available at retirement. *See, e.g.*, U.S. Dep't of Labor, A Look at 401(k) Plan Fees 1–2 (2013) (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).[2]

59.   Numerous academic and financial industry studies have demonstrated that high fees and expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries,* 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

60.   Even if an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. *See, e.g.* Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (Mar. 1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns").

---

[2] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

61. To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000).

62. Fees and expenses are therefore of paramount importance to prudent investment selection. A prudent investor will not select higher-cost funds without undertaking a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

***

63. Morgan Stanley's investment decisions contradict the key insights of the academic and financial industry literature. Morgan Stanley selected and retained several poorly-performing funds in the plan and failed to minimize fees for plan participants.  These decisions evidence both a lack of prudence and a lack of loyalty, as Morgan Stanley profited directly by including poorly-performing and unreasonably expensive funds in the Plan.

## VII.   FACTS APPLICABLE TO ALL COUNTS

### A.   Plan Investments

64. Morgan Stanley's imprudent investment decisions, tainted through a process rife with self-dealing, manifested in three principal ways: (a) Morgan Stanley selected six proprietary mutual funds, each of which was the exclusive option for its respective strategy, and charged unreasonable fees, (b) Morgan Stanley selected and retained three abysmally-performing proprietary mutual funds, and (c) Morgan Stanley selected and retained seven underperforming BlackRock trusts.  In each case, Morgan Stanley promoted its own business interests at the expense

of Plan participants. Each of these thirteen funds was the sole investment option available in its respective investment category.

65.     As of December 31, 2014, the proprietary funds and BlackRock trusts in question together comprised about 40% of the assets in the Plan excluding Morgan Stanley common stock, as well as one third of the investment options available for Plan participants to invest in. Since the funds at issue were the only funds available in their respective strategies, Morgan Stanley deprived Plaintiffs and the plan participants the opportunity to construct well-diversified retirement portfolios consisting of high-performing investments in multiple strategies. By including these investments in the Plan, Morgan Stanley undermined the Plan as a whole and deprived Plaintiffs and other Plan participants of the right to choose superior investment options and pursue positive relative returns.

| Plan Investments | Value of Plan Investment as of 12/31/14 |
| --- | --- |
| MSIF Cap Growth (MGRPX) | $579,087,747 |
| MSIF Emerging Mkts Fund (MMMPX) | $299,067,718 |
| MSIF Mid Cap Growth (MMCGX) | $294,449,060 |
| MSIF International Equity Fund (MIQPX) | $252,213,574 |
| MSIF Small Company Growth (MFLLX) | $146,259,094 |
| MSIF Global Real Estate Fund (MGREX) | $182,539,621 |

| BlackRock Lifepath Index 2025 Non-Lendable Trust | $112,369,188 |
|---|---|
| BlackRock Lifepath Index 2030 Non-Lendable Trust | $125,125,643 |
| BlackRock Lifepath Index 2035 Non-Lendable Trust | $200,097,552 |
| BlackRock Lifepath Index 2040 Non-Lendable Trust | $95,721,675 |
| BlackRock Lifepath Index 2045 Non-Lendable Trust | $83,841,141 |
| BlackRock Lifepath Index 2050 Non-Lendable Trust | $69,890,954 |
| BlackRock Lifepath Index 2055 Non-Lendable Trust | $42,627,038 |

66.     Moreover, in addition to the Morgan Stanley and BlackRock Funds, Morgan Stanley filled the Plan with other options plagued by poor to mediocre investment performance. As a result, Morgan Stanley deprived Plan participants of their right to choose among high quality, high performing investment options to invest their retirement savings. Instead, Morgan Stanley saddled them with an inferior retirement plan.

67.     Many of the other investment options selected and retained by Morgan Stanley underperformed relative to both their benchmarks and comparable investment funds.  For the Plan as a whole, this resulted in a four-year total return, excluding the performance of Morgan Stanley stock held by the Plan, of approximately 31.6%, or less than 8% per annum.

68.     By comparison, the 401(k) plans of similarly situated companies had superior relative investment returns (again excluding their own company stock performance from their overall plan performance). For example, the Credit Suisse 401(k) had an annualized return of approximately 10%. In offering a plan with inferior investment options, Morgan Stanley restricted Plaintiffs' ability to pursue positive investment returns.

**B.      Morgan Stanley's Proprietary Mutual Funds Charged Plan Participants Unreasonable Fees and Performed Poorly**

### a.    Morgan Stanley Placed Its Own Interests Ahead of Plan Participants by Including Proprietary Funds as Exclusive Options in the Plan

69.    Morgan Stanley controlled the menu of investments that were available to Plan participants. Despite the many high-quality and low-cost investment options readily available on the market, Morgan Stanley placed six of its proprietary mutual funds into the Plan. Each of these funds was the exclusive investment option for that fund's particular investment strategy. For example, if a Plan participant wanted to invest in a small company growth strategy, she had no choice but to invest in Morgan Stanley's Small Company Growth fund.

70.    Morgan Stanley managed each of these six proprietary funds for a profit by charging investors—including plan participants—fees for services. Morgan Stanley therefore stood to gain profits by including each of these funds in the Plan.

71.    These incentives tainted Morgan Stanley's investment decisions. Morgan Stanley selected its proprietary funds not based on their merits as investments, or because doing so was in the interest of Plan participants, but because these products provided significant revenues and profits to Morgan Stanley. All six of the Morgan Stanley mutual funds offered in the Plan suffered from high relative fees, poor relative performance, or both. A prudent and loyal fiduciary would not have selected or retained such expensive, poor-performing investments.

### b.    All Six of Morgan Stanley's Proprietary Funds Had Unreasonable Fees

72.    Morgan Stanley is a registered investment advisor. As an investment advisor, Morgan Stanley charges fees for providing asset management and related services to all of its clients, whether the client is a fund of pooled investors' assets (e.g. a mutual fund), such as the Morgan Stanley Institutional International Equity Fund, or an individual separate account, such as the New York State Employee Retirement Systems.

73.    As part of its investment advisory business, Morgan Stanley offers its customers—

24

including employees in the Plan—a variety of mutual funds. Morgan Stanley charges set fees for providing investment advisory services to these mutual funds. Plan participants who invest in Morgan Stanley's proprietary mutual funds cannot negotiate these fees.

74.      In addition to its mutual fund business, Morgan Stanley provides substantially the same investment advisory services to outside clients (such as "institutional investors" like the New York State Employee Retirement System) that hire Morgan Stanley to manage their individual portfolios. These individual portfolios are known as "separate accounts" or "separately managed accounts," and usually must meet minimum asset thresholds to be eligible for this treatment. Although Morgan Stanley's separate accounts often contain the same investments as its mutual funds with similar investment strategies, outside clients are free to negotiate the fees for their separate accounts (and, in fact, do).

75.      Although the Plan had sufficient assets to qualify for separate account treatment by Morgan Stanley, Morgan Stanley offered Plan participants proprietary mutual funds as the exclusive investment options for six investment strategies. Morgan Stanley charged Plan participants significantly higher fees for investing in each of these proprietary mutual funds than Morgan Stanley charge outside clients with separate accounts containing like investment strategies.

76.      According to filings with the SEC, with the exception of the mid-cap growth fund, the total non-negotiated fees that Morgan Stanley charged participants invested in the Morgan Stanley Funds were higher than the *maximum possible* fees it charged its separate account clients who invested in the same investment strategy with similar assets.  This by itself is suggestive of misconduct.

| Name of Strategy | Plan Assets Under Management for each Mutual Fund as of 12/31/2014 | Mutual Fund Advisory and Administrative Fees as a Percentage of Assets | Non-Negotiated Separate Account Bundled Investment Advisory Fees as a Percentage of Assets |
|---|---|---|---|
| Small Cap Growth | $146,259,094 | 0.96% | 0.90%[3] |
| Mid Cap Growth | $294,449,060 | 0.58% | 0.60%[4] |
| Large Cap Growth | $579,087,747 | 0.51% | 0.43%[5] |
| International | $252,213,574 | 0.88% | 0.45%[6] |
| Emerging Markets | $299,067,718 | 0.99% | 0.90%[7] |
| Global Real Estate | $182,539,621 | 0.93% | 0.65%[8] |

77.     The separate account advisory fees listed above represent non-negotiated fees that are the highest fees Morgan Stanley will charge its separate account clients.  Actual fees, including those of the mid-cap separate accounts, are likely lower than those listed. Based on information and belief, separate account clients with multiple accounts may bundle their assets to achieve even

[3] 1.10% on the first $25 million of asset under management 0.900% on the next $25 million of assets under management 0.850% on assets in excess of $50 million

[4] 0.800% on the first $25 million of assets under management 0.700% on the next $25 million of assets under management 0.650% on the next $50 million 0.550% on assets in excess of $100 million

[5] 0.750% on the first $50 million of assets under management 0.500% on the next $25 million of assets under management 0.400% on the next $25 million of assets under management Negotiable thereafter

[6] 0.800% on the first $25 million of assets under management 0.600% on the next $25 million of assets under management 0.500% on the next $25 million of assets under management 0.400% on assets in excess of $75 million

[7] 0.950% on the first $100 million of assets under management 0.900% on the next $100 million of assets under management 0.850% on the next $100 million of assets under management 0.800% on assets in excess of $300 million

[8] 0.750% on the first $100 million in assets under management 0.500% on the next $300 million in assets under management 0.400% on assets in excess of $400 million

lower fees. Based on information and belief, if Morgan Stanley were to deal with its Plan participants on terms at least as favorable as it provides to outside investors with similar amounts of assets, Morgan Stanley would allow Plan participants to bundle their assets across strategies in separate accounts.  Given the fact that the Plan's total assets exceed $8 billion, the resulting reduction in fees would be highly meaningful for Plan participants.

78.    The above chart does not compare the expense ratio of the Morgan Stanley mutual funds with the expense ratios of the Morgan Stanley separate accounts. Rather, it compares the portions of the expense ratios that are allotted specifically for investment advisory and administrative services. This is a direct apples-to-apples comparison.

79.    To illustrate this point, the table below provides an example of the line item expenses for a mutual fund, the Morgan Stanley Institutional International Equity Fund Class IS, as disclosed in the Fund's prospectus dated April 29, 2016:

**Annual Portfolio Operating Expenses** (expenses that you pay each year as a percentage of the value of your investment)

|  | **Class IS** |
|---|---|
| Advisory Fee | 0.80% |
| Distribution and/or Shareholder Service (12b-1) Fee | None |
| Other Expenses | 0.11% |
| Expense Reimbursement | 0.00% |
| Total Annual Portfolio Operating Expenses After Fee Waiver and/or Expense Reimbursement | 0.91% |

80.    The "Advisory Fee" is the fee the Fund pays to Morgan Stanley to manage the assets of the Fund's securities portfolio.

81.     "Other Expenses" typically encompasses a myriad of fees related to custody of the assets, shareholder recordkeeping, calculating the net asset value of the shares, legal, accounting, and board member compensation. Embedded in the "Other Expenses" item is a 0.08% fee that the Fund pays to Morgan Stanley for what could be characterized as administrative fees.

