USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/7/19

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 16-cv-6568 (RJS)

ROBERT J. PATTERSON, TERRI LO SASSO, AND RALPH A. COLO,

Plaintiffs,

VERSUS

MORGAN STANLEY, MORGAN STANLEY DOMESTIC HOLDINGS, INC., MORGAN STANLEY & CO., LLC, THE MORGAN STANLEY RETIREMENT PLAN INVESTMENT COMMITTEE, AND JOHN DOES 1–30,

Defendants.

OPINION AND ORDER
October 7, 2019

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiffs Robert J. Patterson, Terri Lo Sasso, and Ralph A. Colo bring this putative class action against Morgan Stanley, Morgan Stanley Domestic Holdings, Inc., Morgan Stanley & Co., LLC, the Morgan Stanley Retirement Plan Investment Committee, and a group of unnamed John Doe defendants (collectively, "Defendants"), raising various claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Now before the Court are (1) Defendants' motion to dismiss Plaintiffs' Second Amended Complaint, the operative pleading in this action; and (2) Plaintiffs' motion to strike extrinsic evidence and factual assertions in exhibits filed by

Defendants in support of their motion to dismiss. For the reasons set forth below, Defendants' motion is GRANTED, and Plaintiffs' motion is DENIED.

## I. BACKGROUND

### A. Facts

Defendant Morgan Stanley "operates various investment-related businesses, including investment banking, brokerage, and investment management" services.[1]

---

[1] The following facts are taken from the Second Amended Complaint (Doc. No. 88 (the "Complaint" or "Compl.")), documents incorporated therein by reference, and documents upon which Plaintiffs

(Compl. ¶ 31.) Morgan Stanley offers its employees the opportunity to invest in the Morgan Stanley 401(k) Retirement Plan, which is an "individual account," defined-contribution plan. (Doc. No. 94-1 (the "Plan").) Under the terms of the Plan, "[i]ndividual accounts are maintained for each Plan participant" and are "credited with the participant's contributions, allocations of [Morgan Stanley's] contributions, and Plan earnings." (Doc. No. 94-2 at 8.) Individual Plan participants select the investments made on their behalf from a set menu of "investment options offered by the Plan." (*Id.*) The individual Plan participant's contributions and investment choices determine the individual's retirement benefits – "[t]he benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account." (*Id.*; *see also* Compl. ¶ 6.) Approximately 60,000 current and former employees have invested in the Plan. (Compl. ¶¶ 1–2, 6.)

Throughout the class period, Defendants Morgan Stanley Domestic Holdings, Inc. ("MSDH") and Morgan Stanley & Co., LLC (or its predecessor, Morgan Stanley & Co., Inc.) ("MSC") served as the "sponsor" of the Plan. (Compl. ¶¶ 33–34.) In that capacity, MSDH and MSC – and the boards of directors of those entities – "appointed members to the investment committee that was responsible for the management of the investment funds in the plan." (*Id.*) MSDH and MSC also "had the authority to remove

members of the investment committee and to amend and terminate the Plan." (*Id.*)

Defendant Morgan Stanley Retirement Plan Investment Committee (the "Investment Committee") "was established to manage the assets of the Plan." (*Id.* ¶ 35.) In that role, the Investment Committee "controlled the menu of investments that were available to Plan participants," selecting various investment products from which participants could choose. (*Id.* ¶ 69.) Although Plaintiffs never allege the precise set of investment options offered to Plan participants, Plan offerings were fluid. For example, Plan documents reflect that as of the end of 2013, participants could select from "12 mutual funds, 16 commingled or collective trust funds, one employer stock fund, and six separately managed accounts" (Doc. No. 94-2 at 8), but that a year later, participants were offered "11 mutual funds, 13 commingled or collective trust funds, one employer stock fund, and eight separately managed accounts" (Doc. No. 94-3 at 7).

Plaintiffs focus on thirteen investment options – which represent 40% of the Plan's assets and about a third of its investment options – offered for all or substantially all of the time period relevant to this suit. (Compl ¶ 65.) First, Plaintiffs challenge Defendants' decision to offer six proprietary Morgan Stanley mutual funds:  (1) the Morgan Stanley Institutional Small Company Growth Fund (the "Small Cap Fund"), (2) the Morgan Stanley Institutional Mid Cap Growth Fund (the "Mid Cap Fund"), (3) the Morgan Stanley Institutional Global Real Estate Fund (the "Global Real Estate Fund"), (4) the Morgan Stanley Institutional Emerging Markets Fund (the "Emerging Markets Fund"), (5) the Morgan Stanley Institutional Growth Fund (the "Large Cap Fund"), and (6) the Morgan Stanley Institutional International Equity Fund (the "International Equity Fund" and,

relied in bringing suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court has also considered Defendants' memorandum of law in support of their motion to dismiss (Doc. No. 93 ("Mem.")), Plaintiffs' opposition (Doc. No. 96 ("Opp'n")), Defendants' reply memorandum of law (Doc. No. 99 ("Reply")), and the declarations and exhibits attached thereto.

together with the other five Morgan Stanley funds, the "MS Funds"). (Compl. ¶ 221.) Plaintiffs assert that all six MS Funds charged fees that were improperly high (*see, e.g., id.* ¶ 76) and that three of the funds – the Small Cap Fund, the Mid Cap Fund, and the Global Real Estate Fund – performed so poorly that any reasonable fiduciary would have removed them from the array of Plan offerings (*see, e.g., id.* ¶¶ 92, 97).

Second, Plaintiffs argue that Defendants improperly included seven poorly performing target-date retirement funds offered by BlackRock, with target dates of 2025, 2030, 2035, 2040, 2045, 2050, and 2055. (*Id.* ¶¶ 64–65.) Plaintiffs allege that these seven target-date options (the "BlackRock Trusts") were either poorly performing or entirely untested when they were added to the array of Plan investment options (*id.* ¶¶ 158–159), and that the BlackRock Trusts charged inordinate fees and underperformed throughout the class period (*id.* ¶¶ 161–162). Plaintiffs allege that Defendants nevertheless continued to offer the BlackRock Trusts because they were being paid by BlackRock to do so. (*Id.* ¶ 162.)

Plaintiffs Ralph J. Patterson and Terri Lo Sasso are former Plan participants. Patterson participated in the Plan between "January 2011 [and] April 2014." (Compl. ¶ 27.) During his time as a Plan participant, Patterson invested in the Global Real Estate Fund and the International Equity Fund. (*Id.*) Plaintiffs do not allege when Plaintiff Lo Sasso began to invest in the Plan, but allege that she "was a participant . . . through October 1, 2014." (*Id.* ¶ 29.) During her time as a Plan participant, Lo Sasso invested in the Large Cap Fund, the International Equity Fund, the Emerging Markets Fund, and the BlackRock LifePath Index 2025 Non-Lendable Trust (the "2025 Trust"). (*Id.*) Plaintiff Colo, on the other

hand, "is a current participant in the Plan." (*Id.* ¶ 28.) Plaintiffs allege that, during the time period relevant to this suit, Colo invested in the Global Real Estate Fund, the Mid Cap Fund, the Large Cap Fund, the International Equity Fund, and the Emerging Markets Fund. (*Id.*)

B. Procedural History

Plaintiff Patterson filed this putative class action on August 19, 2016 (Doc. No. 1) and, on August 22, 2016, the case was assigned to Judge Abrams. The next day, however, it was reassigned to my docket. Patterson amended his complaint on January 10, 2017, naming the defendants that are currently parties to this action (Doc. No. 62), and on February 9, 2017, Defendants moved to dismiss the amended complaint (Doc. No. 63).

On April 7, 2017 – after Defendants' motion was fully briefed – Patterson requested permission to move for leave to amend his complaint a second time "and to add additional Plaintiffs" (Lo Sasso and Colo). (Doc. No. 73.) The Court granted Patterson's request (Doc. No. 86), and Plaintiffs filed their Second Amended Complaint, the operative pleading, on October 5, 2017 (Doc. No. 88). In Counts I, II, IV, V, and VI, Plaintiffs charge Defendants with various violations of the fiduciary duties imposed by ERISA. In Count III, Plaintiffs assert that Defendants violated 29 U.S.C. § 1106 by engaging in "prohibited transactions" – essentially, by self-dealing.