82.     The 0.8% "Advisory Fee" and the 0.08% administrative fee are the total fees Morgan Stanley earns for its services to the International Equity Class IS portfolio (together, 0.88% of the assets under management). The remaining 0.03% is paid to third parties.

83.     The Chart at paragraph 69, *supra*, therefore compares the fees that Morgan Stanley charges its proprietary mutual funds with the fees that it charges its outside separate account clients. These fees compensate Morgan Stanley for performing essentially the same function and pursuing an identical investment strategy.

84.     Indeed, Morgan Stanley renders substantially similar investment advisory services to its mutual fund clients and separate account clients who have like asset class types (e.g. equities, bonds, etc.) and like investment strategies (e.g. a strategy for U.S. mid-cap equity growth).  Based on information and belief, Morgan Stanley assigns the same personnel to a portfolio management team to manage its proprietary mutual funds and separate accounts with like investment strategies. Furthermore, when the Morgan Stanley portfolio management team decides to buy a particular stock, it buys a large block of the stock and then allocates it pro rata to each of its accounts that have similar investment strategies, including to separate accounts and proprietary mutual funds. Slight variations in positions may be attributable to different levels of available cash or specific individual restrictions (e.g. no tobacco stocks), but the end result is that all of the various accounts managed by Morgan Stanley with a particular investment strategy have substantially similar investment positions, whether the investor's portfolio is invested in a separate account or a parallel-

strategy mutual fund.

85.      Moreover, Morgan Stanley provides comparable administrative services to both the proprietary mutual funds and separate account clients. These can include: (i) maintaining books and records for the securities portfolios of each fund and each separate account client; (ii) calculating the value of the securities in each of the portfolios; (iii) producing transaction data, financial reports and such other periodic and special reports as the fund and separate account clients may reasonably request; and (iv) coordinating with outside service providers of each fund and each separate account client.

86.      Unlike the mutual funds in which Morgan Stanley charges shareholders a separate 0.08% fee for administrative services (see paragraph 74, *supra*), for its separate account clients Morgan Stanley bundles its investment advisory and administrative services costs into a unified investment advisory fee.  The result, as displayed in paragraph 69, *supra*, is that the company charged its own employees higher total fees than what it charged outside separate account investors with like assets and like investment strategies.

87.      In addition, the separate account fees shown above are very likely not the net fees that Morgan Stanley retains.  Based on information and belief, Morgan Stanley pays a commission up to thirty percent (30%) of the investment advisory fee it collects to Morgan Stanley sales personnel who procured the account. By contrast, Morgan Stanley does not pay a commission to sales personnel on the Plan assets invested in the mutual funds.

88.      The total fees that Morgan Stanley charges participants should at least be no *worse* than what it charges its separate account clients with similar amounts of assets under management and identical investment strategies.  Instead, Morgan Stanley charged its employees more. Ironically, because many separate account clients are themselves pension funds, Morgan Stanley

almost certainly gave a better deal to retired workers who had spent their careers at companies *other* than Morgan Stanley—workers to whom Morgan Stanley did not owe the same fiduciary duties as to its own plan participants.

89.     There were a variety of steps Morgan Stanley could have taken to bring the fees it collected from the proprietary mutual funds in line with fees it collected from separate account clients with like assets. For example:

a.   Morgan Stanley could have voluntarily reduced the fees it collected from its proprietary mutual funds to levels equal to the fees it collected from separate accounts.

b.   Morgan Stanley could have created another class of shares with lower pricing designed specifically for the Plan. Morgan Stanley's proprietary funds already had multiple share classes with different pricing models.

c.   Morgan Stanley could have simply offered these investment strategies to participants in the Plan as separate accounts at the lower separate account pricing. Separate account options were in the Plan.  In fact, Morgan Stanley offered separate accounts managed by a variety of other investment advisors in the following strategies: Systematic Mid Cap Value; Shenkman Capital High Yield Bond; T. Rowe Price U.S. Large Cap Value; PIMCO Core Fixed Income Fund; PIMCO Real Return; BlueBay Emerging Market Select Debt; Pyramis Select International Small Cap; and Artisan International Growth.  But Morgan Stanley did not offer the Plan any separate account investment option strategies, proprietary or otherwise, that would compete with the investment strategies of the six proprietary mutual funds that Morgan Stanley placed in the Plan.

90.     Defendants acted to benefit themselves by using proprietary investment funds managed by Morgan Stanley, and by treating Plan participants less favorably than outside investors with similar assets, thereby enriching Morgan Stanley at the expense of participants.  By acting for their own benefit rather than solely in the interest of Plan participants, and failing to consider a more judicious use of other low-cost options available to the Plan, Defendants breached their fiduciary duties of loyalty and prudence, and engaged in transactions expressly prohibited by ERISA.

91.     Plaintiffs did not have knowledge of all material facts and information regarding the fees Morgan Stanley charged its separate account clients necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.

### C.     Morgan Stanley Imprudently and Disloyally Managed the Plan by Selecting and Retaining Three Poor-Performing Proprietary Mutual Funds

92.     For three different investment strategies—Small Company Growth, Mid-Cap Growth, and Global Real Estate—Morgan Stanley offered participants the single option of a Morgan Stanley proprietary mutual fund geared to that strategy, even though comparable but better-performing investment options were readily available to the Plan administrators. Indeed, these funds were so under-performing—and superior investment options were so readily apparent—that an adequate investigation would have revealed their imprudence.

93.     The proprietary mutual funds at issue are known in the industry as "actively managed" funds, which means that each fund's investment objective is to outperform a targeted "benchmark" through superior stock picking skills after accounting for all expenses. Benchmarks are composites of the performance of all of the stocks within a particular investment strategy (e.g., the Standard & Poor's 500 Index, or the Russell 2000 Growth Index, or the Russell Mid Cap

Growth Index). Measuring a mutual fund's performance against an established benchmark is the most recognized method used by investors to assess the success or failure of the mutual fund. When active fund managers succeed in beating their benchmarks, this is commonly referred to as "beating the market."

94.     The three proprietary mutual funds at issue consistently underperformed relative to not only their benchmarks—and thus the market—but also the *majority* of available alternative funds.

95.      Other options that were readily apparent included the investment funds offered by T. Rowe Price and the Vanguard Group.  T. Rowe Price is a highly respected and award winning investment advisor founded in 1937. T. Rowe Price manages approximately $748.5 billion on a discretionary basis and approximately $698.9 million on a non-discretionary basis. Many 401(k) plans, including Credit Suisse, Pfizer, and Qualcomm, offer T. Rowe Price mutual funds as investment options. Vanguard is a highly respected investment advisor founded in 1975. It has over $3 trillion in assets under management and is one of the largest investment advisors in the United States.  The investment funds offered by the Vanguard Group are a staple among many of the nation's largest 401(k) plans.  As of November 30, 2014, Plans that offered Vanguard options included Apple, Chevron, Credit Suisse, Walt Disney, Goldman Sachs, Google, Microsoft, and Pfizer.

96.     The Morgan Stanley Small Company Growth Fund and the Morgan Stanley Mid-Cap Growth Fund consistently underperformed relative to T. Rowe Price and Vanguard funds that have similar investment strategies. The Morgan Stanley Global Real Estate Fund likewise underperformed relative to comparable funds. Accordingly, for each Fund, superior alternative

investment were readily apparent such that an adequate investigation would have uncovered those alternative.

97.     Moreover, all three Morgan Stanley funds regularly underperformed relative to their benchmarks. Indeed, the performance of the three proprietary Funds were so poor during the class period that an adequate investigation would have revealed their imprudence.  Despite their ongoing underperformance during the class period, Morgan Stanley continued to retain these Funds when any prudent fiduciary would have removed them.

98.     Morgan Stanley stood to, and did, benefit from the fees it charged Plan participants for managing the Funds. Of course, had Morgan Stanley offered any of the readily-apparent, better-performing, non-proprietary alternatives, it would have stood to lose a revenue stream worth millions of dollars. Accordingly, the process used by Morgan Stanley to select and maintain its investment options was tainted by failure of effort, competence or loyalty.

99.     Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of Plan costs and investment performance versus other available alternatives, comparisons to other similarly-sized plans, and information regarding separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

100.    Below, Plaintiffs describe in detail the performance of the Morgan Stanley Small

Company Growth Fund, the Morgan Stanley Mid-Cap Growth Fund, and the Morgan Stanley Global Real Estate Fund.

### a.   Morgan Stanley Small Company Fund

101.   The Morgan Stanley Small Company Fund invests primarily in growth-oriented stocks of smaller capitalized companies in the United States. Within the marketplace, investors measure the Fund's success or failure based on its results relative to a benchmark known as the Russell 2000 Growth Index. The Index tracks the investment results of a portfolio of 2000 small capitalization U.S. stocks with growth characteristics.

102.   During the relevant period, the Plan's assets under management in the Small Company Fund ranged between approximately $80 million and $180 million.

103.   If a participant in Morgan Stanley's 401(k) Plan sought a small-cap growth strategy, the Morgan Stanley Small Company Fund was the only option available to them.

104.   For the three-year period prior to the beginning of the class period, the Morgan Stanley Small Company Fund was clearly an underachiever relative to its benchmark.  The Morgan Stanley Small Company Fund also lagged behind a comparable T. Rowe Price Fund and a comparable Vanguard Fund that also invested primarily in growth-oriented stocks of smaller capitalized companies in the United States.

105.   From January 1, 2007 through February 28, 2010, the Morgan Stanley Small Company Fund had a negative return of -15.10%. The T. Rowe Price Fund had a negative return of -7.85%. The Vanguard Small Cap Growth Index Fund had a negative return of -10.73% and the benchmark, the Russell 2000 Growth Index, had a negative return of -11.80%.

106.   During this period, the Morgan Stanley Small Company Fund also had fees that were 46% more expensive than the better-performing T. Rowe Price Fund, and 1300% more

expensive than the better-performing Vanguard fund.

107.    A reasonable investigation in 2010 would have uncovered these readily-apparent alternative investments that were both better performing and cheaper.  In light of the available alternatives, it is inconceivable that a prudent fiduciary would have decided to force small-cap growth investors to invest in the Morgan Stanley Small Company Fund.

108.    The Morgan Stanley Fund's underperformance continued from 2010 through the class period. Morningstar Inc., a leading and well-recognized independent investment research firm specializing in fund investing and fund quality ratings, assigns mutual funds ratings from 1 to 5 stars based on how well the fund performed over the last three, five, and ten years relative to similar funds in their universe. On a scale of 1-star to 5-stars, with 1 being the worst (bottom 10%) and 5 being the best, Morningstar gave the Morgan Stanley Small Company Fund a 1-star rating for three and five years and a 2-star rating for ten years within the small company growth mutual fund universe.