Defendants moved to dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on November 22, 2017. (Doc. No. 92.) Defendants argue that (1) because they did not invest in all of the funds identified in the Complaint, Plaintiffs lack standing to

bring many of the claims they now assert; (2) Plaintiffs' breach of fiduciary duty theories are not properly alleged under Rule 8; (3) several of Plaintiffs' breach of fiduciary duty claims are untimely; (4) Plaintiffs' prohibited transaction claims are barred by the ERISA statute of repose; (5) Plaintiffs' prohibited transaction claims fail as a matter of law; and (6) Plaintiffs' duty to monitor claim must be dismissed for want of a properly alleged underlying violation. Plaintiffs subsequently moved to strike certain exhibits offered by Defendants in their motion. (Doc. No. 95.) Defendants' motion was fully briefed on February 1, 2018 (Doc. No. 99), though Defendants filed notices of supplemental authority on both August 8, 2018 (Doc. No. 102) and February 13, 2019 (Doc. No. 104). Plaintiffs responded to each on August 9, 2018 (Doc. No. 103) and February 15, 2019 (Doc. No. 105), respectively. Plaintiffs filed a notice of supplemental authority on October 3, 2019. (Doc. No. 108.)

## II. LEGAL STANDARD

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the party seeking to invoke the Court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc.*, 493 F.3d at 98; *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for

relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

## III. MOTION TO STRIKE

As a preliminary matter, Plaintiffs move to "strike extrinsic evidence and factual assertions from Defendants' papers in support of their [m]otion to [d]ismiss." (Doc. No. 95 at 1.) They argue that documents not cited or only "[t]angentially [m]entioned" in the Complaint may not be considered by the Court at this stage. (*Id.* at 3.) But as Defendants point out (*see* Doc. No. 97), the documents Plaintiffs challenge are all either "referenced in the [C]omplaint, documents [Plaintiffs] relied on in bringing suit . . . , or matters of which judicial notice may be taken," *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 564 (S.D.N.Y. 2012) –

such as SEC filings, *see Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Accordingly, Plaintiffs' motion to strike is denied.

## IV. STANDING

Defendants initially challenge Plaintiffs' standing to bring claims relating to certain funds. Specifically, Defendants note that Plaintiffs' challenges relate to six Morgan Stanley proprietary funds (the MS Funds) and seven BlackRock target date trusts (the BlackRock Trusts) that were included in the set of investment options available to Plan participants. (Compl. ¶ 65.) But Plaintiffs collectively invested in just six of the thirteen challenged funds (the "Selected Funds"):

- Global Real Estate Fund (Patterson and Colo);

- International Equity Fund (Patterson, Colo, and Lo Sasso);

- Mid Cap Fund (Colo);

- Large Cap Fund (Colo and Lo Sasso);

- Emerging Markets Fund (Colo and Lo Sasso);

- The BlackRock 2025 Trust (Lo Sasso).

(*Id.* ¶¶ 27–29.) Defendants now argue that Plaintiffs lack standing to bring claims related to the seven funds in which they did not invest (the "Non-Selected Funds"). (Doc. No. 93 at 4–6.) Defendants are correct.

Article III of the United States Constitution requires that a plaintiff have suffered an "injury in fact" – that is, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted). "[T]o demonstrate a constitutionally justiciable injury under ERISA, plaintiffs must allege that they suffered specific losses as a result of the alleged breach of fiduciary duty." *In re UBS ERISA Litig.*, No. 08-cv-6696 (RJS), 2014 WL 4812387, at *6 (S.D.N.Y. Sept. 29, 2014), *aff'd sub nom. Taveras v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015). Plaintiffs plainly have standing to bring claims regarding the Selected Funds, and Defendants do not challenge their ability to do so. Rather, Defendants argue that Plaintiffs lack standing to challenge the Non-Selected Funds because the poor performance of those funds did not have any effect on the value of the assets in Plaintiffs' accounts.

The structure of the Plan supports Defendants' argument. The Plan is a defined-contribution plan: "[i]ndividual accounts are maintained for each Plan participant," with contributions credited to those accounts, and "[p]articipants direct the investment of their contributions into various investment options offered by the Plan." (Doc. No. 94-2 at 8.) The value of a Plan participant's individual retirement account is a function of his or her contributions and investment decisions; if a participant does not choose to invest in a particular offering, any change in the value of that financial product has no impact on the participant's account.

Indeed, Plaintiffs do not argue that the value of their individual accounts was impaired by the poor performance of the Non-Selected Funds. Instead, recognizing their burden to allege standing, *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016),

Plaintiffs advance several theories as to why they may continue this action as to the Non-Selected Funds. First, Plaintiffs argue that because they have styled this action as a derivative suit under 29 U.S.C. § 1132(a)(2) to recover for injuries to the Plan, they "need not allege an individualized injury." (Opp'n at 4.) In support of this theory, Plaintiffs rely on the Second Circuit's 2013 decision in *Long Island Head Start Child Development Services v. Economic Opportunity Commission of Nassau County*, which suggests that a plaintiff has properly alleged injury-in-fact when he or she brings a suit in a derivative capacity and alleges that the defendant caused an injury to the plan as a whole. 710 F.3d 57, 67 n.5 (2d Cir. 2013); *see also Leber v. Citigroup 401(k) Plan Inv. Comm.* (*Leber III*), 323 F.R.D. 145, 155 (S.D.N.Y. 2017). But *Long Island Head Start* involved a plan in which the fiduciary managed the entirety of the plan's assets on behalf of the participants. *See UBS*, 2014 WL 4812387, at *7. Under such a plan, "each participant would necessarily be harmed by any losses sustained by the plan as a result of a breach of fiduciary duty." *Id.*

The plan here, by contrast, offered Plaintiffs a range of investment options, which they could invest in – or not – as they saw fit. (Doc. No. 94-2 at 8.) Losses incurred by funds in which Plaintiffs did not invest cannot have impaired the value of Plaintiffs' individual accounts. *See UBS*, 2014 WL 4812387, at *7. Therefore, Plaintiffs have not been injured as to those funds. *See Taveras*, 612 F. App'x at 29 ("An ERISA plan participant lacks standing to sue for ERISA violations that cause injury to a plan but not individualized injury to the plan participant."); *see also Marshall v. Northrop Grumman Corp.*, No. 16-cv-06794 (AB), 2017 WL 2930839, at *8 (C.D. Cal. Jan. 30, 2017) (dismissing claims as to a fund in which plaintiffs did not invest).

The mere fact that Plaintiffs purport to bring this action in a derivative capacity does not absolve them of the need to establish a constitutional injury-in-fact on the basis of the poor performance of the Non-Selected Funds. The Court therefore disagrees with Judge Stein's conclusion in *Leber III* that, when a plan participant sues in a derivative capacity, "the fact that only some . . . alleged losses manifested themselves in the named plaintiffs' individual accounts does not deprive [them] of their standing to seek redress on behalf of the Plan for the broader injuries the Plan incurred." 323 F.R.D. at 156; *see also Beach v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 17-cv-563 (JMF), 2019 WL 2428631, at *4 (S.D.N.Y. June 11, 2019). To hold otherwise would essentially exempt derivative suits from Article III's requirement that plaintiffs suffer an individual harm. It bears noting that, in the quintessential derivative action, a plaintiff-shareholder may sue on behalf of a corporation precisely because he or she has been harmed by the diminution in the company's value caused by a defendant's breach. *See, e.g.*, *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 528 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014). The same is true of the plaintiff plan participants in *Long Island Head Start*, since the nature of the plan in that case resulted in each participant being harmed by the losses to the plan. But Plaintiffs here never invested in the Non-Selected Funds and consequently suffered no losses as a result of the underperformance of those funds. As Judge Castel recognized in *Forte v. U.S. Pension Committee*, plan participants suing in a derivative capacity must still satisfy Article III's individualized-injury requirement. No. 15-cv-4936 (PKC), 2016 WL 5922653, at *7 (S.D.N.Y. Sept. 30, 2016) (agreeing with the court in *UBS* that "in a situation . . . where

the plan participants make their own investment decisions based on options selected by the plan fiduciaries, . . . a plaintiff must still show an individualized harm in order to establish standing"). As to the Non-Selected Funds, Plaintiffs have not done so here.