109.    In 2011, Morningstar ranked the Fund as worse than 86% of all comparable small company growth funds. In 2014, Morningstar ranked the Fund worse than 99% of comparable small company growth funds; and in 2015, worse than 94% of comparable small company growth funds. As the investment advisor to the Fund, Morgan Stanley would have been aware of the investment performance of the Fund on an annual basis, both absolute and relative to its benchmark.[9]

110.    The Fund's prospectus, dated April 29, 2016, disclosed the Fund was underperforming relative to its benchmark during the past ten years by about thirty percent (30%):

---

[9] As investment advisor, Morgan Stanley would have been involved in calculating the Fund's involved performance.

| | One Year | Five Years | Ten Years |
|---|---|---|---|
| Morgan Stanley Small Company Fund IS/I [10] | -9.52% | 7.12% | 5.93% |
| Russell 2000 Growth Index | -1.38% | 10.67% | 7.95% |

111.    From the beginning of the class period in August 2010 through February 2016, when Morgan Stanley removed the fund from the Plan, the performance of the Morgan Stanley Fund was significantly below that of the Russell 2000 Growth Index, the T. Rowe Price Institutional Small Cap Stock Fund and the Vanguard Small Cap Growth Index Fund.

112.    The chart listed below shows the relative performances:

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|---|---|---|---|
| Morgan Stanley Small Company Fund | 62.87% | 9.27% | $162.7 million |
| T. Rowe Price Institutional Small Cap Stock Fund | 110.64% | 14.41% | $210.6 million |
| Vanguard Small Cap Growth Index Fund | 97.16% | 13.15% | $197.1 million |
| Russell 2000 Growth Index | 96.52% | 13.07% | |

113.    During this period, the Fund suffered mass redemptions as investors in droves sought to distance themselves from the Fund and Morgan Stanley's investment advisory services. As investment advisor to the Fund, Morgan Stanley would have been aware of the redemptions. Despite chronic underperformance and mass redemptions, Morgan Stanley continued to offer its

---

[10] The Morgan Stanley Small Companies Fund IS and the Morgan Stanley Small Companies Fund I are two share classes of the same Fund.  The IS Class was introduced to the Plan on February 14, 2014.

Fund in the Plan.

114.    Indeed, Morgan Stanley's decision to retain the Small Company Fund cannot even be justified by the Fund's fees. The fees paid by participants in the Small Company Growth Fund were *excessive* relative to both their T. Rowe Price and their Vanguard counterparts.

| Plan Investments | Expense Ratio | Comparable Lower-Cost Fund | Comparable Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Morgan Stanley Small Company Growth (MFLLX) | 0.98% | Vanguard Small-Cap Growth Index Fund (VSSIGX) | 0.07% | 1,300% |
|  |  | T. Rowe Price Small Cap Stock Fund (TRSSX) | 0.67% | 46% |

115.    The Vanguard and T. Rowe Price Funds listed above are well known, readily available and easily accessible to all investors. These superior alternative investments were readily apparent such that an adequate investigation would have uncovered them. Morgan Stanley would not have had to scour the market to find them, particularly given Morgan Stanley's presence in the investments market place.

116.    On the contrary, Morgan Stanley would likely have had to scour the market to find an offering as poor-performing as its own Fund. Indeed, the Morgan Stanley Fund was so poor performing that an adequate investigation would have revealed that it was an imprudent investment option.

117.    Nevertheless, Morgan Stanley retained the Small Company Growth Fund in the Plan when any reasonable investor would have weeded it out. It did so even long after it became

apparent that its performance was inferior to both its Russell market benchmark and to the readily apparent small company growth funds offered by T. Rowe Price and Vanguard. A fiduciary acting in the best interest of the participants and with due care would have removed the Fund from the Plan.

118.    However, Morgan Stanley had business and financial incentives to select and maintain the Fund in the Plan. This Fund paid Morgan Stanley fees approximately equal to 0.96% of the Fund's assets,[11] or between approximately $800,000 and $1.7 million per year. This by itself is suggestive of improper self-dealing.

119.    Accordingly, Morgan Stanley's process for selecting and maintaining the Fund as a Plan investment option was tainted by a failure of effort, competence and/or loyalty. The Plan and Plan participants suffered millions of dollars in losses as a result of Morgan Stanley's breach of fiduciary duty.

### b.    Morgan Stanley Institutional Mid-Cap Growth Fund

120.    Another chronic underperforming fund option through February 2016 was the Morgan Stanley Institutional Mid-Cap Growth Fund. The Fund invested primarily in companies with market capitalizations within a range of the Russell Midcap Growth Index, which is between approximately $200 million and $28 billion. The Russell Midcap Growth Index measures the performance of the mid-cap growth segment of the U.S. equity universe. Within the marketplace, investors measure the Fund's success or failure based on its results relative to the Russell Midcap Growth Index, the relevant benchmark.

121.    During the relevant period, the Plan's assets under management in the Morgan Stanley Institutional Mid-Cap Growth Fund ranged between approximately $200 million and $300

---

[11] Additionally, participants paid 0.02% fees to third parties (such as custodians, transfer agents, etc.), resulting in the total expense ratio of 0.98% that appears in the chart at ¶107, *supra*.

million.

122.   If a participant in the Plan sought to invest with a mid-cap growth strategy, the Morgan Stanley Institutional Mid-Cap Fund was the only option available to him/her.

123.   According to Morningstar, on a scale of 1-star to 5-stars, with 1 being the worst (bottom 10%) and 5 being the best (top 10%), the Fund carries a 1-star rating for three and five years, and a 2-star rating for 10 years within the mid-cap universe.  In 2011, Morningstar ranked the Fund worse than 72% of all comparable mid-cap mutual funds. In 2012, Morningstar ranked the Fund worse than 88% of all comparable mid-cap mutual funds. In 2014, Morningstar ranked the Fund worse than 87% of comparable mid-cap funds; and in 2015, worse than 88% of comparable mid-cap funds.

124.   As the investment advisor to the Fund, Morgan Stanley would have been aware of the investment performance of the Fund on an annual basis, both absolute and relative to its benchmark.[12] Given these overall investment results, the Fund was so poorly-performing that an adequate investigation would have revealed the imprudence of investing in it. Furthermore, an adequate investigation would have revealed readily-apparent superior funds with a mid-cap growth investment strategy.

125.   The Fund's prospectus, dated January 28, 2016, disclosed that the Fund was underperforming relative to its benchmark, the Russell Midcap Growth Index, on an annualized basis during the past ten years by a significant amount:

---

[12] See Note 9 *supra*

|  | One Year | Five Years | Ten Years |
|---|---|---|---|
| Morgan Stanley Mid-Cap Growth Fund IS/I [13] | -5.73 | 6.11 | 7.42% |
| Russell Midcap Growth Index | -0.20 | 11.54 | 8.16% |

126.    The Mid-Cap Fund began significantly underperforming in 2011. Despite this underperformance, Morgan Stanley kept its portfolio management team in place to manage the Fund.

127.    Beginning in 2012, the Fund suffered mass redemptions as investors fled this Fund and Morgan Stanley's investment advisory services. As investment advisor to the Fund, Morgan Stanley would have been aware of the redemptions. Despite chronic underperformance and mass redemptions, Morgan Stanley continued to offer this Fund in the Plan.

128.    After an anomalous spike in 2013, evidencing an unnerving and volatile portfolio, the Fund suffered severe underperformance in 2014.  Mass redemptions continued. Again, despite the underperformance, Morgan Stanley kept its existing portfolio management team in place to manage the Fund. The performance grew worse and mass redemptions continued unabated.  In spite of the alarming underperformance and the mass redemptions, Morgan Stanley continued to offer its inferior Fund as the sole mid-cap growth option in the Plan.

129.    Throughout the 2011-2014 period, superior alternative investments were readily available.  Except for 2013, the annual performance of the Morgan Stanley Fund was significantly below that of the Russell Midcap Growth Index, the T. Rowe Price Institutional Mid Cap Equity Growth Fund and the Vanguard Mid-Cap Growth Fund.

---

[13] The Morgan Stanley Mid Cap Growth Fund IS and the Morgan Stanley Mid Cap Growth Fund I are two share classes of the same Fund.  The IS Class was introduced on February 14, 2014.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/-Morgan Stanley |
|------|------|------|------|------|-----------|-------------------|
| Morgan Stanley Mid Cap Growth Fund (MMCGX) | -6.89% | 9.49% | 38.35% | 1.33% | 42.28% | |
| T. Rowe Price Institutional Mid Cap Equity Growth Fund (PMEGX) | -1.28% | 14.50% | 37.89% | 13.79% | 64.9% | +22.62% |
| Vanguard Mid-Cap Growth Fund (VMGMX) | -3.68% | 15.96% | 32.22% | 13.48% | 57.98% | +15.7% |
| Russell Mid Cap Growth Index | -1.65% | 15.81% | 35.74% | 11.9% | 61.8% | +19.52% |

130.    Throughout the class period, superior alternative investments were readily apparent. From the beginning of the class period in August 2010 through the February 2016, when Morgan Stanley removed the fund from the Plan, the performance of the Morgan Stanley Fund was significantly below that of the Russell Midcap Growth Index, the T. Rowe Price Institutional Mid Cap Equity Growth Fund and the Vanguard Mid-Cap Growth Fund.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $200 million |
|--------------|------------------------|------------------------|------------------------|
| Morgan Stanley Midcap Growth Fund (MMCGX) | 41.83% | 6.56% | $283.6 million |
| T. Rowe Price Institutional Mid Cap Equity Growth Fund (PMEGX) | 126.47% | 16.02% | $452.9 million |
| Vanguard Mid-Cap Growth Fund (VMGMX) | 99.94% | 13.43% | $399.8 million |
| Russell Midcap Growth Index | 107.14% | 14.16% | |

131.    Moreover, the fees associated Mid Cap Growth Fund did not justify retaining this investment. As indicated by the chart below, the fees paid by participants in the Fund were excessive relative to its Vanguard counterpart and the same as the better-performing T. Rowe fund.

| Plan Investments | Expense Ratio | Comparable Lower-Cost Fund | Comparable Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Morgan Stanley Mid Cap Growth (MMCGX) | 0.61% | Vanguard Mid-Cap Growth (VMGMX) | 0.08% | 650% |
| | | T. Rowe Price Institutional Mid Cap Growth Fund (PMEX) | 0.61% | 0% |

132.    The Vanguard and T. Rowe Price Funds listed above are well known, readily available and easily accessible to all investors.  Morgan Stanley would not have had to scour the market to find them, particularly given Morgan Stanley's presence in the investments market place.

133.    In fact, any reasonable investor would have viewed the Morgan Stanly Mid Cap Fund, which was suffering from abysmal relative performance and ranked at the bottom of its universe, as an investment option in need of weeding out. A fiduciary acting in the best interest of the participants and with due care would have removed the Fund from the Plan.

134.    Morgan Stanley had business and financial incentives to select and maintain the Fund in the Plan.  The Fund paid Morgan Stanley for investment advice and administrative services a fee of .58% of the Fund's assets, or about a $1 million a year.  This by itself is suggestive of improper self-dealing.

135.    Accordingly, Morgan Stanley's process for selecting and maintaining the Fund as a Plan investment option was tainted by a failure of effort, competence and/or loyalty. Any adequate investigation not tainted by self-interest would have revealed that the Fund was so plainly

underperforming as to be an imprudent investment. A reasonable investigation would likewise have revealed that superior alternative investments were readily apparent. As a result of Defendants' failure to prudently and loyally select and monitor the Fund's performance, the Plan and Plan participants suffered millions of dollars in losses.