Plaintiffs next argue that they have standing to raise claims as to the Non-Selected Funds because they bring this suit as a putative class action. Generally, a plaintiff may sue on behalf of a putative class – including those members of the putative class who did not suffer the exact same injury as the plaintiff – where he "plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotation marks, citations, and brackets omitted); *see id.* at 159 (recognizing that the concept of class standing allowed the plaintiff to "assert claims *on behalf of* purchasers of Certificates from other Offerings, or from different tranches of the same Offering"). "When this standard is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014).

Here, Plaintiffs arguably satisfy the first prong of the *NECA* class standing test in that they allege they were injured by Defendants' inclusion of the Selected Funds in the menu of Plan options and their investments in those funds. (Compl. ¶¶ 27–29.) Although

the same cannot be said with respect to the Non-Selected Funds, *NECA*'s first prong seemingly requires only that plaintiffs suffer *some* injury. *See NECA-IBEW Health & Welfare Fund*, 693 F.3d at 162; *see also Moreno v. Deutsche Bank Ams. Holding Corp. (Moreno II)*, No. 15-cv-9936 (LGS), 2017 WL 3868803, at *10 (S.D.N.Y. Sept. 5, 2017) (concluding that, where "Plaintiffs allege that Defendants' process for managing the Plan caused them actual injury," the first prong is generally satisfied even if the prospective class "include[es] those who invested in proprietary or non-proprietary funds offered by the Plan in which none of [Plaintiffs] invested").

Nevertheless, it is with *NECA*'s second prong – whether Defendants' alleged conduct with regard to the Non-Selected Funds "implicates the same set of concerns" as the conduct alleged in connection with the Selected Funds – that Plaintiffs' claim falters. "The 'same set of concerns' are implicated and the named plaintiff[s] ha[ve] class standing where the claims of absent class members and the named plaintiff[s] require similar inquiries and proof." *Moreno II*, 2017 WL 3868803, at *10 (quoting *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 162). Viewed at a high level, Plaintiffs' challenges to the Selected Funds and Non-Selected Funds raise similar *questions* – for example, whether the fees paid to Morgan Stanley were inappropriately high, whether the funds were improperly retained, and whether Defendants' desire to develop a business relationship with BlackRock motivated Defendants to keep the BlackRock Trusts in the Plan. But the evidence that Plaintiffs will have to put forward to establish liability will vary from fund to fund, and Plaintiffs' ability to establish liability as to decisions made in connection with one fund will do little to advance their case for liability as to other funds. *See Ret. Bd. of the Policemen's*

*Annuity & Benefit Fund of the City of Chi.*, 775 F.3d at 161–62; *see also DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 29 (2d Cir. 2014) (rejecting class standing where "[e]ntirely unique evidence" would be required to prove the various claims); *cf. Leber III*, 323 F.R.D. at 157 (finding class standing where "plaintiffs *do* have a clear path forward to demonstrating defendants' misconduct without undertaking . . . [a] fund-by-fund analysis"). For example, Plaintiffs will need to prove an entirely separate set of facts to establish that the fees charged for the Small Cap Fund were inappropriately high than they will to prove that the fees for the Mid Cap Fund were improper. Similarly, as Plaintiffs' allegations reveal, the facts underlying Plaintiffs' assertion that Defendants improperly continued to offer the Small Cap Fund despite its poor performance are almost entirely distinct from the facts Plaintiffs will need in order to prove that Defendants improperly continued to offer the Mid Cap Fund. In short, Plaintiffs' claims will undoubtedly require a fund-by-fund analysis for all thirteen funds identified in Plaintiffs' Complaint. Thus, the mere fact that Plaintiffs have brought this suit as a putative class action is insufficient to provide them with Article III standing to bring claims regarding the Non-Selected Funds.

Finally, in a last-ditch effort to assert Article III standing as to the Non-Selected Funds, Plaintiffs contend that they were in fact individually harmed because the inclusion of the Non-Selected Funds "undermined the plan as a whole" by robbing Plaintiffs of their "right to choose from superior investment options." (Opp'n. at 4 (quoting Compl. ¶ 65).) Plaintiffs cite no source in the statute for such a "right," or any other basis for concluding that the deprivation of the "right to choose from superior investment options" is enough to establish standing under ERISA. Although not offered by Plaintiffs as supplemental authority, the Court is aware of only one case to recognize anything even approaching this "right." *See Sacerdote v. N.Y. Univ. (Sacerdote II)*, No. 16-cv-6284 (KBF), 2018 WL 840364, at *7 (S.D.N.Y. Feb. 13, 2018). In that case, Judge Forrest concluded that "the alleged foregone opportunities from funds that were not included and the alleged reduction in choice that resulted is an alleged injury in fact." *Id.* But that case is neither controlling nor persuasive authority since its sole source of support comes from *Ross v. Bank of America, N.A.*, 524 F.3d 217, 223 (2d Cir. 2008), which is not even an ERISA case. Rather, *Ross* held that the harm resulting from reduced choices was an adequate injury for an antitrust claim – a context in which the "right" to make a choice in any given market is clearly a principal purpose of the statute. The same is not true of ERISA, which is aimed at providing employees with secure pensions, not necessarily broad investment choices. *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) ("ERISA does not guarantee substantive benefits . . . [but] instead[] seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures."). Thus, to the extent that Plaintiffs' alleged injury is premised on the deprivation of their right to choose from superior investment options, the Court finds this theory insufficient to form a basis for standing.

\* \* \*

For all these reasons, the Court finds that Plaintiffs lack standing to bring this suit as to the Non-Selected Funds, and that their claims regarding those funds must therefore be dismissed.

## V. PLAINTIFFS' REMAINING CLAIMS

### A. Breach of Fiduciary Duty

With respect to the Selected Funds, Plaintiffs claim that Defendants violated the duty of loyalty, the duty of prudence, and the duty to monitor imposed by ERISA.[2]

The duty of loyalty is based in 29 U.S.C § 1104(a)(1), which provides that a fiduciary must act "solely in the interest of the participants and beneficiaries" of the plan, and 29 U.S.C § 1104(a)(1)(A), which provides that a fiduciary shall act "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries [and] defraying reasonable expenses of administering the plan." "The Second Circuit has described the duty as one requiring a fiduciary to act . . . with an 'eye single to the interests of the participants and beneficiaries.'" *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y. 2018) (quoting *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003)), *aff'd sub nom. O'Day v. Chatila*, 774 F. App'x 708 (2d Cir. 2019). The duty of prudence is grounded in 29 U.S.C. § 1104(a)(1)(B), and requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise with a like character and like aims." 29 U.S.C. § 1104(a)(1)(B). Plaintiffs assert that Defendants breached these duties by (1) including in the menu of Plan options the MS Funds, which paid fees to Morgan Stanley and charged Plan participants higher fees than it charged other investors (Count II, Compl. ¶¶ 219–229); (2) continuing to offer the Mid Cap Fund and Global Real Estate Fund despite their poor performance (Count IV, Compl. ¶¶ 236–243); and (3) "selecting and then failing to timely remove" the poorly performing BlackRock Trusts "as Plan investment options" (Count V, Compl. ¶¶ 244–251).

The duty to monitor, although not explicitly imposed by statute, flows from the other duties set out in Section 1104(a) and "require[s] those fiduciaries with the power to appoint and remove plan fiduciaries to monitor the performance of those appointees." *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 366 (S.D.N.Y. 2009). In Count VI, Plaintiffs assert that Defendants breached this duty by entirely failing to oversee the operation of the Plan. (Count VI, Compl. ¶¶ 252–260.)

"To state a claim for breach of fiduciary duty under ERISA, Plaintiffs must adequately allege that (1) Defendants were fiduciaries of the plan who, (2) while acting within their capacities as plan fiduciaries, (3) engaged in conduct constituting a breach of an ERISA fiduciary duty." *Gearren v. McGraw-Hill Cos., Inc.*, 690 F. Supp. 2d 254, 261 (S.D.N.Y. 2010). For purposes of this motion, Defendants concede that the Complaint appropriately pleads the first and second elements as to Counts II, IV, V, and VI. Instead, Defendants argue that Plaintiffs have not properly alleged violations of the fiduciary duties imposed by ERISA. The Court will address each of Plaintiffs' counts in turn.[3]

---

[2] Throughout their Complaint, Plaintiffs treat all Defendants as fiduciaries within the meaning of ERISA. (*See, e.g.*, Compl. ¶ 1.) Defendants do not dispute this characterization, and thus the Court assumes for purposes of this motion that all Defendants are in fact ERISA fiduciaries.