### c.   Morgan Stanley Global Real Estate Fund

136.   The Morgan Stanley Global Real Estate Fund provides yet another example of a chronically poor-performing proprietary fund that Morgan Stanley loaded onto the Plan despite readily apparent alternatives.

137.   Morgan Stanley launched the Morgan Stanley Global Real Estate Fund in August 2006. The Fund invests primarily in equity securities of companies in the real estate industry located throughout the world, including the United States. Within the marketplace, investors measure the Fund's success or failure based on its results relative to a benchmark known as the FTSE EPRA/NAREIT Developed Real Estate Index. The FTSE EPRA/NAREIT Developed Real Estate Index is a market capitalization weighted index designed to reflect the stock performance of companies engaged in the North American, European and Asian real estate markets.

138.   During the relevant period, the Plan's assets under management in the Fund ranged between approximately $100 million and $182 million.

139.   If a participant sought a real estate strategy, the Morgan Stanley Global Real Estate Fund was the only option available to them.

140.   During the relevant period, the Fund underperformed relative to its FTSE EPRA/NAREIT Developed Real Estate benchmark. The Fund's prospectus, dated April 29, 2016 and for the period ending December 31, 2015, disclosed the Fund was underperforming relative to

its benchmark, the FTSE EPRA/NAREIT Developed Real Estate Index, during the past five years by about fifteen percent (15%):

|  | One Year | Five Years |
|---|---|---|
| Morgan Stanley Global Real Estate Fund IS | -0.84 | NA |
| Morgan Stanley Global Real Estate Fund I[14] | -0.94 | 6.59 |
| FTSE EPRA/NAREIT Developed Real Estate | -0.11 | 7.73 |

141.    Moreover, the Morgan Stanley Fund underperformed its benchmark, the FTSE EPRA/NAREIT Developed Real Estate in 2011, 2013, 2014 and 2015. In 2011, the underperformance was 3.21%. As the investment advisor to the Fund, Morgan Stanley would have been aware of the investment performance of the Fund on an annual basis, both absolute and relative to its benchmark.[15]

142.    During the relevant period, the Fund also underperformed relative to other comparable global real estate mutual funds that were readily available. According to Morningstar data, there are eleven comparable global real estate mutual funds that exist today and were available at the time Morgan Stanley launched the Global Real Estate Fund. Eight of the eleven comparable global real estate mutual funds performed better than the Morgan Stanley fund over the course of the class period. Neither T. Rowe Price nor Vanguard offered global real estate funds.

143.    The Prudential Global Real Estate Fund provides an example of one of the superior alternatives to the Morgan Stanley Fund that would have been readily apparent to a prudent fiduciary. The Prudential Fund had a much more mature investment track record than the Morgan Stanley Fund, dating back to 1998. During the four-year period from 2008 to 2011, Morningstar

---

[14] The Morgan Stanley Global Real Estate Fund IS and the Morgan Stanley Global Real Estate Fund I are two share classes of the same Fund. The IS Class was introduced to the Plan on February 14, 2014.

[15] See Note 9 *supra.*

ranked the Prudential Fund's investment performance in the top quartile of global real estate funds. During that same period, the Prudential Fund had better cumulative performance than Morgan Stanley and beat the Morgan Stanley Fund in every year except 2009.  In addition, according to the Prudential Fund's Annual Report, as October 31, 2015, the Prudential Global Real Estate Fund outperformed the FTSE EPRA/NAREIT Developed Real Estate Index during the prior one, five and ten years:

|  | One Year | Five Years | Ten Years |
|---|---|---|---|
| Prudential Global Real Estate Fund Z | 3.57 | 7.93 | 5.50 |
| FTSE EPRA/NAREIT Developed Real Estate | 2.73 | 7.54 | 4.71 |

144.     The Morgan Stanley Global Real Estate Fund significantly underperformed relative to the Prudential Fund beginning in 2010 and throughout the class period. The chart below shows the relative performance of the two funds from September 2010 through August 2016.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million investment |
|---|---|---|---|
| Morgan Stanley Global Real Estate Fund (MGREX) | 73.29% | 9.60% | $173.2 million |
| Prudential Global Real Estate Fund (PURZX) | 77.34% | 10.02% | $177.3 million |

145.     Moreover, the Prudential Fund outperformed the Morgan Stanley Fund in 2011, 2013, 2014, and 2015.

146.     The Prudential Fund was well known, readily available and easily accessible to investors like Morgan Stanley. The Prudential Fund and the seven other funds (out of eleven) that outperformed the Morgan Stanley fund were all readily apparent superior alternative investment

such that an adequate investigation would have uncovered them. Morgan Stanley would not have had to scour the marketplace to locate these alternative investments.

147.     Indeed, the Morgan Stanley Fund was such a poor performer that an adequate investigation would have revealed it to be an imprudent investment option. A fiduciary acting in the best interest of the participants and with due care would have removed the Fund from the Plan.

148.     Morgan Stanley, however, had business and financial incentives to select and maintain the Fund in the Plan. Throughout the class period, Morgan Stanley collected fees for itself to the tune of $1.5 million a year for services to the Global Real Estate Fund.  This by itself is suggestive of misconduct.

149.     Accordingly, Morgan Stanley's process for selecting and maintaining the Global Real Estate Fund in the Plan was tainted by a failure of effort, competence and/or loyalty. As a result of Morgan Stanley's breach of fiduciary duty, the Plan and Plan participants lost millions of dollars.

### D.     BlackRock Collective Investment Trust Life Path Portfolios

#### a.     Morgan Stanley's Business Dealings with BlackRock Created an Incentive for Morgan Stanley to Offer Plan Participants the BlackRock Products

150.     Morgan Stanley and BlackRock have a long-standing business relationship, in which BlackRock pays Morgan Stanley for a variety of services, including both brokerage services and for selling BlackRock products to Morgan Stanley's customers. Blackrock's business resulted in millions of dollars in revenue for Morgan Stanley.

151.     According to public filings with the Securities and Exchange Commission, BlackRock and certain of its affiliates made payments to Morgan Stanley out of their own profits for the sale and distribution of BlackRock funds.  These extra payments to Morgan Stanley could

have taken the form of "due diligence" payments, "listing" fees, "finders' fees," "distribution and marketing support" fees, "revenue sharing," or infrastructure support. According to the filings, these payments "may be substantial and may be significant." As will be discussed below, Vanguard offered readily apparent superior peer products. Vanguard, however, does not pay Morgan Stanley (or any other firm) for the sale and distribution of its funds.

152.    In addition, as a global investment management firm, BlackRock selects securities broker-dealers, such as Morgan Stanley, to place billions of dollars of purchase and sell orders annually for its securities transactions. BlackRock compensates these broker-dealers with asset-based fees and sales commissions. Based on information and belief, BlackRock selected Morgan Stanley as one of its top securities broker-dealers to handle its brokerage trades and paid Morgan Stanley millions of dollars of brokerage commissions to execute securities trades. As a result, BlackRock represents one of Morgan Stanley's largest revenue producing clients for its equity, fixed income and currency trading business.

153.    The fees and commissions that Morgan Stanley made from BlackRock—and two firms' deep business relationship—created incentives that tainted Morgan Stanley's investment decisions. Morgan Stanley disloyally offered its Plan participants BlackRock's retirement trusts not in service to the current and former employees to whom the company owed a fiduciary duty, but to further its business relationship with a large, important customer. Unfortunately for Morgan Stanley's Plan participants, BlackRock's inferior products ensured only that the company's retirees would lose millions of dollar due to poor performance.

      **b.**    **Morgan Stanley Imprudently and Disloyally Selected Poorly-Performing BlackRock Target Date Funds**

154.    During the relevant period, the Plan offered participants eight different target date retirement portfolios, with target retirement dates ranging from 2020 to 2055. Plan participants

invested approximately $1 billion in these target date retirement portfolios. BlackRock was the sole investment advisor for each of these trusts (the "BlackRock Life Path Trusts" or "BlackRock Trusts"). As with the Plan's offering of Morgan Stanley's six proprietary mutual funds, participants who sought a target retirement date strategy were forced to choose poor-performing and/or high-fee options from which Morgan Stanley stood to gain.

155.    Target date retirement portfolios are designed to achieve certain investment results based on the investor's anticipated retirement date. The portfolios are composed of a mix of stock, bonds and cash. Allocations are based on the target retirement date of the investor.  A portfolio of an investor with a 2020 retirement date would be weighted more heavily in bonds and cash to reduce risk, whereas the portfolio for an investor with a 2060 retirement date would be weighted more heavily in stocks. The investment advisor adjusts the portfolios over time as the target date gets closer.  Therefore, though the Plan offered eight BlackRock Trusts ranging from 2020 to 2055, any given participant-investor would realistically only have one option to choose from among those funds—the option most closely corresponding with the participant's anticipated retirement year.

156.    The BlackRock Trusts were created as collective investment trusts in February 2009 and added to the Plan shortly thereafter.  Within the marketplace, investors measure a target date fund's success or failure based on its results relative to a target date benchmark.  One such benchmark used by the Plan is the  S&P Target Date Indices[16] which measure the performance of a portfolio of stocks, bonds, and cash based upon a target retirement date.  Seven out of the eight BlackRock Life Path Trusts in the Plan underperformed relative to their respective S&P Target Date Indexes.

---

[16] The Plan's 2013 Annual Fee Disclosure identifies the S&P Target Date Index as the benchmark for each of the corresponding BlackRock Trusts

157.     Furthermore, as described below, these seven BlackRock Trusts seriously underperformed relative to comparable collective investment trusts. The most readily-apparent alternative on the market was Vanguard, which had been offering target date retirement funds since 2006. Comparably-sized Plans managed by Chevron and Amazon included Vanguard Target Date Funds as options. Each of the seven BlackRock Trusts at issue underperformed relative to the comparable Vanguard Target Retirement Trusts. Moreover, the BlackRock Life Path Trusts carried a 3-star rating from Morningstar, whereas the Vanguard Trusts carried a 5-star rating except for the 2050 and 2055 funds, which each carried a 4-star rating. Of course, as described above, Morgan Stanley's business relationships were with BlackRock, the purveyor of the new and untested funds, rather than with Vanguard, the seller of the established and well-performing funds.

158.     When Morgan Stanley decided to include the seven BlackRock Trusts in the Plan, historical performance data was available for only three of the seven funds. Prior to 2009, BlackRock did not offer any target date retirement funds ending in 2025, 2035, 2045, or 2055. Therefore, when Morgan Stanley added the 2025, 2035, 2045, and 2055 Trusts to the Plan, they were untested, without a historical track record that would have allowed a prudent investor to compare the quality of these funds to alternatives on the market. Vanguard, by contrast, had been offering target date retirement mutual funds ending in all years, including 2025, 2035, 2045, and 2055, since 2006, and therefore had a performance track record dating back to 2006.