[3] In Count I, Plaintiffs raise a generalized claim that unspecified breaches of Defendants' fiduciary duties caused the Plan – as a whole – to underperform. Neither party addresses this count in their briefs,

### 1. Count II – Fees Associated with the MS Funds

Plaintiffs first allege that Defendants breached their duty of loyalty by offering the MS Funds to Plan participants and charging higher advisory and administrative fees to the Plan than it charged to "separate account clients" with similar assets and investment strategies "for performing substantially the same services." (Compl. ¶ 225; *see also id.* ¶ 76.) It bears noting that Plaintiffs do not assert that Defendants breached their duty of loyalty by simply including the proprietary MS Funds in the set of investment options available to Plan participants.[4] (*See* Opp'n at 7–8.) Nor do Plaintiffs argue that Plan participants who allocated portions of their retirement investments to the MS Funds were charged higher fees than other – i.e., outside – investors in the MS Funds. Rather, Plaintiffs allege that outside investors (such as the New York State Employee Retirement System) that hired Morgan Stanley to manage their "separate accounts" (the outside investors' portfolios) often made "the same investments" and pursued

"similar investment strategies" as Morgan Stanley's mutual funds, but were charged lower fees. (Compl. ¶ 12.) Therefore, Plaintiffs' theory boils down to an allegation that Defendants either did not (1) offer Plan participants the opportunity to invest in "separate accounts" that replicated the strategies of the MS Funds, but with reduced fees (*see* Opp'n at 9 ("Morgan Stanley should have selected better-priced investments that were sitting under its own nose – its *own* variety of financial solutions.")), or (2) unilaterally discount the fees associated with the MS Funds to equal those charged to its separate account clients (Compl. ¶ 88 ("The total fees that Morgan Stanley charges participants should at least be no *worse* than what it charges its separate account clients with similar amounts of assets under management and identical investment strategies.")). Under either framing, Plaintiffs' theory must be dismissed.

To the extent Plaintiffs argue that Defendants should have provided Plan participants the opportunity to participate in separate accounts replicating the strategies of the various MS Funds, Plaintiffs fail to allege precisely how that scenario would not itself be barred by ERISA. ERISA fiduciaries are forbidden from "deal[ing] with the assets of the plan in [their] own interest or for [their] own account." 29 U.S.C. § 1106(b). In fact, in Count III, Plaintiffs allege that Defendants engaged in a similar prohibited transaction when "Morgan Stanley dealt with the assets of the Plan in their own interest and for their own account when they caused the Plan to pay unreasonable investment management and administrative fees to Morgan Stanley." (Compl. ¶ 233.) To be sure, many exemptions to this rule exist. For instance, ERISA fiduciaries may offer a "common or collective trust or pooled investment fund maintained by a party in interest who is a

---

which focus entirely on the sufficiency of the factual allegations that underlie Counts II, IV, V, and VI. The Court finds that it is duplicative of Counts II, IV, and V, and therefore it rises and falls with those claims.

[4] In the Complaint, Plaintiffs assert that Defendants' conduct in connection with the fees charged by the MS Funds violated both the duties of loyalty and prudence. (Compl. ¶¶ 219–229.) However, in their opposition to Defendants' motion to dismiss, Plaintiffs address only the duty of loyalty and make only a passing reference to "high fees" when discussing the duty of prudence. (Opp'n at 12; *see id.* at 7–10.) Accordingly, the Court finds that Plaintiffs have abandoned any separate duty of prudence claim as to the fees charged in connection with the MS Funds. In any event, as stated *infra* at 15–16, Plaintiffs have failed to plead facts sufficient to demonstrate that Defendants breached the duty of prudence.

bank or trust company supervised" by a government agency, or "a pooled investment fund of an insurance company." 29 U.S.C. § 1108(b)(8). Federal regulations also set forth exemptions from Section 1106(b), including, as relevant here, Prohibited Transaction Exemption 77-3 ("PTE 77-3"), which exempts certain transactions involving *mutual funds* from the restrictions of Section 1106(b). *See* Prohibited Transaction Exemption 77-3, 42 Fed. Reg. 18,734, 18,735 (Apr. 8, 1977); *see also supra* Section V Part B. But the Court is not aware of an exemption which permits fiduciaries to invest plan assets in single-client "separate accounts" in which the fiduciary has an interest or receives fees. And even if some exemption did apply, certainly nothing in ERISA requires a Plan to offer separate accounts in lieu of reasonably-priced mutual funds. *See Taylor v. United Techs. Corp.*, No. 3:06-cv-1494 (WWE), 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), *aff'd,* 354 F. App'x 525 (2d Cir. 2009) ("ERISA does not require a fiduciary to take any particular course so long as the fiduciary's decision meets the prudent person standard." (internal quotation marks and citations omitted)). For these reasons, the Court is not persuaded that Plaintiffs have stated a claim for breach of the duty of loyalty based on the fees associated with the MS Funds.

To the extent Plaintiffs allege that Defendants breached their duty of loyalty by either charging Plan participants the same fees as other participants in the MS Funds, or by not unilaterally reducing the fees to equal those charged to separate account clients, Plaintiffs' theory is likewise untenable. Nothing in ERISA requires Morgan Stanley to unilaterally offer Plan participants a discounted fee as to the MS Funds, or to reduce the market-based fees of the MS Funds to equal those charged to separate account clients simply because those funds are included in an ERISA plan. Of course, nothing in ERISA *prevents* Defendants from offering a discount for Plan participants. But "[w]hen unrelated plans can invest in a pooled account . . . at a fee that the unrelated plans' fiduciaries . . . have determined is reasonable, there is a reasonable basis for allowing the [plan sponsor's] own plan to make an identical investment in the same account at the same fee." *Dupree v. Prudential Ins. Co. of Am.*, No. 99-cv-8337 (JJ), 2007 WL 2263892, at *41 (S.D. Fla. Aug. 10, 2007); *see also Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (approving the inclusion of fund options where "th[e] funds were also offered to investors in the general public, and so the expense ratios necessarily were set against the backdrop of market competition"). Defendants therefore did not violate their duty of loyalty by offering Plan participants the opportunity to invest in the MS Funds subject to the same fees applicable to non-Plan investors. Count II must therefore be dismissed.

2. Count IV – Continuing to Offer the Mid Cap Fund and Global Real Estate Fund

Plaintiffs next assert that Defendants breached their duties of prudence and loyalty by offering, and not removing from the menu of Plan investment options, the Mid Cap Fund and the Global Real Estate Fund.[5] (Compl. ¶¶ 236–243.) The Court will address each of Plaintiffs' assertions in turn.

---

[5] Plaintiffs make similar allegations about the Small Cap Fund. However, as noted above, Plaintiffs did not invest in the Small Cap Fund, and therefore lack standing to challenge its offering and continued inclusion in the Plan.

### a. Duty of Prudence

As noted above, the duty of prudence requires an ERISA fiduciary to exercise "the care, skill, prudence, and diligence under the circumstances . . . that a prudent [person] acting in a like capacity . . . would use." 29 U.S.C. § 1104(a)(1)(B). To that end, "[t]he duty of prudence standard focuses 'on a fiduciary's conduct in arriving at an investment decision, not on its *results*.'" *Leber III*, 323 F.R.D. at 157 (emphasis added) (quoting *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.* ("*PBGC*"), 712 F.3d 705, 716 (2d Cir. 2013)). That said, "a claim for breach of fiduciary duty under ERISA may survive a motion to dismiss – even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary – if the complaint allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *PBGC*, 712 F.3d at 718 (internal quotation marks omitted). In so alleging, "plaintiffs 'cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price,'" and it is not "necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions." *Id.* (alterations in original) (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011)). Instead, to survive a motion to dismiss pursuant to Rule 12(b)(6), Plaintiffs must allege facts sufficient to raise the plausible inference that Defendants breached their duty of prudence in view of the facts available *at the time* they made the challenged decisions. *Id.* at 716. Plaintiffs do not meet this threshold.