159.     But Morgan Stanley did not merely add four untested BlackRock Trusts to the Plan. Morgan Stanley also selected the 2030, 2040, and 2050 BlackRock Trusts, which had poor historical performance indicators. BlackRock's 2030, 2040, and 2050 Trusts (which were all collective investment trusts) were clones, respectively, of BlackRock's 2030, 2040, and 2050 target date mutual funds, for which historical performance data existed. A reasonable investigation

at the time would have revealed that compared to the Vanguard target date mutual funds ending in years 2030, 2040, and 2050, the corresponding BlackRock mutual funds had inferior investment performance on a significant scale.

160.    Because the BlackRock Trusts and the predecessor BlackRock target date mutual funds are both pooled investment vehicles that invest in and hold substantially the same portfolio of securities, the gross investment performance of the two portfolios would be substantially the same. The difference in the net performance would be attributable to each vehicle's operating expenses.[17]    The same would be true for the Vanguard portfolios.  Given the similarities in the two types of vehicles, in evaluating the attributes of each potential collective investment trust option, a prudent, disinterested fiduciary would have examined and compared the historical performance track records of both the BlackRock and Vanguard target retirement date mutual funds. Accordingly, an adequate investigation would have revealed that the Vanguard target date trusts for 2030, 2040, and 2050 were readily-apparent, superior alternative investments to the BlackRock Trusts with the same target retirement dates.

161.    Moreover, a reasonable investigation into public information would have revealed that the fees charged by the Vanguard target retirement date collective investment trust options were considerably lower than fees by the BlackRock Life Path Trusts. Nevertheless, Morgan Stanley selected BlackRock over Vanguard for the Plan.

---

[17] The performance of a predecessor mutual fund (e.g. the BlackRock Life Path 2030 Fund) will be indicative of the performance of a cloned collective investment trust (e.g. the BlackRock Life Path 2030 Trust) because these investment vehicles are substantially similar. A collective investment trust is like a mutual fund but only sells to institutional investors such as 401(k) plans.  Because a collective trust does not take on retail investors, it is exempt from many regulatory requirements. Therefore, operating expenses of a collective investment trust tend to be lower than mutual fund operating expenses.

| Plan Investments | Expense Ratio | Identical Lower-Cost Option | Lower-Cost Vanguard Fee | Plan's Excess Cost |
|---|---|---|---|---|
| BlackRock Life Path 2025 NL Trust | 0.12% | Vanguard Target Retirement 2025 Trust | 0.07% | 71% |
| BlackRock Life Path 2030 NL Trust | 0.12% | Vanguard Target Retirement 2030 Trust | 0.07% | 71% |
| BlackRock Life Path 2035 NL Trust | 0.12% | Vanguard Target Retirement 2035 Trust | 0.07% | 71% |
| BlackRock Life Path 2040 NL Trust | 0.12% | Vanguard Target Retirement 2040 Trust | 0.07% | 71% |
| BlackRock Life Path 2045 NL Trust | 0.12% | Vanguard Target Retirement 2045 Trust | 0.07% | 71% |
| BlackRock Life Path 2050 NL Trust | 0.12% | Vanguard Target Retirement 2050 Trust | 0.07% | 71% |
| BlackRock Life Path 2055 NL Trust | 0.12% | Vanguard Target Retirement 2055 Trust | 0.07% | 71% |

162.    All of the shortcomings associated with the BlackRock Life Path Trusts should have raised serious questions in the mind of any prudent fiduciary about their selection. Instead, Morgan Stanley selected and retained the BlackRock Trusts, from which it stood to benefit from the fees and commissions it was earning from BlackRock.  Accordingly, Morgan Stanley's process for selecting and maintaining Plan investment options was tainted by a failure of effort, competence and/or loyalty.  If the Defendants had not imprudently selected and retained the BlackRock Life Path Trusts, the Plan would have accrued significantly more investment gains.

163.    Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of Plan costs and investment performance versus other available alternatives,

comparisons to other similarly-sized plans, and information regarding collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

164.    Below Plaintiffs describe the under-performance of the seven BlackRock Life Path Trusts at issue compared to their benchmark and to readily apparent, superior alternative investments, including the Vanguard Trust as well as two other readily-apparent alternative funds: the State Street Target Retirement Trusts and the Voya Target Solutions Trusts.

### c.    BlackRock Life Path Index 2030 NL Trust

165.    The BlackRock Life Path Index 2030 NL Trust and its predecessor were habitual underperformers. For the period from December 31, 2006 through February 28, 2010, Morningstar data shows a cumulative negative return of -11.97% for the predecessor BlackRock mutual fund, as compared with a cumulative negative return of -9.17% for the Vanguard mutual fund. Moreover, the predecessor BlackRock mutual fund exhibited extremely volatile performance between 2006 and 2010. Although the fund had periods of relative good performance in 2006 and 2008, it performed worse than 86% of comparable funds in 2007, 84% of comparable funds in 2009, and 83% of comparable funds in 2010.  Despite the extreme volatility and poor performance of the predecessor BlackRock mutual fund, and the superior performance numbers generated by

the Vanguard Fund, Morgan Stanley selected the BlackRock Life Path Index 2030 NL Trust for the Plan.

166.    The underperformance continued in the BlackRock Trust. As the fiduciary to the Plan, Morgan Stanley should have known the Trust's investment performance on an annual basis, both absolute and relative to its benchmark and comparable options. Even after three and four more years of underperformance, Morgan Stanley kept the BlackRock Trust on the Plan. The chart below illustrates a comparison of the annual performance of the Trust for the 2011-2014 period with comparable funds and benchmark.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/- BlackRock |
|------|------|------|------|------|------------|---------------|
| BlackRock LifePath 2030 Trust | -.97% | 13.39% | 14.25% | 5.96% | 32.63% | |
| Vanguard Target Retirement 2030 Trust | -1.26% | 14.40% | 20.57% | 7.28% | 40.99% | +8.36% |
| StateStreet Target Retirement 2030 Trust NL | 3.28% | 14.61% | 17.85% | 6.15% | 41.89% | +9.26% |
| Voya Target Solution 2030 Trust | -3.36% | 14.72% | 19.28% | 6.51% | 37.15% | +4.52% |
| S&P 2030 Target Date Index | -1.17% | 13.46% | 19.14% | 5.64% | 37.07% | +4.46% |

167.    The chart below illustrates the significant underperformance of the BlackRock Life Path Index 2030 NL from September 1, 2010 through February 29, 2016, versus the S&P Target

Date 2030 Index and the comparable Vanguard, State Street, and Voya collective investment trusts. The chart represents the growth of $100 million had Morgan Stanley invested it on September 1, 2010 in the BlackRock Life Path Index 2030 NL Trust and the comparable Vanguard, State Street and Voya 2030 Trusts. By February 29, 2016, the investment would have been worth $148 million in the BlackRock Trust and $162 million in the Vanguard Trust, $161 million in the State Street Trust, and $156 million in the Voya Trust.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|---|---|---|---|
| BlackRock LifePath Index 2030 Non-Lendable Trust | 48.07% | 7.40% | $148 million |
| Vanguard Target Retirement 2030 Trust | 62.56% | 9.24% | $162 million |
| State Street Target Retirement 2030 Trust NL | 61.2% | 9.07% | $161 million |
| Voya Target Solution 2030 Trust | 56.67 | 8.51 | $156 million |
| S&P Target Date 2030 Index | 57.67% | 8.63% | |

168.    Plan Participants invested approximately $125 million in the BlackRock LifePath Index 2030 NL Trust. Accordingly, approximately $26 million more would have accrued to the Plan if Morgan Stanley had loyally and prudently investigated, selected, and monitored its Plan's 2030 target date option.

### d.    BlackRock Life Path Index 2040 NL Trust

169.    The BlackRock Life Path Index 2040 NL Trust and its predecessor were also habitual underperformers. Morningstar data from December 31, 2006 through February 28, 2010

shows a cumulative negative return of -16.95% for the predecessor BlackRock mutual fund and a negative return of -10.52% for the comparable Vanguard mutual fund. Moreover, the predecessor BlackRock mutual fund exhibited extreme instability between 2006 and 2010. Although the fund had relative good performance in 2006 and 2008, it performed worse than 83% of comparable funds in 2007, 79% of comparable funds in 2009, and 81% of comparable funds in 2010. Despite the extreme volatility and poor performance of the predecessor BlackRock mutual fund, and the superior performance numbers generated by the Vanguard mutual fund, Morgan Stanley selected the BlackRock Life Path Index 2040 NL Trust for the Plan.

170.    The underperformance continued in the BlackRock Trust. As the fiduciary to the Plan, Morgan Stanley should have known the Trust's investment performance on an annual basis, both absolute and relative to its benchmark and comparable options. Even after three and four more years of underperformance, Morgan Stanley kept the Trust on the Plan. The chart below illustrates a comparison of the annual performance of the Trust in the 2011-2014 period with comparable funds and the benchmark.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/- BlackRock |
|------|------|------|------|------|------------|---------------|
| BlackRock LifePath 2040 Non-Lendable Trust | -2.59% | 15.14% | 17.47% | 6.26% | 36.35% | |
| Vanguard Target Retirement 2040 Trust | -2.48% | 15.69% | 24.47% | 7.29% | 44.97% | +8.62% |

| State Street Target Retirement 2040 Trust NL | -.21% | 15.67% | 20.95% | 5.97% | 42.38% | +6.03% |
|---|---|---|---|---|---|---|
| Voya Target Solution 2040 Trust | -5.19% | 16.02% | 22.93% | 7.29% | 41.05% | +4.7% |
| S&P 2040 Target Date Index | -2.17% | 14.69% | 22.10% | 5.69% | 40.31% | +3.96% |

171.    The chart below illustrates the significant underperformance of the BlackRock Life Path Index 2040 NL Trust from September 1, 2010 through February 29, 2016 versus the S&P Target Date 2040 Index and the comparable Vanguard, State Street and Voya collective investment trusts.   The chart represents the growth of $100 million had Morgan Stanley invested it on September 1, 2010 in the BlackRock Life Path Index 2040 NL Trust and the comparable Vanguard, State Street, and Voya 2040 Trusts.  By February 29, 2016, the investment would have been worth $153.1 million in the BlackRock Trust and $167 million in the Vanguard Trust. $162 million in the State Street Trust, and $161 million in the Voya Trust.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|---|---|---|---|
| BlackRock LifePath Index 2040 Non-Lendable Trust | 53.17% | 8.06% | $153.1 million |
| Vanguard Target Retirement 2040 Trust | 67.09% | 9.78% | $167 million |
| State Street Target Retirement 2040 NL | 62.14% | 9.18% | $162 million |
| Voya Target Solution 2040 Trust | 61.07% | 9.05% | $161 million |

| S&P Target Date 2040 Index | 62.96% | 9.28% | |
|---|---|---|---|

172.    Plan participants invested approximately $90 million in the BlackRock LifePath Index 2040 NL Trust. Accordingly, as much as $11 million more would have accrued to the Plan if Morgan Stanley had loyally and prudently investigated, selected, and monitored its Plan's 2040 option.