Plaintiffs assert that Defendants' inclusion of the Mid Cap Fund among the Plan offerings was imprudent because (1) the Mid Cap Fund underperformed relative to its benchmark, the Russell Midcap Growth Index, on a one-, five-, and ten-year basis as measured in January 2016 (Compl. ¶ 125); (2) the Mid Cap Fund's cumulative performance over the class period was worse than both its benchmark (the Russell Midcap Growth Index) and two alleged comparators, the T. Rowe Price Institutional Mid Cap Equity Growth Fund and the Vanguard Mid-Cap Growth Fund (*id.* ¶ 130); (3) the Mid Cap Fund underperformed vis-á-vis its benchmark and two alleged comparator funds in 2011, 2012, and 2014 (*id.* ¶ 129); (4) the Mid Cap Fund had lower ratings from Morningstar – a ratings agency upon which both parties rely – than other comparable investment options (*id.* ¶ 123); and (5) the Mid Cap Fund sustained "mass redemptions" in 2012 and 2014 (*id.* ¶¶ 127–128).

Plaintiffs' assertions that the Mid Cap Fund performed worse than the Russell Midcap Growth Index – the relevant benchmark for "the mid-cap growth segment of the U.S. equity universe" (*id.* ¶ 120) – on a one-, five-, and ten-year basis as measured in a prospectus dated January 28, 2016 do not plausibly establish that Defendants acted imprudently at any particular point during the class period. "To state a claim for a breach of the fiduciary duty of prudence, the plaintiff must allege *non-conclusory* factual content raising a *plausible* inference of misconduct and may not rely on the vantage point of hindsight." *Leber v. Citigroup 401(K) Plan Inv. Comm.* (*Leber II*), 129 F. Supp. 3d 4, 14 (S.D.N.Y. 2015) (internal quotation marks, citations, and brackets omitted).

Here, Plaintiffs point to average annual returns articulated in a 2016 prospectus to allege that the Mid Cap Fund's performance was so deficient that it was imprudent for Defendants to retain it. (Compl. ¶ 125.) But

this allegation relies on a prospectus and data unavailable to the fiduciaries throughout much of the class period. The same is true of Plaintiffs' comparison of the "cumulative performance" of the Mid Cap Fund to its benchmark and the two alleged comparator funds, which relies on numbers not alleged to have been available to Defendants as early as August 2010, when the class period began. (*Id.* ¶ 198.) In fact, just after the 2016 prospectus was made public, Defendants removed the Mid Cap Fund from the Plan's menu of investment options. (*Id.* ¶ 130.) Plaintiffs cannot rely on data accumulated in 2016 – when the Mid Cap Fund was removed – to demonstrate imprudence with regard to breaches alleged to have occurred earlier.

Even assuming these allegations are not improperly based on hindsight, "Plaintiffs' allegations of the Fund['s] alleged underperformance in average annual returns as compared to certain benchmark indices or alleged insufficient performance history . . . do not raise a plausible inference that a prudent fiduciary would have found [the] Fund[] to be 'so plainly risky' as to render the investments in them imprudent." *Leber II*, 129 F. Supp. 3d at 14 (quoting *PBGC*, 712 F.3d at 719). Although courts in this district have recognized that allegations of consistent, ten-year underperformance may support a duty of prudence claim, *see Sacerdote v. New York Univ.* (*Sacerdote I*), No. 16-cv-6284 (KBF), 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017), the underperformance must be substantial, *see Jacobs v. Verizon Commc'ns, Inc.*, No. 16-cv-1082 (PGG), 2017 WL 8809714, at *9 (S.D.N.Y. Sept. 28, 2017) (denying motion to dismiss prudence claim because the "fund had an average annual return of 1.74% compared to its benchmark, which returned 10.37% over that same ten-year period"). Here, Plaintiffs allege that the Mid Cap Fund had an average annual return of 7.42%

compared to its benchmark, the Russell Midcap Growth Index, which returned 8.16% over the same ten-year period. (Compl. ¶ 125.) This difference of less than one percentage point is certainly insubstantial compared to the nine-point differential in *Jacobs*. Even assuming the truth of these allegations, such a small disparity in performance relative to its benchmark does not support the inference that Defendants were imprudent to retain the Mid Cap Fund in the set of Plan offerings.

Plaintiffs' yearly comparisons of the Mid Cap Fund to its benchmark and to the two alleged comparators fare no better. Although the Mid Cap Fund lagged behind its alleged comparators in 2011, 2012, and 2014, it outperformed all of Plaintiffs' suggested alternative investments in 2013. (Compl. ¶ 129.) Though Plaintiffs might now wish that Defendants had removed the Mid Cap Fund from the array of Plan options in 2011 or 2012, the mere fact that the Mid Cap Fund did not do as well as other options does not give rise to the inference that Defendants' decision to retain that investment offering was imprudent. *See PBGC*, 712 F.3d at 718; *see also White v. Chevron Corp.* (*White I*), No. 16-cv-0793 (PJH), 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("Indeed, a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy."); *White v. Chevron Corp.* (*White II*), 752 F. App'x 453, 455 (9th Cir. 2018) (affirming dismissal of amended complaint because "allegations . . . that [the defendant] could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund" were insufficient to state a claim); *Dorman v. Charles Schwab Corp.*, No. 17-cv-00285 (CW), 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019) (observing that "three to five years . . . [is]

considered [a] relatively short period[] of underperformance" that does not imply imprudence). Put simply, the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers. If that were the case, Plan sponsors would be duty-bound to merely follow the industry rankings for the past year's results, even though past performance is no guarantee of future success. Clearly, no court has ever suggested the existence of such a duty.

To the contrary, whether an ERISA fiduciary acted prudently is measured in light of *all* the circumstances at the time the challenged decision was made. *See PBGC*, 712 F.3d at 716–17. Here, the 2013 Fee Disclosure for the Plan – upon which Plaintiffs rely in their Complaint (Compl. ¶ 23) and which the Court may therefore consider, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) – shows that in 2013 the Mid Cap Fund was still outperforming its benchmark on a five- and ten-year trailing basis. (Doc. No. 94-12 at 8.) The Plan's fiduciaries clearly adjusted to changing information, as they removed the Mid Cap Fund from the menu of Plan offerings in early 2016. (Compl. ¶ 130.) Viewed with all the information available at the time at which they decided to retain the investment, the underperformance upon which Plaintiffs now rely is not sufficient to support their duty of prudence claim. *See White I*, 2016 WL 4502808, at *17.

Similarly, that the Mid Cap Fund fell below other investment products in the Morningstar rankings (Compl. ¶ 123) does not lead to the conclusion that the Mid Cap Fund was an imprudent investment. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("No authority requires a fiduciary to pick the best performing fund."). And even viewed in light of Plaintiffs' other allegations, Plaintiffs' conclusory assertion that the Mid Cap Fund faced "mass redemptions" in 2012 and 2014 (Compl. ¶¶ 127, 128) – without more context as to the nature or circumstances surrounding those redemptions – is insufficient to push Plaintiffs' duty of prudence claim across the line of plausibility.

Plaintiffs' duty of prudence claim based on Defendants' supposedly improper retention of the Global Real Estate Fund in the menu of Plan offerings is also deficient. Plaintiffs allege that the Global Real Estate Fund (1) underperformed relative to its benchmark – the FTSE EPRA/NAREIT Developed Real Estate Index – on a one- and five-year basis in the period, as measured in 2016 (Compl. ¶ 140), and (2) performed worse than a supposed comparator fund, the Prudential Global Real Estate Fund, throughout the class period (*id.* ¶¶ 143–144). As with Plaintiffs' allegations regarding the Mid Cap Fund, these allegations are impermissibly hindsight-based. Data compiled in 2016 would not have been known to the fiduciaries earlier in the class period, and beyond that, the difference in performance – the Global Real Estate Fund's average annual return over five years was 6.59% compared to the benchmark's 7.73% – is relatively small and certainly not enough to support a claim for breach of the duty of prudence.