### e.    BlackRock Life Path Index 2050 NL Trust

173.    The BlackRock Life Path Index 2050 NL Trust and its predecessor also were habitual underperformers.  Morningstar data from June 30, 2008 (the date of inception for the predecessor BlackRock mutual fund) through February 28, 2010, shows a cumulative negative return of -13.39% for the predecessor BlackRock mutual fund and a cumulative negative return of -7.98% for the comparable Vanguard mutual fund. Moreover, the predecessor BlackRock mutual fund performed worse than 56% of comparable funds in 2009 and 74% of comparable funds in 2010. Despite the poor performance of the predecessor BlackRock mutual fund, and the superior performance numbers generated by the Vanguard mutual fund, Morgan Stanley selected the BlackRock Life Path Index 2050 NL Trust for the Plan.

174.    The underperformance continued in the BlackRock Life Path Index 2050 NL Trust. As the fiduciary to the Plan, Morgan Stanley should have known the Trust's investment performance on an annual basis, both absolute and relative to its benchmark and comparable options. Even after three and four more years of underperformance, Morgan Stanley kept the BlackRock Trust on the Plan. The chart below illustrates a comparison of the annual performance of the Trust in the 2011-2014 period with comparable funds and benchmark.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/- BlackRock |
|------|------|------|------|------|-----------|---------------|
| BlackRock LifePath 2050 Non-Lendable Trust | -3.96% | 16.76% | 20.31% | 6.51% | 39.62% | |
| Vanguard Target Retirement 2050 Trust | -2.44% | 15.76% | 24.52% | 7.29% | 45.13% | +4.51% |
| StateStreet Target Retirement 2050 Trust NL | -.20% | 15.66% | 21.08% | 5.93% | 42.38% | +2.76% |
| Voya Target Solution 2050 Trust | -4.84% | 16.07% | 23.82% | 7.16% | 44.97% | +5.35% |
| S&P 2050 Target Date Index | NA | NA | 24.13% | 5.69% | | |

175.     The chart below illustrates the significant underperformance of the BlackRock Life Path Index 2050 NL Trust during the period of September 1, 2010 through February 29, 2016 versus the S&P Target Date Index and the comparable Vanguard, State Street, and Voya collective investment trusts.  The chart represents the growth of $100 million had Morgan Stanley invested it on September 1, 2010 in the BlackRock Life Path Index 2050 NL Trust and the comparable Vanguard, State Street, and Voya 2050 Trusts.  By February 29, 2016, the investment would have been worth $159.7 million in the BlackRock Trust and $166.9 million in the Vanguard Trust, $161.5 million in the State Street Trust, and $164.9 million in the Voya Trust.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|--------------|------------------------|------------------------|------------------------|
| BlackRock LifePath Index 2050 Non-Lendable Trust | 59.71% | 8.89% | $159.7. million |

| | | | |
|---|---|---|---|
| Vanguard Target Retirement 2050 Trust | 66.95% | 9.77% | $166.9 million |
| State Street Target Retirement 2050 Trust NL | 61.58% | 9.12% | $161.5 million |
| Voya Target Solution 2050 Trust | 64.99% | 9.53% | $164.9 million |
| S&P Target Date 2050 Index | Data Not Available | | |

176.    Plan participants invested approximately $69 million in the BlackRock LifePath Index 2050 NL Trust. Accordingly, as much as $5.5 million more would have accrued to the Plan if Morgan Stanley had investigated, selected, and monitored its Plan's 2050 option loyally and prudently.

###### f.    BlackRock Life Path Index 2025 NL Trust

177.    Unlike the comparable Vanguard Target Retirement 2025 Trust, the BlackRock Life Path Index 2025 NL Trust had no predecessor mutual fund from which to analyze historical investment performance.  The 2025 NL Trust was new and untested.  Despite the lack of historical data, Morgan Stanley selected the BlackRock Life Path Index 2025 NL Trust for its Plan.

178.    As the fiduciary to the Plan, Morgan Stanley should have known the Trust's investment performance on an annual basis, both absolute and relative to its benchmark and comparable options. Even after three and four years of underperformance, Morgan Stanley kept the Trust on the Plan. The chart below illustrates a comparison of the annual performance of the Trust in the 2011-2014 period with comparable funds and benchmark.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/- BlackRock |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| BlackRock Life Path 2025 Non-Lendable Trust | .07% | 12.28% | 12.40% | 5.78% | 30.53% | |
| Vanguard Target Retirement 2025 Trust | -.33% | 13.42% | 18.22% | 7.25% | 38.56% | +8.03% |
| State Street Target Retirement 2025 Trust NL | 4.68% | 13.98% | 15.66% | 6.08% | 40.4% | +9.87% |
| Voya Target Solution 2025 Trust | -2.67% | 13.97% | 16.78% | 6.11% | 34.19% | +3.66% |
| S&P 2025 Target Date Index | -.28% | 12.51% | 17.03% | 5.56% | 34.82% | +4.29% |

179.    The chart below illustrates the significant underperformance of the BlackRock Life Path Index 2025 NL Trust from September 1, 2010 through February 29, 2016, versus the S&P Target Date 2025 Index, and the comparable Vanguard, State Street and Voya collective investment trusts.  The chart represents the growth of $100 million had Morgan Stanley invested it on September 1, 2010 in the BlackRock Life Path Index 2025 NL Trust and the comparable Vanguard, State Street, and Voya 2025 Trusts.  By February 29, 2016, the investment would have been worth $144.9 million in the BlackRock Trust and $158.4 million in the Vanguard Trust, $158 in the State Street Trust, and $153.7 million in the Voya Trust.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|---|---|---|---|
| BlackRock LifePath Index 2025 Non-Lendable Trust | 44.97% | 6.99% | $144.9 million |
| Vanguard Target Retirement | | | |

| 2025 Trust | 58.43% | 8.73% | $158.4 million |
|---|---|---|---|
| State Street Target Retirement 2025 Trust  NL | 58.06% | 8.68% | $158 million |
| Voya Target Solution 2025 Trust | 53.76% | 8.14% | $153.7 million |
| S&P Target Date 2025 Index | 53.84% | 8.15% | |

180.    Plan participants invested approximately $112 million in the BlackRock LifePath Index 2025 Trust. Accordingly, as much as $13.5 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.

### g.    BlackRock Life Path Index 2035 NL Trust

181.    Unlike the comparable Vanguard Target Retirement 2035 Trust, the BlackRock Life Path Index 2035 NL was new and untested. Accordingly, the Trust had no predecessor mutual fund from which to analyze historical investment performance. Despite the lack of historical data, Morgan Stanley selected the BlackRock LifePath Index 2035 NL Trust for its Plan.

182.    As the fiduciary to the Plan, Morgan Stanley should have known the Trust's investment performance on an annual basis, both absolute and relative to its benchmark and comparable options. Even after three and four years of underperformance, Morgan Stanley kept the Trust on the Plan. The chart below illustrates a comparison of the annual performance of the Trust in the 2011-2014 period with comparable funds and benchmark.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/- BlackRock |
|---|---|---|---|---|---|---|
| BlackRock Life Path 2035 | -1.77% | 14.26% | 15.93% | 6.13% | 34.55% | |

| Non-Lendable Trust | | | | | | |
|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2035 Trust | -2.22% | 15.33% | 22.96% | 7.26% | 43.33% | +8.78% |
| State Street Target Retirement 2035 Trust NL | 1.27% | 15.19% | 19.43% | 6.09% | 41.98% | +7.43% |
| Voya Target Solution 2035 Trust | -3.95% | 15.55% | 20.70% | 6.31% | 38.61% | +4.06% |
| S&P 2025 Target Date Index | -1.71% | 14.12% | 20.84% | 5.69% | 38.94% | +4.39% |

183.    The chart below illustrates the significant underperformance of the BlackRock Life Path Index 2035 NL Trust from September 1, 2010 through February 29, 2016 versus the S&P Target Date 2035 Index, and the comparable Vanguard, State Street and Voya collective investment trusts .  The chart represents the growth of $100 million had Morgan Stanley invested it on September 1, 2010 in the BlackRock Life Path Index 2035 NL Trust and the comparable Vanguard, State Street, and Voya 2035 Trusts.  By February 29, 2016, the investment would have been worth $150.8 million in the BlackRock Trust and $166.4 million in the Vanguard Trust, $162 million in the State Street Trust, and $159.5 million in the Voya Trust.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|---|---|---|---|
| BlackRock LifePath Index 2035 Non-Lendable Trust | 50.86% | 7.76% | $150.8 million |
| Vanguard Target Retirement 2035 Trust | 66.49% | 9.71% | $166.4 million |
| State Street Target Retirement 2035 Trust NL | 62.15% | 9.19% | $162 million |

| | | | |
|---|---|---|---|
| Voya Target Solution 2035 Trust | 59.55% | 8.86% | $159.5 million |
| S&P Target Date 2035 Index | 60.81% | 9.02% | |

184.    Plan participants invested approximately $200 million in the BlackRock LifePath Index 2035 Trust. Accordingly, as much as $32 million more would have accrued to the Plan if Morgan Stanley had investigated, selected and monitored its Plan's 2035 option loyally and prudently.

### h.    BlackRock Life Path Index 2045 NL Trust

185.    Unlike the comparable Vanguard Target 2045 Trust, the BlackRock Life Path Index 2045 NL Trust had no predecessor mutual fund from which to analyze historical investment performance.  The BlackRock LifePath Index 2045 NL Trust was new and untested.  Despite the lack of historical data, Morgan Stanley selected the BlackRock LifePath Index 2045 NL Trust for its Plan.

186.    As the fiduciary to the Plan, Morgan Stanley should have known the Trust's investment performance on an annual basis, both absolute and relative to its benchmark and comparable options. Even after three and four years of underperformance, Morgan Stanley kept the Trust on the Plan. The chart below illustrates a comparison of the annual performance of the Trust in the 2011-2014 period with comparable funds and benchmark.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/- BlackRock |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| BlackRock Life Path 2045 Non-Lendable Trust | -3.32% | 15.91% | 18.96% | 6.38% | 37.93% | |
| Vanguard Target Retirement 2045 Trust | -2.46% | 15.74% | 24.44% | 7.29% | 45.01% | +7.08% |
| State Street Target Retirement 2045 Trust NL | -,18% | 15.66% | 21.08% | 5.93% | 42.49% | +4.56% |
| Voya Target Solution 2045 Trust | -4.89% | 15.99% | 23.80% | 6.99% | 41.89% | +3.96% |
| S&P 2045 Target Date Index | -1.59% | 13.96% | 19.89% | 6.60% | 38.86 | +.93% |

187.    The chart below illustrates the significant underperformance of the BlackRock Life Path Index 2045 NL Trust from September 1, 2010 through February 29, 2016 versus the S&P Target Date Index and the comparable Vanguard, State Street, and Voya collective investment trusts.   The chart represents the growth of $100 million had Morgan Stanley invested it on September 1, 2010 in the BlackRock Life Path Index 2045 NL Trust and the comparable Vanguard, State Street and Voya 2045 Trusts.  By February 29, 2016, the investment would have been worth $156.1 million in the BlackRock Trust and $169.9 in the Vanguard Trust, $161.5 million in the State Street Trust, and $165.7 million in the Voya Trust.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|---|---|---|---|
| BlackRock LifePath Index 2045 Non-Lendable Trust | 56.17% | 8.44% | $156.1 million |

| | | | |
|---|---|---|---|
| Vanguard Target Retirement 2045 Trust | 66.97% | 9.77% | $169.9 million |
| State Street Target Retirement 2045 Trust | 61.59 | 9.12% | $161.5 million |
| Voya Target Solution 2045 Trust | 65.77% | 9.63% | $165.7 million |
| S&P Target Date 2045 Index | 64.30% | 9.45% | |

188.    Plan participants invested approximately $80 million in the BlackRock LifePath 2045 Fund. Accordingly, as much as $7.3 million more would have accrued to the Plan if Morgan Stanley had investigated, selected and monitored its Plan's 2045 option loyally and prudently.