Plaintiffs further contend that the Global Real Estate Fund (1) performed worse than the benchmark in 2011, 2013, 2014, and 2015 (*id.* ¶ 141), and (2) lagged behind the Prudential Global Real Estate Fund in 2011, 2013, 2014, and 2015 (*id.* ¶ 145). But Plaintiffs' conclusory assertion that the Global Real Estate Fund did not perform as well as a supposedly comparable investment opportunity lacks any detail as to the extent of the investment's shortcomings or why the

Global Real Estate Fund is a comparable investment. And even assuming the funds are comparable, Plaintiffs have provided no details or facts – such as specific yearly numbers – reflecting the comparable performance. Plaintiffs therefore have provided no basis upon which the Court can assess the prudence of the Plan fiduciaries' decision to retain the Global Real Estate Fund. Such conclusory assertions are insufficient to state a claim.

Finally, Plaintiffs argue that the Mid Cap Fund and the Global Real Estate Fund charged fees that were higher than those charged by the T. Rowe Price Mid Cap Growth Fund and the Vanguard Mid-Cap Growth Fund. (*Id.* ¶ 131.) But the facts alleged in the Complaint do not give rise to a plausible inference that the Mid Cap Fund's fees were so excessive as to reflect a breach of fiduciary duty. For starters, the T. Rowe Price Mid Cap Fund charged exactly the same rate – 0.61% – as the Mid Cap Fund, which contradicts the claim that the cost of the Mid Cap Fund was too high. As for the Vanguard Mid-Cap Fund, which did indeed charge lower fees (0.08% compared to 0.61%), Plaintiffs assert in a conclusory manner that the Vanguard Mid-Cap Growth Fund was "comparable" to the Mid Cap Fund (*see, e.g., id.* ¶ 96), without ever explaining how or *why* the funds were comparable. Significantly, Plaintiffs acknowledge that both the Mid Cap Fund and the Global Real Estate Fund are "actively-managed" (Compl. ¶ 93), and the 2013 Fee Disclosure warned participants that "[a]ctively[-]managed Funds typically have higher expenses [than passively-managed funds] because the Fund manager is trying to outperform a benchmark and is therefore more actively involved in the Fund's management." (Doc. No. 94-12 at 3.) But Defendants point out – and Plaintiffs apparently concede (Opp'n at 14 n.20) – that the Vanguard Mid-Cap Fund is

passively-managed (Mem. at 11), and the 2013 Fee Disclosure notified plan participants that these funds "usually have lower fees than actively managed [f]unds and track the performance and characteristics of specified market indices, foregoing the opportunity for outperformance but reducing the risk of underperformance relative to the applicable index" (Doc. No. 94-12 at 12). Therefore, Plaintiffs' conclusory assertion that the funds were similar is belied by the facts actually set forth in and incorporated into the Complaint, which suggest that the Vanguard Mid-Cap Fund's fees cannot be meaningfully compared to Morgan Stanley's Mid Cap Fund's fees. In any event, the conclusory assertion that the Vanguard Mid-Cap Fund is a lower-cost comparator is not enough to state a claim of imprudence. *See Bekker v. Neuberger Berman Grp. LLC*, No. 16-cv-6123 (LTS) (BCM), 2018 WL 4636841, at *7 (S.D.N.Y. Sept. 27, 2018) (dismissing ERISA breach of fiduciary duty complaint in part because the complaint "[did] not allege that the [actively-managed fund and index fund] employed similar operations or investment strategies"); *Meiners*, 898 F.3d at 823–24 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice. . . . An ERISA plaintiff must offer more than 'labels and conclusions' about the fees before a complaint states a claim.'"); *see also Dorman*, 2019 WL 580785, at *5 (concluding that the fact that fees charged by the relevant fund were three times higher than fees charged by a comparable fund was insufficient on its own to state a claim for imprudence).

If anything, Plaintiffs' claims regarding the Global Real Estate Fund's fees are even more sparse than their (deficient) assertions about the Mid Cap Fund. Specifically,

Plaintiffs assert that the fund charged a 0.93% fee in 2014 (*id.* ¶ 76), but do not explain how that fee fit into the marketplace or whether any comparable fund charged a lower rate. Without more detail, Plaintiffs have failed to allege that the Global Real Estate Fund was inappropriately priced or that Defendants acted imprudently by retaining it.

For these reasons, Plaintiffs' allegations that Defendants breached their duty of prudence by continuing to offer the Mid Cap Fund and Global Real Estate Fund are insufficient to state a claim.[6] Plaintiffs' duty of prudence claim as to those funds must therefore be dismissed.

b. Duty of Loyalty

Plaintiffs also argue that Defendants "disloyally retained" the "poorly-performing proprietary funds . . . to collect fees from Plan participants." (Opp'n at 10; *see also* Compl. ¶¶ 120–149.) "To state a claim for breach of loyalty, a plaintiff must allege facts that permit a plausible inference that the defendant engaged in transactions involving self-dealing or [that] otherwise

---

[6] The two cases provided by Plaintiffs in their October 3, 2019 notice of supplemental authority (Doc. No. 108) do not change this conclusion. In *Karg v. Transamerica Corp*, No. 18-cv-134 (CM), 2019 WL 3938471, at *7 (N.D. Iowa Aug. 20, 2019), the district court concluded with little analysis that allegations of underperformance relative to both comparable funds and the relevant benchmark were sufficient to state a claim for imprudence. The district court in *Pizarro v. The Home Depot*, No. 18-cv-1566, Doc. No. 74, at 8–9 (N.D. Ga. Sept. 20, 2019), did the same, despite acknowledging that the plaintiffs failed to plead actual performance data or meaningful benchmarks. To the extent these cases stand for the proposition that conclusory allegations of underperformance are enough to state a claim for breach of fiduciary duties under ERISA, the Court disagrees.

involve or create a conflict between the trustee's fiduciary duties and personal interests." *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 688 (D. Conn. 2018) (internal quotation marks and brackets omitted). However, a plan fiduciary does not breach its duty of loyalty simply by offering the plan sponsor's financial products; rather "a plaintiff must allege plausible facts supporting an inference that the defendant acted *for the purpose* of providing benefits to itself or someone else." *Sacerdote I*, 2017 WL 3701482, at *5; *see also id.* at *6 ("[A]n act which has the effect of furthering the interests of a third party is fundamentally different from an act taken with that as a goal.").

A duty of loyalty claim may lie where a plaintiff alleges that "the defendants who were Plan fiduciaries" offered "proprietary index funds . . . [that] charged fees that were excessive compared with similar investment products" and where the defendants stood to gain from those fees. *Moreno v. Deutsche Bank Americas Holding Corp.* (*Moreno I*), No. 15-cv-9936 (LGS), 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) ("Specifically, the Complaint alleges that one proprietary index fund charged fees that were more than eleven times higher than a comparable Vanguard index fund, and this fee differential increased each year as did the Plan's investment in the proprietary fund."); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) ("The complaint alleges, moreover, that these options were chosen to benefit the trustee at the expense of the participants."). However, as described in connection with the duty of prudence claims, Plaintiffs have not properly alleged that the fees charged by the Mid Cap Fund or the Global Real Estate Fund were excessive. *See Meiners*, 898 F.3d at 824 ("[The Court cannot reasonably infer [the defendants] acted out of a motive to seed underperforming or inordinately

expensive funds if [the plaintiff] has not plausibly pled that those funds were, in fact, underperforming or inordinately expensive."). Here, the fee differential between the Mid Cap Fund (0.61%) and the Vanguard Mid-Cap Fund (0.08%) is not insignificant. However, as discussed with respect to the duty of prudence claims, Plaintiffs have failed to properly allege that the passively-managed Vanguard Mid-Cap Fund was in fact comparable to the actively-managed Mid Cap Fund. And even assuming the funds were comparable, the fee differential alone is insufficient to demonstrate disloyalty without allegations that Defendants acted "for the purpose" of providing themselves or others a benefit. *See Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) (dismissing duty of loyalty claims "[b]ecause these claims do not support an inference that defendants' actions were *for the purpose* of providing benefits to themselves or someone else and did not simply have that incidental effect"). Here, Plaintiffs offer no facts to suggest such an improper purpose. In fact, Plaintiffs' duty of loyalty allegations largely overlap with their failed duty of prudence claims. *See Sacerdote I*, 2017 WL 3701482, at *6 (refusing to allow a duty of loyalty and duty of prudence claim "collapse into a single claim"). Absent other evidence demonstrating some improper motivation, Plaintiffs have failed to plead sufficient facts demonstrating the fiduciaries acted disloyally.