### i.    BlackRock Life Path Index 2055 NL Trust

189.    Unlike the comparable Vanguard Target 2055 Trust, the BlackRock Life Path Index 2055 NL Trust had no predecessor mutual fund from which to analyze historical investment performance.  The BlackRock LifePath Index 2055 NL Trust was new and untested.  Despite the lack of historical data, Morgan Stanley selected the BlackRock LifePath Index 2055 NL Trust for its Plan.

190.    As the fiduciary to the Plan, Morgan Stanley should have known the Trust's investment performance on an annual basis, both absolute and relative to its benchmark and comparable options. Even after three and four years of underperformance, Morgan Stanley kept the Trust on the Plan. The chart below illustrates a comparison of the annual performance of the Trust in the 2011-2014 period with comparable funds and benchmark.

| Fund | 2011 | 2012 | 2013 | 2014 | Cumulative | +/- BlackRock |
|---|---|---|---|---|---|---|
| BlackRock Life Path 2055 Non-Lendable Trust | -4.31% | 17.50% | 21.48% | 6.59% | 41.26% | |
| Vanguard Target | -2.23% | 15.69% | 24.41% | 7.27% | 45.14% | +3.88% |

| | | | | | |
|---|---|---|---|---|---|
| Retirement 2055 Trust | | | | | |
| State Street Target Retirement 2055 Trust NL | Not Available | | | | |
| Voya Target Solution 2055 Trust | -4.84% | 16.07% | 23.82% | 7.16% | 42.21% | +.95% |
| S&P 2055 Target Date Index | Not Available | Not Available | 24.96% | 5.64% | | |

191.    The chart below illustrates the significant underperformance of the BlackRock Life Path Index 2055 NL Trust during the period of November 1, 2010 through February 29, 2016 versus the Dow Jones Index and a comparable Vanguard Trust.  The chart represents the growth of $100 million had Morgan Stanley invested it on November 1, 2010 in the BlackRock Life Path Index 2055 NL Trust and the Vanguard Target Retirement 2055 Trust and Voya Target Solution 2055 Trust.  By February 29, 2016, the investment would have been worth $142.5 million in the BlackRock Trust, and $148.5 million in the Vanguard Trust and $145 million in the Voya Trust. For a $42 million fund, as much as $2.4 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.

| Name of Fund | Cumulative Performance | Annualized Performance | Growth of $100 million |
|---|---|---|---|
| BlackRock LifePath Index 2055 Non-Lendable Trust | 42.56%% | 6.88% | $142.5 million |
| Vanguard Target Retirement 2055 Trust | 48.52%% | 7.7% | $148.5 million |
| Voya Target Solution 2055 Trust | 45.47% | 7.29% | $145 million |

| S&P Target Date 2055 Index | Data Not Available | | |
|---|---|---|---|

192.     Plan participants invested approximately $42 million in the BlackRock LifePath Index 2055 NL Trust. Accordingly, as much as $2.4 million more would have accrued to the Plan if there had been no breach of fiduciary duty by Morgan Stanley.

### D.  Other Equities and Bond Investment Options

193.     The Plan also offered participants other poor-to-mediocre investment options.  One example is the BlackRock Liquidity Fund, which is a money market or stable value fund whose net asset value is designed to stay constant at $1 per share.   Given the poor-to-mediocre performance of a majority of the Plan options available to participants, many participants sought shelter in the "safe" confines of the BlackRock Liquidity Fund. With over $600 million in Plan assets, it represented approximately 10% of the Plan's assets excluding Morgan Stanley's common stock. Unfortunately, like most of the other options in the Plan, the BlackRock Liquidity Fund performed poorly throughout the class period relative to the 3 Month U.S. Treasury Auction Rate and a comparable Vanguard fund.

194.     Other poor to mediocre performing options included the following:

  a.  The Systematic Financial Management Mid-Cap Value Portfolio, which has been a consistent underperformer relative to its benchmark, the Russell Mid Cap Value Index, from 2012 through the present, and also underperformed a comparable Vanguard mutual fund.  According to Morningstar, the strategy carried a 2-star

rating for the past three and five years with above-average risk and below-average return.

b. The Fidelity (Pyramis) Select International Small Cap Composite, which underperformed relative to its Morningstar category of comparable portfolios throughout the class period. It carried a 3-star rating for 3-year performance and a 1-star rating for 5 years.

c. The Shenkman High Yield Composite, which underperformed relative to the Morningstar high yield bond category throughout the class period. It carried a Morningstar 3-star rating for three and five years.

195.    These investment options, together with the funds managed by Morgan Stanley and BlackRock comprised the majority of the entire Plan's assets, excluding Morgan Stanley common stock.  From many of these options, Morgan Stanley disloyally pocketed millions of dollars out of their employees' retirement savings. Furthermore, by constructing a plan with a multitude of poor to mediocre investment performers, Morgan Stanley deprived Plan participants of the ability to choose among properly vetted, superior investment options. This caused millions of dollars more in additional damages to the retirement savings of Plan participants.

196.    By providing a menu of inferior choices, Morgan Stanley steered Plan participants to its proprietary funds and left them without a fair opportunity to realize a competitive return.


**VIII.   CLASS ACTION ALLEGATIONS**

197.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

198.    In acting in a representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as a representative of, the following class:

a.    All participants and beneficiaries of the Plan from August 19, 2010 through the date of final judgment, excluding the Defendants (the "class period").

199.    This action meets the requirements of Federal Rule of Civil Procedure 23(a) and is certifiable as a class action for the following reasons:

a.    The Class includes approximately 60,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

c.    Plaintiffs' claims are typical of the claims of the Class because each was a participant during the time period at issue in this action. Plaintiffs and all participants in the Plan were similarly harmed by Defendants' misconduct. As a result of Defendants' self-dealing and imprudence, Plaintiffs and all other Plan

Participants suffered from excessive fees, deficient performance, and inadequate investment options. This directly caused each of them substantial monetary harm. Plaintiffs and all other participants' retirement savings are depleted as compared to what they could have realized in a robust and cost-effective Plan.

d.  Plaintiffs are adequate representatives of the Class because each was a participant in the Plan during the relevant period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

200.  This action may be certified as a class action under Rule 23(b)(1)(A) or (B). Prosecution of separate actions by individual participants and beneficiaries for Defendants' breaches of fiduciary duties would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

201.   Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Plaintiffs seek comprehensive reformation of the Plan to make it a more viable retirement investment option, which will benefit them and other Plan participants.

202.    Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

203.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4) – including but not limited to Defendants' liability to the class for their allegedly disloyal and imprudent conduct.

204.    Plaintiffs' counsel, Sanford Heisler LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## CAUSES OF ACTION

## COUNT I

**Breach of Duties of Loyalty and Prudence by Mismanaging the Investment Options Selected For and Retained By the Plan During the Relevant Period**
**(Violation of ERISA, 29 U.S.C. § 1104)**

205.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs.

206.    Morgan Stanley used its Plan as a strategic and financial benefit to recruit and retain workers.

207.    In joining Morgan Stanley and subsequently enrolling in the Plan, Morgan Stanley employees trusted and relied on Morgan Stanley's resources and expertise to construct and maintain a state-of-the-art 401(k) plan.

208.   At all relevant times, the Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and its assets.

209.   29 U.S.C. § 1104(a)(1) requires plan fiduciaries to act "solely in the interest" of plan participants and beneficiaries.

   a.   Subsection (A) of this section requires that the fiduciary act for the "exclusive purpose" of providing benefits to plan participants and defraying reasonable expenses of plan administration. 29 U.S.C. § 1104(a)(1)(A).

   b.   Subsection (B) adds the duty of prudence, requiring a plan fiduciary to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

210.   The scope of the fiduciary duties and responsibilities of Morgan Stanley includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses, and acting and administering the plan with the care, skill, diligence and prudence required by ERISA. Morgan Stanley is directly responsible for selecting prudent investment options, eliminating imprudent ones, evaluating and monitoring the Plan's investment on an on-going basis, and taking all necessary steps to ensure the Plan's assets are invested prudently.

211.   Morgan Stanley restricted the captive participants to an investment portfolio that underperformed relative to its 401(k) peers of like size and composition.

212.    Morgan Stanley selected and retained Plan investment options. The process for selecting and retaining the Plan's investment portfolio options is and has been based on a faulty investment process that was tainted by Defendants' self-interest and imprudence.

213.    The faulty process resulted in a plan loaded with relatively expensive and poor-to-mediocre options which substantially impaired the Plan's use, its value and its investment performance for all participants, past and present.  This process included the use of both proprietary mutual funds and target date collective investment trusts, and the retention of these options despite sustained high relative costs and mediocre and poor performance.

214.    A prudent investigation would have concluded that the process used by Morgan Stanley was causing the Plan to waste hundreds of millions of dollars of participants' retirement savings.

215.    The fact that the Plan's poor-to-mediocre investment options have caused material underperformance relative to its peers constitutes a breach of Morgan Stanley's fiduciary duty under ERISA to each and every person who was a participant in the Plan during the relevant period regardless of the investment option in which the participant had actually invested.

216.    In failing to adequately consider better-performing investments for the Plan, Defendants failed to discharge their duties with respect to the entire Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

217.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages and lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29

U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

218.   Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence— Unreasonable Fees (Violation of ERISA, 29 U.S.C. § 1104)

219.   Plaintiffs restate and incorporate the allegations of the preceding paragraphs.

220.   Morgan Stanley is directly responsible for ensuring the Plan's fees are reasonable for the services provided.

221.   Morgan Stanley entered into contracts under which Morgan Stanley and its affiliates provided investment advisory and fund administration services to the following Morgan Stanley proprietary mutual funds offered on the Plan in exchange for compensation.

Morgan Stanley Institutional Small Company Growth Fund

Morgan Stanley Institutional Mid Cap Growth Fund

Morgan Stanley Institutional Global Real Estate Fund

Morgan Stanley Institutional Emerging Markets Fund

Morgan Stanley Institutional Growth Fund

Morgan Stanley Institutional International Equity Fund

222.    Morgan Stanley's own proprietary mutual funds, which were open to Plan participants through the Plan's menu of funds, paid investment advisory and fund administration fees to Morgan Stanley. The fees were generated by regularly deducting money from mutual fund investors' accounts as "expenses."