\* \* \*

Because Plaintiffs fail to allege facts supporting their duty of prudence and duty of loyalty theories, Plaintiffs' breach of fiduciary duty claim in Count IV must be dismissed.[7]

### 3. Count V – BlackRock Trusts

Plaintiffs further allege that Defendants breached their fiduciary duties of prudence and loyalty by "selecting and then failing to timely remove" the BlackRock Trusts as investment options offered to Plan participants. (*Id.* ¶ 245.) As noted above, Plaintiffs only invested in – and thus only have standing to challenge – one BlackRock Trust offered by the Plan: the 2025 Trust, in which Plaintiff Lo Sasso invested. Accordingly, the Court will consider Defendants' challenges to the Complaint in the context of that Trust only.

#### a. Duty of Prudence

Plaintiffs first contend that Defendants breached the duty of prudence by offering and continuing to offer the 2025 Trust as an investment option to Plan participants. In support of this theory, Plaintiffs rely on factual allegations similar to those set out in support of their Mid Cap Fund duty of prudence claim. Specifically, Plaintiffs contend that the decision to offer and retain the 2025 Trust was imprudent because (1) the 2025 Trust underperformed compared to its benchmark (the S&P Target Date 2025 Index) and three allegedly comparable alternative investment options (the Vanguard Target Retirement 2025 Trust, the State Street Target Retirement 2025 Trust NL, and the Voya Target Solution 2025 Trust) over the class period (*id.* ¶ 179); (2) the 2025 Trust fared worse than the State Street Target Retirement 2025 Trust NL in

---

[7] Because the Court concludes that Plaintiffs here failed to plead sufficient facts to support their breach of fiduciary duty claim, the Court need not address Defendants' statute of limitations argument with respect to Count IV. (Mem. at 16.)

2011, and worse than all three investment alternatives and the benchmark in 2012, 2013, and 2014 (*id.* ¶ 178); (3) the fees associated with the Vanguard Target Retirement 2025 Trust were lower than those charged by the 2025 Trust (*id.* ¶ 161); (4) the 2025 Trust carried a lower Morningstar rating than the Vanguard Target Retirement 2025 Trust (*id.* ¶ 157); and (5) the 2025 Trust was a relatively new financial product at the time it was included in the Plan (*id.* ¶ 158).

As with the prior claims, Plaintiffs' conclusory allegations of cumulative underperformance are insufficient to state a claim, since backward-looking contentions regarding overall underperformance are improperly grounded in hindsight. *See Leber II*, 129 F. Supp. 3d at 14. Putting aside the fact that Plaintiffs have again failed to allege that the 2025 Trust may properly be compared to the three allegedly superior trusts, *see Meiners*, 898 F.3d at 823–24, Plaintiffs comparison of the trusts' yearly performance demonstrates only intermittent underperformance by the 2025 Trust. For instance, although Plaintiffs allege that the Vanguard Target Retirement 2025 Trust, the State Street Target Retirement 2025 Trust NL, the Voya Target Solution 2025 Trust, and the benchmark outperformed the 2025 Trust in some years, they concede that the 2025 Trust beat three of the four comparators in 2011 (including beating the Voya Target Solution 2025 Trust by 2.74 percentage points in 2011), beat the benchmark in 2014, and lagged closely behind the comparator trusts in 2012, 2013, and 2014. (Compl. ¶ 178.) *See White I*, 2016 WL 4502808, at *17. In short, this mixed performance is insufficient to state a claim that Defendants abdicated their duties by including the 2025 Trust in the Plan.

Plaintiffs attempt to bolster their imprudence claim by comparing the fees charged by the 2025 Trust with the fees of the Vanguard Target Retirement 2025 Trust. Once again, Plaintiffs make only a conclusory allegation that the Vanguard Target Retirement 2025 Trust is a proper comparator for the 2025 Trust, stating that "[t]he most readily-apparent alternative on the market was Vanguard." (Compl. ¶ 157.) Moreover, the fees charged by the 2025 Trust (0.12%) are only marginally higher than the Vanguard product (0.07%) that Plaintiffs cite (*id.* ¶ 161) – nowhere near the situation in *Moreno I*, where the funds at issue charged fees "eleven times higher than a comparable Vanguard index fund." 2016 WL 5957307, at *6.

Plaintiffs' reliance on the Morningstar ratings of the Vanguard offering is similarly deficient, and in any event, the mere fact that Vanguard's 2025 Retirement Trust had a higher rating than the 2025 Trust in no way tends to show that the 2025 Trust was not a suitable investment. *See Meiners*, 898 F.3d at 823 ("No authority requires a fiduciary to pick the best performing fund."). That the 2025 Trust was untested is also insufficient to establish imprudence in the selection and retention of the fund. *See Vellali*, 308 F. Supp. 3d at 682 (observing that prudence is determined by a totality of the circumstances). Moreover, the fact that Defendants ultimately removed the 2025 Trust from the set of Plan offerings (Compl. ¶ 179) supports an inference that Defendants acted within the bounds of their duties to the Plan. On the whole, Plaintiffs have failed to plausibly allege that Defendants breached their duty of prudence in connection with the decision to offer, and to continue to offer, the 2025 Trust. Accordingly, this claim must be dismissed.

b. Duty of Loyalty

Plaintiffs next argue that Defendants breached their duty of loyalty to the Plan

because their decision to offer the 2025 Trust was motivated by a desire to foster a business relationship with Blackrock (*id.* ¶¶ 150–153), even though the 2025 Trust carried a higher fee (0.12%) than the Vanguard Target Retirement 2025 Trust (0.07%) (*id.* ¶ 161). But Plaintiffs' duty of loyalty claim based on the 2025 Trust suffers from the same deficiencies that plagued its claim based on the retention of the Mid Cap Fund and the Global Real Estate Fund. As stated above, Plaintiffs have not adequately alleged that the 2025 Trust's fees were excessive or even unreasonable, in part because Plaintiffs make only conclusory allegations that the Vanguard Target Retirement 2025 Trust is a proper comparator to the 2025 Trust, *see Meiners*, 898 F.3d at 823, but also because the disparity between the fees (0.05 percentage points) is relatively small. Moreover, the mere fact that Morgan Stanley might incidentally benefit from its relationship with BlackRock is not enough to raise an inference of disloyalty by Defendants *See Cunningham*, 2017 WL 4358769, at *6. Despite their attempts to imply some quid pro quo from a common business relationship, Plaintiffs do not actually allege any facts to suggest that Defendants' business relationship with BlackRock was contingent on Defendants offering BlackRock's trusts in the Plan. In fact, Plaintiffs acknowledge that Defendants disclosed to Plan participants its relationship with BlackRock. (Comp. ¶ 151.) And the fact that Defendants ultimately removed the 2025 Trust from the Plan on February 19, 2016 (*id.* ¶¶ 167, 171) contradicts the conclusory assertion that Defendants intended to benefit BlackRock at the expense of the Plan. Put simply, the mere existence of a business relationship between two large financial institutions is not enough to lift Plaintiffs' otherwise deficient

disloyalty claims above the bar set by *Twombly*, 550 U.S. at 570. More is needed.

\* \* \*

Accordingly, Plaintiffs' Complaint fails to state a claim as to the remaining breach of fiduciary duty claims relating to the BlackRock 2025 Trust and must be dismissed.

### 4. Count VI – Duty to Monitor

As noted above, ERISA fiduciaries with the power to appoint and remove other fiduciaries owe a duty "to monitor the performance of those appointees." *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d at 366; *see also Cunningham*, 2017 WL 4358769, at *11 (noting that while "[t]he text of ERISA does not explicitly impose on plan fiduciaries a duty to monitor, . . . several courts have held that there is a duty to monitor appointed fiduciaries under ERISA"). Nevertheless, a duty to monitor claim cannot survive without an underlying breach of a fiduciary duty. *See Reinhart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016). Thus, "[b]ecause Plaintiffs have failed to allege an underlying breach, the duty to monitor claim is dismissed." *Jander v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 538, 546–47 (S.D.N.Y. 2016).