223.    Morgan Stanley set the amount of its compensation for investment advisory and administrative services for the mutual funds in the Plan in the same manner—calculated to earn a profit—as it set its rates for all of its clients; though unlike as to its separate account clients, Morgan Stanley charged a higher rate to its proprietary mutual funds and thus to employees who were participants in the Plan.

224.    The Investment Committee approved Morgan Stanley's proprietary mutual funds for inclusion in the Plan.

225.    The Investment Committee members allowed Morgan Stanley—also a fiduciary—to make a profit from the Plan by collecting more in investment advisory and administrative services fees from the proprietary Morgan Stanley mutual funds than it collected for performing substantially the same services from its separate account clients with like assets and like investment strategies.

226.    Moreover, the Investment Committee members had a potential conflict of interest as employees of the Plan sponsor (Morgan Stanley), and failed to expressly consider the potential effect of that conflict of interest on their decision-making.

227.    By using its fiduciary authority as investment advisor to the Morgan Stanley proprietary funds to affect its own compensation and by failing to use the excess fees collected

from the proprietary Morgan Stanley mutual funds to offset fees the Plan would have otherwise had to pay, Morgan Stanley failed to discharge their duties with respect to the Plan:

    a.   Solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A); and

    b.   With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

228.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages and lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

229.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each

Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

## COUNT III

**Prohibited Transactions Concerning Investment Management
and Administrative Services Fees
(Violation of ERISA, 29 U.S.C. § 1106)**

230.   ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits fiduciaries from causing plans to engage in transactions that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest.

231.   ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits fiduciary self-dealing.

  a.   Subsection (1) provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account."

  b.   Subsection (2) provides that a fiduciary shall not "in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

  c.   Subsection (3) provides that a fiduciary shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

232.   Morgan Stanley caused the Plan to utilize the following relatively high-cost investments that generated revenue for Morgan Stanley:

> Morgan Stanley Institutional Small Company Growth Fund
> Morgan Stanley Institutional Mid Cap Growth Fund
> Morgan Stanley Institutional Global Real Estate Fund
> Morgan Stanley Institutional Emerging Markets Fund

77

Morgan Stanley Institutional Growth Fund

Morgan Stanley Institutional International Equity Fund

233. Throughout the relevant time period, Morgan Stanley deducted unreasonable fees and expense from the assets being held for the Plan that were invested in the Morgan Stanley proprietary funds. Morgan Stanley dealt with the assets of the Plan in their own interest and for their own account when they caused the Plan to pay unreasonable investment management and administrative fees to Morgan Stanley.

234. Accordingly, Morgan Stanley engaged in prohibited transactions as follows:

a. By causing the Plan to engage in transactions that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(D); and

b. By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in his own interest or for his own account in violation of 29 U.S.C. § 1106(b)(1); and

c. By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan, in his individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries, in violation of 29 U.S.C. § 1106(b)(2); and

d. By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for his/its own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, in violation of 29 U.S.C. § 1106(b)(3).

235.   Pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Morgan Stanley is liable to restore all losses suffered by the Plan as a result of these prohibited transactions and disgorge all revenues received and/or earned by Morgan Stanley resulting from the above-mentioned prohibited transactions or received in connection with the management of Plan assets or other services performed for the Plan for more than reasonable compensation.

## COUNT IV

**Breach of Duties of Loyalty and Prudence by Failing to Remove or Replace
Certain Morgan Stanley Proprietary Funds as 401(k) Plan Investment Vehicles
(Violation of ERISA, 29 U.S.C. § 1104)**

236.   Plaintiffs restate and incorporate the allegations of the preceding paragraphs.

237.   Morgan Stanley breached its duties of loyalty and prudence by selecting and then failing to timely remove as Plan investment options the following Morgan Stanley Funds (the "Morgan Stanley Funds"):

> Morgan Stanley Institutional Small Company Fund
> Morgan Stanley Institutional Mid Cap Growth Fund
> Morgan Stanley Institutional Global Real Estate Fund

238.   These Morgan Stanley proprietary funds charged high fees and exhibited poor performance during the relevant period. Morgan Stanley profited from the Plan by causing the Plan to retain Morgan Stanley's own poor-performing proprietary funds.

239.   A prudent investigation not tainted by self-interest would have revealed to a reasonably prudent fiduciary that the Morgan Stanley Funds were inferior to other readily apparent investment options.  Morgan Stanley's conduct reflects a failure to consider and obtain better-performing alternative, unaffiliated funds at the expense and to the detriment of the Plan.

240.    Had a prudent and loyal fiduciary conducted such an investigation, it would have concluded that the Morgan Stanley Funds were selected and retained for reasons other than the best interest of the Plan and were causing the Plan to waste hundreds of millions of dollars of employees' retirement savings in underperformance relative to prudent investment options available to the Plan.

241.    Morgan Stanley committed these breaches during each of the meetings of the Investment Committee that occurred periodically during each year of the relevant period.  At each of these meetings, the Investment Committee had cause to remove the Morgan Stanley Funds based on their poor performance, but failed to do so. A prudent fiduciary would have removed the Morgan Stanley Funds from the Plan.

242.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages and lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

243.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each

Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

### COUNT V

**Breach of Duties of Loyalty and Prudence by Failing to Remove or Replace
Certain Non-Morgan Stanley Funds and Portfolios as 401(k) Plan Investment Vehicles
(Violation of ERISA, 29 U.S.C. § 1104)**

244.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs.

245.    Morgan Stanley breached its duties of loyalty and prudence under 29 U.S.C. §§ 1104(a)(1)(A) and (B) by selecting and then failing to timely remove as Plan investment options the following portfolios:

> BlackRock Lifepath Index 2025 Non-Lendable Trust
> BlackRock Lifepath Index 2030 Non-Lendable Trust
> BlackRock Lifepath Index 2035 Non-Lendable Trust
> BlackRock Lifepath Index 2040 Non-Lendable Trust
> BlackRock Lifepath Index 2045 Non-Lendable Trust
> BlackRock Lifepath Index 2050 Non-Lendable Trust
> BlackRock Lifepath Index 2055 Non-Lendable Trust

246.    Morgan Stanley failed to engage in a prudent process for the selection and retention of Plan investment options.  Instead, Morgan Stanley selected and retained the portfolios despite (a) inferior historical performance relative to their benchmarks and comparable alternative options, in the case of the 2030, 2040, and 2050 funds, and (b) a totally untested track record in the case of the 2025, 2035, 2045, and 2055 funds, despite ready apparent, high-performing comparable options with extensive positive track records.

247.    Morgan Stanley had business and financial incentives to select the BlackRock Trusts. According to public filings with the Securities and Exchange Commission, BlackRock and certain of their affiliates made payments to Morgan Stanley out of their own profits for the sale and distribution of BlackRock funds.  These extra payments to Morgan Stanley could have taken the form of "due diligence" payments, "listing" fees, "finders' fees," "distribution and marketing support" fees, "revenue sharing," and infrastructure support. According to the filings, these payments "may be substantial and may be significant."

248.    In addition, based on information and belief, BlackRock selected Morgan Stanley to execute securities transactions for its securities portfolios and paid Morgan Stanley millions of dollars in commissions to do so.

249.    Had a prudent and loyal fiduciary taken these factors into consideration, it would have concluded that the Plan's investment options were selected and retained for reasons other than the best interest of the Plan and its participants and were causing the Plan to lose millions of dollars of participants' retirement savings due to underperformance relative to prudent investment options available to the Plan.

250.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages and lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

82

251.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

## Count VI

### Failure to Monitor Fiduciaries

252.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs as though fully set forth here.

253.    As alleged above, Morgan Stanley is a fiduciary under 29 U.S.C. § 1002(21), and thus bound by the duties of loyalty and prudence.

254.    The Plan states that Morgan Stanley "has the authority to control and manage the operation and administration of the Plan, make rules and regulations and take actions to administer the Plan" and "has delegated certain operational and administrative responsibilities…"

255.    The Plan further authorizes the Investment Committee to manage the investment options of the Plan.  Section 7(e) of the Plan also empowered the Board of Directors of Morgan Stanley & Co, Inc. and Morgan Stanley Domestic Holdings, Inc. to appoint and remove members of the Morgan Stanley Investment Committee.

256.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not doing so.

257.     To the extent the Investment Committee managed the assets of the Plan, the Board of Directors' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

258.     The Board of Directors breached its fiduciary monitoring duties by, among other things:

    a.   failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.   failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the self-interested incentives for selecting the proprietary mutual funds and the BlackRock Trusts, the unreasonable administrative and investment management fees, and consistent underperforming Plan investments in violation of ERISA;

    c.   failing to ensure that the monitored fiduciaries considered the ready availability of comparable investment options to such a jumbo plan, including lower-cost share classes of the identical mutual funds, still lower-cost separate accounts, and lower-cost collective trusts, that charged far lower fees than the Plan's mutual fund options; and

    d.   failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive-cost investments, and options that did not even keep up with a majority of funds with comparable investment strategies, all to the detriment of Plan participants' retirement savings.

259.    As a consequence of these breaches of the fiduciary duty to loyally and prudently select investments and monitor their performance, the Plan failed to accrue millions of dollars of additional investment performance and moreover suffered very substantial losses.  Had the Board of Directors discharged its fiduciary monitoring duties loyally and prudently as described above, the losses suffered by the Plan would have been avoided.  Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and Plaintiffs and other Plan participants, lost millions of dollars in their retirement savings.

260.    Pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are personally liable to make good and restore to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

261.    Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan $150 million in losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from

future ERISA violations;

- reform the Plan to render it compliant with ERISA;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the Class, appoint Plaintiffs as class representatives, and appoint Sanford Heisler, LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and/or the common fund doctrine;

- order the payment of interest to the extent it is allowed by law;

- grant reinstatement into the Plan for Plaintiff Patterson and any former Plan participant who seeks reinstatement following notice of reformations to the Plan at the conclusion of this lawsuit; and

- grant other equitable or remedial relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Constitution of the United States, Plaintiff hereby demands a trial by jury.

Dated:  October 5, 2017                          **SANFORD HEISLER, LLP**

                                     By:   _Charles H. Field_

                                           Jeremy Heisler (JH-0145)
                                           David Tracey (DT-8106)
                                           **SANFORD HEISLER, LLP**

1350 Avenue of the Americas
31st Floor
New York, New York 10019
Phone: (646) 402-5650
jheisler@sanfordheisler.com
dtracey@sanfordheisler.com

David Sanford (*Pro Hac Vice*)
**SANFORD HEISLER, LLP**
1666 Connecticut Ave. NW
Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7780
dsanford@sanfordheisler.com

Charles H. Field (*Pro Hac Vice*)
Edward Chapin, CA Bar No. 053287
**SANFORD HEISLER, LLP**
501 West Broadway
Suite 515
San Diego, California 92101
Phone:  619.577.4252
cfield@sanfordheisler.com
echapin@sanfordheisler.com

Qiaojing Zheng, CA Bar No. 294608
**SANFORD HEISLER, LLP**
111 Sutter Street
Suite 975
San Francisco, California 94104
Phone: 415-795-2013
qzheng@sanfordheisler.com

*Attorneys for Plaintiff and the Proposed Class*