### B. Prohibited Transactions

In addition to imposing general fiduciary duties of prudence and loyalty, ERISA categorically bars plan fiduciaries from engaging in certain "prohibited transactions." *See* 29 U.S.C. § 1106; *see also Harris Tr. & Sav. Bank v. Salmon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (Section 1106 "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically

barring certain transactions deemed 'likely to injure the pension plan.'" (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993))). Specifically, Section 1106 prohibits an ERISA fiduciary from transferring plan assets to itself or the employer whose members are covered by the plan, 29 U.S.C. § 1106(a)(1)(D), and from "deal[ing] with the assets of the plan in his own interest or for his own account," *id.* § 1106(b)(1). In Count III, Plaintiffs allege that Defendants violated Section 1106 by investing Plan assets in the MS Funds and permitting the MS Funds to deduct annual fees from the Plan assets invested in the fund. (Compl. ¶¶ 230–235.)

Defendants first argue that Plaintiffs' claims are barred by the statute of repose set out in 29 U.S.C. § 1113(1), which provides that "[n]o action may be commenced" more than "six years after . . . the date of the last action which constituted a part of the breach or violation." Defendants argue that the last "transaction" attributable to the Plan fiduciaries was the initial selection of the MS Funds, which they assert occurred before 2010. (Mem. at 16–17.) Plaintiffs, relying on *Moreno I*, counter that the fees assessed by the MS Funds, which were paid from Plan assets, constitute prohibited transactions that continued into the limitations period. (Opp'n at 24–25.) The Court need not resolve the parties' dispute at this time since the Complaint is silent as to when the "relevant breaches occurred," *Leber v. Citigroup, Inc.* (*Leber I*), No. 07-cv-9329 (SHS), 2010 WL 935442, at *7 (S.D.N.Y. Mar. 16, 2010), and a motion to dismiss on statute of limitations grounds "may be granted only if it is clear on the face of the complaint that the statute of limitations has run," *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013). Accordingly, Defendants may not prevail on their statute of limitations argument at this time.

Defendants next assert that Plaintiffs fail to state a claim because the conduct at issue falls within the regulatory exception allowing plan fiduciaries to invest in certain affiliated mutual funds. *See* PTE 77-3, 42 Fed. Reg. at 18,734, 18,735; *Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 913 (W.D. Mo. 2017) (noting that the exception "allows plans sponsored by mutual fund advisors to invest in affiliated mutual funds," but that it "is specific to prohibited transaction claims under 29 U.S.C. § 1106" and "does not relieve a fiduciary from its duties of loyalty and prudence to a plan"). To be entitled to protection under PTE 77-3, Defendants must prove that four factors are met: (1) the plan must not pay any "'investment management, investment advisory, or similar fee' to the mutual fund, although the mutual fund may pay such fees to its managers;" (2) "the plan must not pay a 'redemption fee' when selling its shares;" (3) "the plan must not pay a sales commission in connection with the sale or acquisition" of shares in the mutual fund; and (4) "all other dealings between the plan and the affiliated fund must be 'on a basis no less favorable to the plan than such dealings are with other shareholders.'" *Leber I*, 2010 WL 935442, at *10 (quoting PTE 77-3, 42 Fed. Reg. at 18,735).

Because the application of PTE 77-3 is an affirmative defense, Plaintiffs have no obligation to plead around it. *See, e.g.*, *BPP Ill., LLC v. Royal Bank of Scotland Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) ("[A] plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." (quoting *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014)). *But see Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510 (E.D. Pa. 2001) (dismissing plaintiffs' prohibited transactions claims because plaintiffs "d[id] not allege that the fees paid by the Plans are

not in compliance with the requirements of PTE 77-3"). But even though Plaintiffs are under no affirmative burden to plead that PTE 77-3 is inapplicable, "[a] complaint must allege conduct that is plausibly actionable under the relevant statute and must go beyond creating a 'sheer possibility that a defendant has acted unlawfully.'" *Leber I*, 2010 WL 935442, at *10 (quoting *Iqbal*, 556 U.S. at 678). Therefore, where an affirmative defense "appears on the face of the complaint," the Court may apply the defense to dismiss a claim. *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) (internal quotations marks and citations omitted).

Here, the Complaint makes clear that, as permitted by PTE 77-3, the MS Funds pay "set fees for . . . investment advisory services" to its managers at Morgan Stanley (Compl. ¶ 73), thus establishing the first element of PTE 77-3. Nothing in Plaintiffs' Complaint or in Plaintiffs' opposition suggests that the MS Funds were subject to redemption fees or sales commissions – the second and third elements – and the table in the Complaint comparing the MS Funds' fees to the separate account fees indicates that the fees were predictable. (*Id.* ¶ 76 & nn.3–8). *See Patterson v. Capital Grp. Cos., Inc.*, No. 17-cv-4399 (DSF) (PJW), 2018 WL 748104, at *5 (C.D. Cal. Jan. 23, 2018) (dismissing a prohibited transaction claim based on PTE 77-3 where "Plaintiff [did] not allege that the Plan pays management or advisory fees, except for Defendants' standard fees or that the plan pays redemption fees or sales commissions"). Indeed, as Defendants point out, Plaintiffs' central complaint regarding the fees charged on the Plan's investments in the MS Funds is that "the MS Funds' advisor . . . did not *depart* from the generally applicable mutual fund fee structure" (Mem. at 18), thus demonstrating that dealings between Defendants and the Plan were "on a basis no less favorable to the [P]lan than such dealings [were] with other shareholders." PTE 77-3, 42 Fed. Reg. at 18,735. Consequently, Plaintiffs' allegations establish that Plan investments in the MS Funds were treated in parity with outside investors' contributions to the MS Funds as required by PTE 77-3. *See Leber I*, 2010 WL 935442, at *10 ("The complaint alleges the very type of activity that the exemption expressly allows to occur – the investment by a plan in its affiliated mutual funds on the terms generally available to other investors.").

Nevertheless, citing *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781 (SRN) (JSM), 2012 WL 5873825, at *17 (D. Minn. Nov. 20, 2012), Plaintiffs argue that, to satisfy PTE 77-3, Defendants must also prove that the fees charged to the MS Funds were "reasonable." (Opp'n at 20–21.) But this argument is based on a single case not binding on this Court, and in any event, is unpersuasive. Plaintiffs' assertion that the payments must be "reasonable" is grounded in 29 U.S.C. § 1108(b)(8)(B), which applies to transactions between a plan and "a common or collective trust fund or pooled investment fund." Plaintiffs here do not assert that the MS Funds fall into any of the three categories enumerated there. Moreover, even if the MS Funds did qualify as "a common or collective trust fund or pooled investment fund" within the meaning of ERISA, Plaintiffs' argument would still fail because, as the Court has already concluded, Plaintiffs have not adequately alleged that the fees associated with any of the funds at issue in this suit were improperly high or otherwise unreasonable. *Id.* The Court therefore finds that PTE 77-3 is applicable, and Count III must be dismissed.

## VI. Conclusion

Contrary to Plaintiffs' claims, ERISA does not require clairvoyance on the part of plan fiduciaries, nor does it countenance opportunistic Monday-morning quarterbacking on the part of lawyers and plan participants who, with the benefit of hindsight, have zeroed in on the underperformance of certain investment options. More is required, and Plaintiffs come nowhere close to alleging such a case in their Complaint. Accordingly, because Plaintiffs lack standing as to the Non-Selected Funds, and because their Second Amended Complaint fails to state a claim under ERISA as to the Selected Funds, Defendants' motion to dismiss is GRANTED.

The Clerk of the Court is respectfully directed to terminate the motion pending at document number 92 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: October 7, 2019
    New York, New York

\*    \*    \*

Plaintiffs Robert J. Patterson, Terri Lo Sasso, and Ralph Colo are represented by David H. Tracey, Charles Field, David W. Sanford, and Kevin Sharp of Sanford Heisler Sharp, LLP, 1350 Avenue of the Americas, 31st Floor, New York, New York 10019.

Defendants Morgan Stanley, Morgan Stanley Domestic Holdings Inc., Morgan Stanley & Co., LLC, and Morgan Stanley Retirement Plan Investment Committee are represented by Brian D. Boyle, Meaghan VerGow, and Shannon M. Barrett of O'Melveny & Myers LLP, 1625 I Street NW, Washington, District of Columbia 20006, and Pamela A. Miller of O'Melveny & Myers LLP, 7 Times Square, New York, New York 10036.